*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 9, 2017

**BY ECF/EMAIL**

Hon. Katherine B. Forrest
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   *United States* v. *Razhden Shulaya*, 17 Cr. 350 (KBF)

Dear Judge Forrest:

The Government writes in advance of the pretrial detention hearing for Razhden Shulaya scheduled for Thursday, August 10, 2017.  The defendant poses a significant risk of flight and a continued danger to the community. Because no set of conditions can adequately guard against those risks, the defendant should be detained until trial.

## Factual Background

Shulaya holds himself out as a "*vor v zakone*." *Vor v zakone* is a Russian phrase that translates to "Thief-in-Law" and refers to "a fraternal order of elite criminals that dates back to the time of the czars."[1] A *vor v zakone* – commonly known as a *vor* – stands at the highest level of Russian organized criminal groups, akin to a "Godfather" within an Italian organized criminal group.  Traditionally, *vors* demand and receive *obshchak,* or tribute, from criminals and laypersons within the *vor*'s protection, license criminal activity by others, and resolve disputes between members of the criminal community.

Shulaya, in his capacity as a *vor,* led a large-scale racketeering conspiracy that operated in New York City, Las Vegas, Florida, and elsewhere. Shulaya oversaw loyal subordinates who participated in criminal activities with his permission and for his benefit, who received his protection and extended it to others, and who enforced his authority through intimidation and violence. While in the United States, Shulaya communicated with other *vors*, including those in Los Angeles and abroad, and acknowledged that he collected *obshchak* and sent a portion overseas. Shulaya also frequently boasted of his status and success. As Shulaya himself put it

---

[1] *See generally* Robert L. Friedman, Red Mafiya: How the Russian Mob Has Invaded America (Little Browns & Co. 2000) at 9.

during an intercepted February 18, 2017 phone call, "Everything is great. I am in America. I put everything on thief rails, dear. Everything as it should be."[2]

Shulaya's organization—the "Shulaya Enterprise"—transported and sold stolen property, used false identification documents to cash forged checks and to use counterfeit credit cards, ran an illegal gambling parlor, extorted debtors to its gambling operations, laundered criminal proceeds, and planned to rig slot machines to defraud casinos. As described during the initial pretrial conference held on Friday, June 9, 2017, the Government has obtained an array of evidence on these schemes, including:

- Intercepted calls about stealing cargo shipments; recordings created by a confidential source about the negotiation and purchase of stolen cargo; and the seizure of, among other things, approximately 10,000 pounds of chocolate confections and numerous boxes of athletic apparel.

- Intercepted calls and captured emails about the creation and use of false identification documents and fake checks; seized false identity documents; seized identity card-making equipment; and records of false documents presented to businesses in New York, New Jersey, Nevada, and Florida.

- Witness testimony and recordings that reflect efforts to collect debts owed to the Shulaya Enterprise through intimidation;

- Wire transfer records, bank records, intercepted calls, and source recordings demonstrating the Shulaya Enterprise's use of fake names and nominees to conceal financial transactions; and

- Intercepted calls, surveillance photographs, and witness testimony demonstrating attempts to seduce, incapacitate, and rob (or extort) individuals.

*Examples of Shulaya's Personal Conduct*

In addition to enabling—and profiting from—the criminal activities of others, Shulaya himself executed multiple schemes. For example, Shulaya personally directed the scheme to distribute contraband cigarettes. Intercepted calls and text messages capture Shulaya facilitating the delivery of cigarettes from a confidential source to a rotating cast of Shulaya's underlings. Typically, as documented by surveillance, the underlings then sold the cigarettes to corner stores and remitted the profits to Shulaya. Shulaya, in turn, would pay the source. Between April 2015 and March 2017, Shulaya paid the source approximately $760,000 in cash. The Shulaya Enterprise's cigarette operations evaded approximately $2,097,102 in cigarette taxes.

---

[2] The quotations in this letter are drawn from draft English-language transcripts of foreign-language calls. The original recordings and the preliminary translations have been provided to the defendant.

Shulaya also directed the Enterprise's efforts to defraud casinos. The scheme involved deciphering and replicating the payoff-algorithm of a particular video slot machine and then using that knowledge to place bets free of the vagaries of chance. Because such a scheme required computer expertise and high-powered computer servers, Shulaya recruited hackers, including co-defendant Evgheni Melman, to advance the plan. The two discussed their plans, repeatedly, over intercepted telephone lines. Those calls included conversations about targeting particular machines, about surveillance conducted at casinos to find suitable target machines, and about difficulties in maintaining computer servers to effectuate the plot. Shulaya obtained a sample video slot machine to test the fraud and performed some of those tests in the presence of a confidential source and an undercover officer. Once the Enterprise achieved the technical ability to execute the fraud, Shulaya sent a team to Philadelphia to perpetrate it. Shulaya received frequent updates on the team's progress by telephone. (The FBI and casino security recorded the team's actions, which were successful, in real time.)

Shulaya achieved his influence, in part, by enforcing his authority through violence. In July 2016, for example, Shulaya took exception to a source's accounting of the winnings from the poker room. Shulaya became enraged with the source's explanation: "What, do you want to confuse me? I'll confuse you so badly." A few minutes later, Shulaya threatened the source's life: "You motherfucker. I'll see to it that your life ends." Shulaya continued with still other threats:

> Listen to me carefully. I want to give you the last chance. Come to your senses, my friend, before it's too late. Otherwise, you'll be victimized so fucking badly, that there will be nowhere to go further. Now you listen. We are going to start counting this money again, according to this list, three more times. If what was counted gets subtracted again, the day is going to end so badly for you, it will be very sad. I told you right before this, bring the rest of the paperwork. You should be running to look and to show that, at least, you didn't make mistakes there.

The source then tossed his pocketknife on the table and dared Shulaya to follow through on his words. "If you think I stole the money, fucking slaughter me." The fact that the source had a knife on his person further aggravated Shulaya, who exclaimed, "You bastard, why the fuck did you come to a thief with a knife? Who are you going to use the knife on?" When the source attempted to respond, Shulaya cut him off: "You fucking lowlife. I'll slaughter you, you know that, you bastard." Shulaya directed one of his enforcers, a professional boxer, to punch the source in the face; the boxer did, in fact, strike the source in the face. Shulaya demanded the source stand upright with his hands behind his back while Shulaya screamed at him. Approximately thirty minutes later, Shulaya then struck the source in the face himself.

The July 2016 episode was not an aberration. In February 2016, a source saw Mamuka Chaganava leave a meeting with Shulaya while covering his face. The source then saw—and photographed—a blood stain on the carpet of that meeting room. Later, Shulaya showed the

source a photograph of Chaganava with a partially-dislodged eyeball. (After his arrest, Shulaya admitted to directing this assault.) Shulaya also described other acts of violence. On January 2, 2017, for instance, Shulaya and Nazo Gaprindashvili had a conversation about an assault:

> RS: I talked to Zura today. When he was saying some things – we'll see.
>
> NG: Ok. Talk to him.
>
> RS: I'll tell you later. We smashed that Kombala's teeth and fingers, fucker, that day.
>
> NG: [Sighs]
>
> RS: [U/I] and then Zurikela, too.

More generally, Shulaya took advantage of the implicit threat of violence to advance his criminal organization. Shulaya himself threatened an associate over an intercepted telephone line that he would do to that person what had been done to Chaganava. He convened organizational meetings at local restaurants and walked out without paying the tab. He demanded a business owner turn over his business for Shulaya's use, or pay $100,000 to continue in operation. He also surrounded himself with professional boxers and mixed martial arts fighters, and he dispatched them on his behalf. In September 2016, for instance, Shulaya sent Avtandil Khurtsidze and Akaki Ubilava to collect a debt owed to the poker room; the presence of those enforcers signaled that failure to pay would result in violence.

Shulaya simultaneously endeavored to conceal his influence and wealth. Recorded calls, for instance, capture Shulaya consulting with others about using corporate bank accounts to shield his finances. Banking and corporate records—including records found at Shulaya's residence—confirm that he controlled at least one such entity and used its accounts to receive and transfer funds. Shulaya used a vehicle leased in the name of another. Shulaya registered his phones in the names of others or in fictitious names. Shulaya repeatedly used nominees to transfer money on his behalf, including to overseas contacts. He often recruited these nominees through a third-party to distance himself from the transaction. He kept tens of thousands of dollars in cash at his residence. On one occasion he appears to have sought medical treatment under an alias to avoid drawing the attention of law enforcement. And his lieutenant orchestrated the creation and use of dozens of fake identity documents.

### *Shulaya and the Community*

The defendant's ties to the New York City area are predominantly criminal. The Shulaya Enterprise headquartered itself in the New York City area. The group established the poker room in Brighton Beach. They frequented a handful of restaurants and clubs in Brooklyn. They had created an after-hours nightclub—at which drugs and prostitutes were on offer—and planned to launch others. Shulaya resided nearby in New Jersey, having moved there from Manhattan; many of the members of the enterprise resided in Brooklyn.

Most of Shulaya's calls pertained to the Enterprise. The FBI conducted a preliminary call frequency analysis[3] to identify the defendant's top contacts. Those contacts are as follows:

| Frequency | Date | User |
|---|---|---|
| 1168 | 12/25/2016 to 06/08/2017 | Maryusha LNU |
| 776 | 12/01/2016 to 05/25/2017 | Evgheni Melman |
| 703 | 12/24/2016 to 06/06/2017 | Zurab Dzhanashvili |
| 614 | 12/01/2016 to 06/07/2017 | Tatiana Baranova Abreu |
| 521 | 12/02/2016 to 06/07/2017 | Koba Chvaladze |
| 512 | 12/01/2016 to 01/27/2017 | Nazo Gaprindashuioi |
| 327 | 12/01/2016 to 05/31/2017 | Azer Arslanouk |
| 313 | 12/15/2016 to 03/15/2017 | Avtandil Khurtsidze |
| 285 | 12/08/2016 to 05/06/2017 | Merab Dvalishvili |
| 264 | 12/04/2016 to 06/04/2017 | Zurab Natchkepia |
| 244 | 12/06/2016 to 04/13/2017 | Levan Makashvili |

This analysis shows that Shulaya's co-defendants form the bulk of his top contacts: Melman, Dzhanashvili, Chvaladze, Gaprindashvili, Arslanouk, Khurtsidze, and Makashvili. An additional contact—Merab Dvalishvili—is a prizefighter who attending meetings of Shulaya Enterprise members. Two of the remaining contacts are women whose calls with Shulaya suggest romantic relationships and at least one of whom appears to have purchased narcotics for the defendant. The final frequent contact, Natchkepia, appears to be a Brooklyn shop owner making payments to Shulaya. Shulaya's wife does not make the list, nor does his family.

Shulaya used his physical presence in New York to amass and store the implements of his criminal work. In connection with Shulaya's arrest and the search of his apartment, for instance, the FBI seized, among other things, the following:

- Approximately forty-five cellular telephones
- Approximately nine tablet computers
- A crossbow
- More than $50,000 in cash
- A storage unit lease agreement in the name of another person
- An automobile lease agreement in the name of another person (seized from Shulaya's hotel room)

---

[3] The FBI's preliminary analysis derives from data captured by pen register trap and trace and TIII interceptions; it includes calls made and received over four different cellphones used by Shulaya between in or about December 2016 and in or about June 2016. This analysis does not include calls placed over lines unknown to the Government, or over encrypted communication systems.

- A Georgian passport in the name of another person
- A Russian passport in the name of another person

The searches of the residences of co-conspirators revealed other repositories of racketeering paraphernalia, such as an identity-making equipment (Savgir's residence), stolen identity information (Petrushyn's residence), credit card skimming devices (Marat-Uulu's residence), and computer and video slot machine equipment (Melman's residence).

The defendant has ties abroad. He has a Russian passport and, by telephone, spoke predominantly in Russian and Georgian. The defendant kept in touch with individuals who, based on call content, appear to be located in Eastern Europe. Additionally, the defendant has repeatedly discussed Georgia, particularly Tbilisi, Georgia, and has associated with co-defendants, including Khurtsidze, who frequently travel there. At the same time, the defendant has a conditional lawful permanent resident status in the United States. The defendant received this status in 2011 based on his marriage to a United States citizen. His status is conditioned, in part, on his marriage being legitimate and his not committing crimes that would render him removable.

### *Factual Representations in the Defendant's Submission*

In the defendant's bail application, he asserts that (a) he has resided in the United States for ten years, (b) he has lawful employment, (c) his marriage ties him to the community, and (d) he was unaware that he was wanted by Russian authorities. The evidence suggests otherwise.

*Residence.* Based on border entry records, the defendant has been present in the United States for approximately three years and two months since his first visit to the United States in 2006. He has resided here continuously since June 2015.

*Employment.* Based on years of surveillance and months of wiretaps, the Government believes that the defendant has no legitimate employment. He reported to Pretrial Services, for example, that he worked for "Lukas Transportation" but internet searches reveal no such business in New York, FBI agents have never seen the defendant at an office for "Lukas Transportation," and he does not appear to have discussed his employment at Lukas Transportation over any of the four intercepted telephone lines during approximately six months of interception.

*Marriage.* The defendant's marriage also bears indicia of fraud, perhaps motivated by the defendant's pending application for unconditional lawful permanent residence. Shulaya does not live with his wife—though they both reside in the New York City area—and the FBI surveillance team does not recall once encountering Shulaya's wife as they followed Shulaya. On the occasions where the defendant spoke to his wife by telephone, they have discussed filing documents related to their legal union, such as tax returns.

*Russian Warrant.* The defendant knew no later than March 13, 2017 that Russia had a warrant for his arrest. On that day, Shulaya had a number of conversations about having been recently stopped in his car by police. During a call with Tatiana Baranov, who was either also in the car or listening to Shulaya's interaction with the police via telephone, the following conversation ensued, in part:

TB:   This is what he said before that: he came up and said: "The reason that I stopped you – the reason I stopped you, because you were speeding, and I'm gonna give you for now only the speeding ticket.  But I have to make couple phone calls because by your name, by exactly the same name and the same birth date there is somebody, uh, in Russia" and, in other words, they are looking [for him] [UI].

RS:   [OV] In Russia -- yes -- in Russia have what?

TB:   Uh, have warrant.

RS:   [OV] [UI]

TB:   "They have a warrant," he said, "they have warrant for you in Russia" and I asked "For what?" Like, "Minor something? Minor or something?" And he says, "No." "It is," he says, uh, "kidnapping of an adult." And so you and I started laughing, as you remember, because, naturally, it can't be you, we know that it is a mix-up, a double or something like that.

RS:   Yes.

## Legal Standard

The Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* requires a defendant's release pending trial "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b); *see also United States* v. *Sabhnani*, 493 F.3d 63, 74–75 (2d Cir. 2007). "Because the law generally favors bail release, the [G]overnment carries a dual burden in seeking pre-trial detention." *Sabhnani*, 493 F.3d at 75. First, the Government must show that the defendant presents a risk of flight or is dangerous to another person or the community. If it satisfies this first requirement, the Government must then demonstrate that no condition or combination of conditions could reasonably assure the defendant's appearance in court as required or the community's safety. When the basis for detention is risk of flight, the Government must meet its burden by a preponderance. When the basis for detention is dangerousness, the Government must meet its burden by clear and convincing evidence. *See* 18 U.S.C. § 3142(f); *United States* v. *Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).

**Argument**

This defendant presents an extraordinary risk of flight and a continued danger to the community that cannot be ameliorated by conditions of release.

*Flight*

First, the defendant has an incentive to flee. The defendant's varied criminal conduct—ranging from violence to tax evasion to illicit gambling to fraud—exposes him to decades of possible imprisonment. Moreover, the possibility of custodial punishment is high because the defendant committed his acts often over intercepted telephone lines, with confidential sources wearing recording devices, and on video. For this reason, the defendant's emphasis on the post-arrest statement in his bail application misses the mark. That statement includes some lawfully-obtained admissions of guilt, but it does not represent a significant aspect of the proof against the defendant.

Second, the defendant has the means to flee. The defendant boasts ties to an international criminal brotherhood based in foreign countries, including Russia and Georgia. He speaks Russian and Georgian, and has Russian citizenship and a passport. Prior to his arrest, he routinely spoke about his activities with individuals who appear to be abroad, including persons in Georgia and Israel. He was arrested in the middle of a trip with foreign nationals, two of whom appear to have left their passports at Shulaya's residence. He has lived abroad for most of his life and has been present in the United States for a little more than three years. Further, the defendant has transferred money abroad and has a documented history of using false names and nominees to conceal his association to particular assets.

Third, the defendant has little incentive to remain in the United States. The defendant's ties to the United States are minimal, have been severely diminished by the arrest of his co-conspirators, and are overwhelmingly criminal. While the fact that Russia has issued a warrant for Shulaya's arrest may dissuade him from traveling to Russia, it does not anchor him to the United States.

*Danger*

First, the defendant is violent. On at least one occasion, the defendant struck a confidential source after threatening to "slaughter" that confidential source. The defendant has directed others to commit acts of violence on his behalf, including a professional boxer. Such violence appears to have been severe enough in one case to dislodge a person's eyeball. The defendant has also directly and indirectly threatened violence in order to obtain what he wants, whether it be to collect a debt from a gambler or to obtain a business owner's establishment.

Second, the defendant poses an economic danger to the community. *See, e.g., United States* v. *Dupree*, 833 F.Supp. 2d 241, 253 (E.D.N.Y. 2011) ("The court may also consider 'economic harm' as evidence of dangerousness [under the Bail Reform Act]."); *see also id.*

(citing *United States* v. *Madoff*, 586 F. Supp. 2d 240, 253 (S.D.N.Y. 2009) (Ellis, M.J.). Shuyala—who appears to have no lawful employment and whose domestic cash has been seized—would be both motivated and able to coordinate others' successful participation in many of the schemes that he established, such as the casino fraud, the purchase and sale of contraband cigarettes, and the use of others to collect debts through intimidation.

*The inadequacy of release conditions*

No combination of conditions of release can reasonably assure the defendant's appearance in court or the safety of the community.

First, the defendant has committed himself to a criminal livelihood. In recorded communications, for example, he boasts of his status as *vor* and celebrates his success in establishing a criminal enterprise in the United States. The FBI may have disabled Shulaya's New York criminal enterprise, but it has not stripped him of his title or arrested all of his criminal associates. The defendant's status as *vor* will endure even on home confinement and will continue to carry influence (and, therefore, opportunity) within the criminal world. That Shulaya has no other skill set heightens the danger that he will resume his criminal activities, either here or abroad.

Second, no set of conditions could prevent Shulaya from fleeing to Eastern Europe. The defendant has sent money abroad. The Government has uncovered evidence of international wires, but has not yet succeeded in identifying all of the recipients—let alone seizing those accounts. Further, Shulaya has routinely moved money by using intermediaries, making detection difficult. Additionally, as a *vor*, Shulaya would be entitled to draw upon a common fund kept for just such exigencies. Shulaya's organization developed the ability to create false identification documents and used them. Shulaya himself was found to be in possession of numerous passports.

Third, the fact or possibility of court intervention has not halted the defendant's criminal conduct. During the course of the poker house scheme, for instance, a number of gamblers were arrested by the Drug Enforcement Administration at a different poker establishment. The defendant simply focused on other schemes, such as the casino fraud and the contraband cigarettes; he did not cease his criminal activities. Similarly, word that the defendant was wanted by Russia for criminal conduct did not stop him. Even now—after arrest—he remains disrespectful of the judicial process. For example, the defendant claims to have resided in the United States for a decade, but has not. He has reported to Pretrial that he is employed by "Lukas Transportation," but appears to have no legitimate employment whatsoever. He emphasizes his marriage, but does not live with his wife (or frequently speak to her), and is often recorded discussing prostitutes. Finally, the defendant claims that he had no knowledge of the Russian arrest warrant until his detention in this case, but is recorded saying otherwise at least as far back as March. Any one of these misstatements might be an accident; taken together, they reveal a lack of respect for the process.

\* \* \*

For these reasons, the Government respectfully submits that no conditions of release are adequate to reasonably assure this defendant's presence in court or the safety of the community, and therefore requests that the Court order the defendant's detention pending trial.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

by: _____/s/_____
Andrew C. Adams
Lauren Schorr
Andrew Thomas
Assistant United States Attorneys
(212) 637-2340/-2299/-2106

cc: Peter Kapitonov, Esq. (by ECF)
*Counsel for Razhden Shulaya*