UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                      :

UNITED STATES OF AMERICA         :

                                        :

        - v. -                :       17 Cr. 350 (KBF)

                                        :

RAZHDEN SHULAYA, et al.      :

                                        :

               Defendants.      :

                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE AND FOR OTHER RELIEF

JOON H. KIM
Acting United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Andrew C. Adams
Lauren B. Schorr
Andrew Thomas
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND .................................................................................................................. 2

I.    THE FBI INVESTIGATES A RACKETEERING CONSPIRACY ................................. 2

II.   THE ORDERS OF INTERCEPTION ................................................................. 3

III.  CELLPHONE LOCATION WARRANT AND ORDER ................................................. 5

IV.   THE INDICTMENT AND ARREST .................................................................... 6

V.    DISCOVERY AND PRETRIAL ......................................................................... 7

ARGUMENT ...................................................................................................................... 10

I.    THE TITLE III ORDERS WERE LAWFULLY ISSUED ............................................... 10

    A.    THE TITLE III ORDERS WERE PROPERLY ENTERED IN THE SOUTHERN DISTRICT OF
        NEW YORK ....................................................................................... 10

        I.    THE LEGAL STANDARD ........................................................... 10

        II.   DISCUSSION ......................................................................... 11

    B.    THE AUTHORIZING JUDGES PROPERLY FOUND THAT THE TITLE III APPLICATIONS
        SATISFIED 18 U.S.C. § 2518 ............................................................ 13

        I.    THE LEGAL STANDARD ........................................................... 13

        II.   DISCUSSION ......................................................................... 15

II.   MAGISTRATE JUDGE PARKER PROPERLY FOUND PROBABLE CAUSE TO
    ISSUE A WARRANT FOR AFANASYEV'S CELLPHONE LOCATION
    INFORMATION .................................................................................... 21

    A.    THE LEGAL STANDARD ...................................................................... 21

    B.    DISCUSSION ..................................................................................... 22

III.  COUNT FOUR PROPERLY ALLEGES A MULTI-OBJECT IDENTITY FRAUD
    CONSPIRACY ...................................................................................... 24

    A.    THE LEGAL STANDARD ...................................................................... 24

    B.    DISCUSSION ..................................................................................... 25

IV.   DEFENDANTS' ASSORTED DISCOVERY AND PROCEDURAL REQUESTS
    SHOULD BE DENIED ............................................................................ 26

    A.    THE GOVERNMENT HAS PUT THE DEFENDANT ON NOTICE OF THE CHARGES
        AGAINST HIM AND NO BILL OF PARTICULARS IS REQUIRED ................................... 26

    B.    THE DEFENDANTS ARE NOT ENTITLED TO THE IDENTITIES OF GOVERNMENT
        WITNESSES AT THIS STAGE .................................................................... 31

    C.    DEFENDANTS'S REMAINING DISCOVERY REQUESTS SHOULD BE DENIED .............. 32

CONCLUSION .................................................................................................................. 35

## TABLE OF ABBREVIATIONS

### *Filings*

| | |
|---|---|
| Thomas Declaration | Declaration of AUSA Andrew Thomas dated December 1, 2017. |
| Afanasyev Motions | Motion to suppress, for a bill of particulars, and for other relief filed by Ivan Afanasyev. *See* ECF Doc. 391. |
| Dzhanashvili Motion | Motion to suppress and for other relief filed by Zurab Dzhanashvili. *See* ECF Doc. 385. |
| Gallicchio Declaration | Declaration of Amy Gallicchio, Esq., dated November 17, 2017. ECF. Doc. 386. |
| Mitselmakher Motion | Motion to suppress and for other relief filed by Alex Mitselmakher. *See* ECF Doc. 390. |
| Hovhannisyan Motions | Motion to dimiss Count Four, for a bill of particulars, and for other relief filed by Vache Hovhannisyan. *See* ECF Doc. 402. |
| December Affidavit | Affidavit of FBI Special Agent Robert Hanratty dated December 12, 2016, attached to the Gallicchio Declaration as Exhibit A. |

### *Title III Interception Documents*

| | |
|---|---|
| December 12 Order | Order of interception dated December 12, 2016, entered by the Hon. Katherine Polk Failla, attached to the Thomas Declaration as Exhibit 1. |
| January Affidavit | Affidavit of Special Agent Hanratty dated January 12, 2017, attached to the Gallicchio Declaration as Exhibit B. |
| January 12 Order | Order of interception dated January 12, 2017, entered by the Hon. Lewis A. Kaplan, attached to the Thomas Declaration as Exhibit 2. |
| February Affidavit | Affidavit of FBI Special Agent Aaron Otterson dated February 10, 2017, attached to the Gallicchio Declaration as Exhibit C. |
| February 10 Order | Order of interception dated February 10, 2017, entered by the Hon. Paul A. Engelmayer, attached to the Thomas Declaration as Exhibit 3. |

| | |
|---|---|
| March Affidavit | Affidavit of Special Agent Otterson dated March 10, 2017, attached to the Gallicchio Declaration as Exhibit D. |
| March 10 Order | Order of interception dated March 10, 2017, entered by the Hon. Denise L. Cote, attached to the Thomas Declaration as Exhibit 4. |
| April Affidavit | Affidavit of Special Agent Aaron Otterson dated April 7, 2017, attached to the Gallicchio Declaration as Exhibit E. |
| April 7 Order | Order of interception dated April 7, 2017, entered by the Hon. George B. Daniels, attached to the Thomas Declaration as Exhibit 5. |
| May Affidavit | Affidavit of FBI Special Agent Bruce Turpin dated May 17, 2017, attached to the Thomas Declaration as Exhibit 7. |
| May 17 Order | Order of interception dated May 17, 2017, entered by the Hon. Loretta A. Preska, attached to the Thomas Declaration as Exhibit 6. |
| Title III Orders | The orders of interception entered on December 12, 2016, January 12, 2017, February 10, 2017, March 10, 2017, April 7, 2017, and May 17, 2017. |
| Title III Affidavits | The affidavits of Special Agents Hanratty, Otterson, and Turpin submitted in support of the Title III Orders. |

### *GPS Warrant Documents*

| | |
|---|---|
| GPS Affidavit | Affidavit of FBI Special Agent Robert Hanratty dated May 31, 2016 provided in connection with an application for a warrant and order for cellphone location and pen register information, filed at 17 Mag. 4107 and attached to the Afanasyev Motion as Exhibit 4. |
| GPS Warrant | Warrant and order for cellphone location and pen register information dated May 31, 2017, signed by Hon. Katharine H. Parker, filed at 17 Mag. 4107, and attached to the Afanasyev Motion as Exhibit 1. |

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to various motions filed by defendants to suppress evidence, dismiss counts, or for other relief.

Zurab Dzhanashvili has moved to suppress the Title III Orders, principally on the theory that the Government's application did not sufficiently demonstrate that other investigative techniques were inadequate. *See* ECF Doc. 387.

Alex Mitselmakher has moved to suppress the Title III Orders, principally on the theory that this District Court lacked "territorial jurisdiction to authorize the [challenged] wiretaps." *See* ECF Doc. 390.

Vache Hovhannisyan has moved to dismiss Count Four as duplicitous and for a bill of particulars. *See* ECF Doc. 402.

Ivan Afanasyev has moved to suppress location information gathered about his cellphone, for a bill of particulars, and for early disclosure of witness identities and Rule 404(b) evidence. *See* ECF Doc. 392.

In addition to the Dzhanashvili Motion, the Mitselmakher Motion, the Hovhannisyan Motion, and the Afanasyev Motions, certain additional co-defendants joined in these substantive motions to the extent applicable to each filing co-defendant. *See* ECF Doc. 394 (Nazo Gaprindashvili); 395 (Denis Savgir); 396 (Mikheil Toradze); 397 (Diego Gabisonia); 398 (Azer Arslanouk); 399 (Giorgi Lomishvili); 400 (Erekle Kereselidze); 401 (Zurab Buziashvili); 403 (Akaki Ubilava); 404 (Andriy Petrushyn); 405 (Levan Makashvili); 406 (Artur Vinokurov); and 420 (Bakai Marat-Uulu).

1

For the reasons set forth below, the Court should deny each of these motions as a matter of law. Additionally, because no defendant has raised an issue of fact, the Court need not hold a hearing to resolve the motions.

## BACKGROUND

### I.       THE FBI INVESTIGATES A RACKETEERING CONSPIRACY

In the summer of 2014, agents with the Federal Bureau of Investigation ("FBI") began investigating a criminal group based in New York City. December Aff. 16. The FBI believed that the group was controlled by a "*vor v zakone*." *Vor v zakone* is a Russian phrase that translates to "Thief-in-Law" and refers to "a fraternal order of elite criminals that dates back to the time of the czars." *See generally* Robert L. Friedman, Red Mafiya: How the Russian Mob Has Invaded America (Little Browns & Co. 2000) at 9. A *vor v zakone* – commonly known as a *vor* – stands at the highest level of Russian organized criminal groups, akin to a "Godfather" within an Italian organized criminal group. Traditionally, *vors* demand and receive *obshchak,* or tribute, from criminals and laypersons within the *vor*'s protection, license criminal activity by others, and resolve disputes between members of the criminal community. December Aff. 16-17.

The FBI discovered that there was such a criminal group and that it was led by Razhden Shulaya, one of a small number of recognized *vors* in the New York City and New Jersey area. As a *vor*, Shulaya oversaw loyal subordinates who participated in criminal activities with his permission and for his benefit, who received his protection and extended it to others, and who enforced his authority through intimidation and violence. December Aff. 17-18.

The FBI deployed a wide range of investigative techniques to build the case against the members of the Shulaya Enterprise. The FBI obtained information from confidential sources about Shulaya's position. *E.g.* December Aff. 18-19. The FBI made controlled sales of purportedly stolen cigarettes. *E.g.* December Aff. 21-25. The FBI conducted stakeouts. The FBI

2

used an undercover officer. *E.g.* December Aff. 20. The FBI obtained recordings of Shulaya and others through body recording devices and over consensually recorded telephone lines. *E.g.* December Aff. 26-28, 29, 35. The FBI collected pen register, telephone toll data, and bank records. *E.g.* December Aff. 34, 43-47. And the FBI spoke to various victims in the community. *E.g.* December Aff. 29-30 & n.8.

By Fall 2016, the FBI had developed proof that the Shulaya Enterprise had, among other things, operated an underground poker room, extorted debtors, and purchased and sold untaxed cigarettes. The FBI had also uncovered evidence that the Shulaya Enterprise was planning to defraud casinos in Atlantic City. Despite the investigative success to that point, the full scope of the Shulaya Enterprise's activities, its financing, and its complete membership remained unknown. *See* December Aff. 7 (discussing objectives of the interception).

## II.    THE ORDERS OF INTERCEPTION

In December 2016, following almost eighteen months of other investigative work, the FBI began intercepting wire and, in some cases, electronic communications of various members of the Shulaya Enterprise. At various points, the FBI intercepted calls to and from telephones used by Razhden Shulaya, Zura Dzhanashvili, and Nazo Gaprindashvili. The Government intercepted and monitored communications from wirerooms in Manhattan, New York. *See* December Aff. 12; January Aff. 13; February Aff. 14; March Aff. 15; April Aff. 15; and May Aff. 15.

The FBI acted pursuant to authority conferred by six consecutive judicial orders of interception:

- An initial order of interception was signed on December 12, 2016, by the Hon. Katherine Polk Failla. The December 12 Order permitted the interception of wire communications occurring over the cellular phones initially identified as 929-247-6909

3

(the "Shulaya 6909 Phone"), 201-887-7880 (the "Shulaya 7880 Phone"), 347-571-1345 (the "Zura Phone"), and 941-224-8643 (the "Anna Phone"). Thomas Decl. ¶ 4.

- A second order of interception was signed on January 12, 2017, by the Hon. Lewis A. Kaplan. The January 12 Order authorized continued interception of wire communications over the Shulaya 6909 Phone, the Shulaya 7880 Phone, and the Zura Phone. The January 12 Order further authorized the initial interception of electronic communications over the Shulaya 7880 Phone and the Zura phone, as well as the initial interception of wire communications (but not electronic communications) over the cellular telephone initially identified as 929-355-2477 (the "Shulaya 2477 Phone"). Thomas Decl. ¶ 5.

- A third order of interception was signed on February 10, 2017, by the Hon. Paul A. Engelmayer. The February 10 Order authorized the continued wire and electronic interception over the Zura phone; continued wire interceptions over the Shulaya 6909 Phone and the Shulaya 7880 Phone; and authorized initial electronic interceptions and continued wire interceptions over the Shulaya 2477 Phone. Thomas Decl. ¶ 6.

- A fourth order of interception was signed on March 10, 2017, by the Hon. Denise Cote. The March 10 Order authorized the continued wire and electronic interception over the Zura Phone and the Shulaya 2477 Phone and continued wire interceptions over the Shulaya 6909 Phone and the Shulaya 7880 Phone. Thomas Decl. ¶ 7.

- A fifth order of interception was signed on April 7, 2017 by the Hon. George B. Daniels. The April 7 Order authorized the continued wire and electronic interception over the Zura Phone and the Shulaya 2477 Phone and continued wire interceptions over the Shulaya 6909 Phone and the Shulaya 7880 Phone. Thomas Decl. ¶ 8.

4

- A sixth order of interception was signed on May 17, 2017 by the Hon. Loretta A. Preska. The May 17, 2017 Order authorized continued interception of wire communications over the Shulaya 6909 Phone and the Shulaya 7880 Phone, and the interception of both wire and electronic communications over the Shulaya 2477 Phone and the Zura Phone. Thomas Decl. ¶ 9.

In each of the Title III Affidavits, the affiant described various investigative techniques deployed by the FBI up to that point, their limitations, and the need for interception to satisfy outstanding investigative goals. *See* December Aff. 47-54; January Aff. 70-79; February Aff. 42-53; March Aff. 51-63; April Aff. 61-75; and May Aff. 59-73. In each of the Title III Orders, the authorizing judge found that the Government had demonstrated adequately that normal investigative techniques had been tried and failed, were reasonably thought to be unlikely to succeed, or were too dangerous to attempt. *See* December 12 Order at 6; January 12 Order at 7; February 10 Order at 8; March 10 Order at 8; April 7 Order at 8; May 17 Order at 8.

Interception pursuant to the Title III Orders succeeded in overcoming many of the obstacles that had constrained the investigation up to December 2016. Indeed, the wiretaps revealed that the Shulaya Enterprise was pursuing a staggering range of criminal activity, that its leaders were in contact with criminal authorities in other cities and in other countries, and that the Enterprise was committing fraud in cities around the United States. *Compare* December Aff. 5-7 (first wire affidavit) *to* May Aff. 7-10, 43-44 (sixth wire affidavit).

## III.    CELLPHONE LOCATION WARRANT AND ORDER

On or about May 31, 2017, the Government sought a warrant and order for prospective location information for approximately seventeen different cellphones believed to be used by approximately seventeen different target subjects. *See generally* the GPS Affidavit, No. 17 Mag.

4107. The Hon. Katharine H. Parker, U.S. Magistrate Judge, issued the requested warrants, including a warrant for a cellphone believed to be used by Afanasyev. *See* GPS Warrant, No. 17 Mag. 4107.

In the GPS Affidavit—as in the Title III Affidavits—the Government summarized the investigation into the Shulaya Enterprise, many of the Shulaya Enterprise's criminal schemes, and the proof connecting the various target subjects (and their cellphones) to the criminal activity. GPS Affidavit ¶¶ 7-25.

As relevant here, the GPS Affidavit included specific allegations about the Shulaya Enterprise's identity fraud and cargo theft schemes. GPS Affidavit ¶¶ 11-19. The GPS Affidavit also discussed Afanasyev and Hovhannisyan. For example: The GPS Affidavit identified Afanasyev's and Hovhannisyan's cellphones as cellphones that were used in the counterfeit credit card and forged check schemes. *See* GPS Warrant Aff. 23 n.14. The Affidavit further described a February 13, 2017 criminal event involving both Afanasyev and Hovhannisyan. Aff. ¶ 19(c). It also described Afanasyev's involvement in a scheme to deliver and sell stolen goods. Aff. ¶ 15.

The FBI began collecting location information pursuant to the GPS Warrant on or about June 2, 2017. *See* Thomas Decl. ¶ 13.

## IV.    THE INDICTMENT AND ARREST

On or about June 6, 2017, a grand jury returned an indictment charging twenty-six members and associates of the Shulaya Enterprise. *See* ECF Doc. No. 1. In subsequently unsealed superseding indictments, the grand jury charged additional persons. *See* ECF. Docs. No. 58 (Khurtsidze), and No. 189 (Marat-Uulu and Jikia).

The grand jury charged Zurab Dzhanashvili in four counts: racketeering conspiracy, conspiracy to transport and sell stolen goods, conspiracy to distribute untaxed cigarettes, and identity fraud conspiracy. *See* ECF Doc. 1 ¶¶ 6, 9 (racketeering), 12-14 (stolen goods), 16-17 (cigarettes), 19-24 (identity fraud). Ivan Afanasyev and Vache Hovhannisyan were also charged in the racketeering conspiracy and the identity fraud conspiracy. *See* ECF Doc. 1 ¶¶ 9, 19-24. Mitselmakher was charged only in the identity fraud conspiracy. ECF Doc. 1 ¶¶ 19-24.

The identity fraud conspiracy—Count Four of the Indictment—alleged that Dzhanashvili, Afanasyev, Hovhannisyan, and Mitselmakher violated Title 18, United States Code, Section 1028(f). *See* ECF Doc.1 ¶¶ 19-24. That conspiracy had multiple objectives related to the creation, transfer, and use of unlawful identification documents. *See* ECF Doc. 1 ¶¶ 18-24. Of relevance here, the grand jury charged both Afanasyev and Hovhannisyan with agreeing to each of the conspiratorial objects.

Agents with the FBI arrested Dzhanashvili, Mitselmakher, Afanasyev, Hovhannisyan, and many of the other defendants on or about June 7, 2017. *See* ECF Minute Entries dated June 7, 2017. That same day, the Government ceased Title III interceptions pursuant to the May 17 Order and ceased collecting cellphone location data pursuant to the GPS Warrant. *See* Thomas Decl. ¶ 9.

## V.    DISCOVERY AND PRETRIAL

Starting on or about June 27, 2017, the Government began producing discovery material to the defendants. Within approximately the first month following the defendants' arrests and presentments the Government had produced all affidavits and legal process in support of the series of Title III Orders obtained in the course of the investigation; affidavits and warrants pertaining to various search electronic mail accounts, collected geolocation data, searched

physical premises; draft transcriptions and line sheets of Title III interceptions, consensually recorded calls, and in-person meetings; surveillance video and photographs; pen register data; subpoena returns (including telephone subscriber information, bank records, and other business records); and photographs of the content of certain electronic devices and computers, including screenshots pertaining to software programs used to conduct the casino scheme charged in the Indictment. Meanwhile, the FBI processed and reviewed electronic devices collected at the time of the defendants' arrests. That process is nearing an end, and the Government, consistent with the Court's prior scheduling, is copying the content of those devices to storage media provided by the defendants and will make this tranche of discovery available before the end of this year.

Among the first documents provided in discovery were the Title III Affidavits. The final such affidavit, the May Affidavit, totaled approximately 77 pages in length and incorporated each of the prior affidavits. As such, the May Affidavit alone provides well over 200 pages of narrative description and analysis of the Shulaya Enterprise's composition and activities. That affidavit specifically discussed the operation of the Shulaya Enterprise's poker house, its cargo theft scheme, its contraband cigarette distribution, its various identity theft schemes (including both the cargo theft and other credit card and check-based frauds), extortions, violence, and the casino fraud. The May Affidavit and its attachment provides a detailed, narrative description of each of those offenses, and of the various defendants' (and other co-conspirators') roles in those offenses, much of which is directly incorporated into the overt acts set forth in the Indictment.

On June 9, 2017, the Court convened an initial pretrial conference during which the Government set out a lengthy summary of the case. That summary included a description of the various schemes charged in the original indictment, as well as a detailed summary of the evidence collected in the course of the Government's investigation.

The following week, on June 16, 2017, the Court convened a conference at which the bail conditions previously imposed for defendant Hovhannisyan, in the district of his arrest, were appealed by the Government. In advance of that conference, the Government submitted a letter proffering facts regarding the fraudulent schemes in which Hovhannisyan and others (including, principally, Dzhanashvili, Afanasyev, and Savgir) had been involved. That proffer included quotations from draft line sheets obtained via the Title III intercepts described above, as well as summaries of surveillance, emails exchanged between defendants, and the Government's interpretation of key events and communications involving the defendants described in that letter. On July 26, 2017, the Government submitted a substantially similar letter in connection with a bail application by Denis Savgir. That letter further included a description of various card-making equipment and devices found in Savgir's home as the result of a search warrant executed on those premises. On August 9 and 28, 2017 the Government submitted similar bail letters regarding in advance of bail and detention hearings requested by Shulaya and Gabisonia, respectively. Each of these letters has set forth detailed discussions of the respective defendant's roles and criminal conduct.

**ARGUMENT**

**I.    THE TITLE III ORDERS WERE LAWFULLY ISSUED**

    **A.  The Title III Orders Were Properly Entered in the Southern District of New York**

        **i.  The Legal Standard**

Under Title 18, United States Code, Section 2518(3), a "judge may enter an *ex parte* order . . . authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the U.S. in the case of a mobile interception device authorized by a Federal court within such jurisdiction)." 18 U.S.C. § 2518(3). "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). In interpreting these provisions, the Second Circuit has held that "a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard." *United States* v. *Rodriguez*, 968 F.2d 130, 136 (2d Cir. 1992). Accordingly, a "federal court sitting in the jurisdiction in which the to-be-tapped telephone is located would have the authority, under § 2518(3), to authorize a wiretap [on that telephone]," and a district judge sitting in the jurisdiction where "the redirected contents are first heard" likewise has authority to authorize the interception of those communications. *Rodriguez*, 968 F.2d at 136.

Courts in this Circuit have repeatedly relied on *Rodriguez* in this respect. *See, e.g.*, *United States v. Goodwin*, 131 F.3d 132, at *2 (2d Cir.1997) (summary order) ("Telephone communications are deemed intercepted at two places: where the tapped telephone is located and where the communications are overheard . . . . The FBI agents overheard the conversations while in the Northern District of Georgia, and the calls were therefore intercepted within that

10

jurisdiction for purposes of 18 U.S.C. § 2518(3).”); *United States v. Rodriguez*, No. 08 Cr. 1311 (RPP), 2009 WL 2569116, at *6 (S.D.N.Y. Aug. 20, 2009) (“Defendants do not challenge the assertion that the calls were routed to an Arizona location where they were intercepted and recorded. Under existing case law, this is sufficient to demonstrate that the calls were ‘intercepted’ within Arizona, thereby giving the Arizona court jurisdiction to issue the wiretap.”); *United States* v. *Bernardino*, No. 07 Cr. 151 (PKC), 2007 WL 4462176, at *3 (S.D.N.Y. Dec. 17, 2007) (court where the calls are first listened to and recorded has jurisdiction to authorize their interception); *United States* v. *Gotti*, 42 F. Supp. 2d 252, 286 (S.D.N.Y. 1999) (same).

### ii. Discussion

Judges sitting in the Southern District of New York issued the Title III Orders and authorized the FBI to intercept communications from a wire room in the Southern District of New York. *See* December 12 Order; January 12 Order; February 10 Order; March 10 Order; April 7 Order; and May 17 Order.  The FBI, in fact, monitored the intercepted communications from wirerooms in the Southern District of New York. Accordingly, the Title III Orders—both as entered and as executed—complied with the territorial jurisdiction limitations of Title III. *See Rodriguez*, 2009 WL 2569116, at *6.

The Mitselmakher Motion appears to acknowledge that the established Second Circuit law cited above controls this case and renders his request for relief meritless. *See* Mitselmakher Br. (ECF Doc. 390) at 3 (“This Court may be compelled to follow *Rodriguez*. . . .”). That concession, coupled with the plain holdings of the controlling case law set forth above and the absence of any allegation that the agents’ interception of communications under the various Title

III orders occurred other than as set forth in their applications, is sufficient to deny the Mitselmakher Motion.

Mitselmakher's argument fares no better on the merits. First, Mitselmakher appears to base his argument on the omission of key words from the applicable statute. Title III does not, as Mitselmakher writes, "authorize[] a wiretap only from 'electronic communications within the territorial jurisdiction of the court in which the [authorizing] judge is sitting,'" Mitselmakher Br. 4, but rather authorizes the *interception* of such communications in such territory. As the Second Circuit has clearly held, "interception" includes initially hearing communications in a given district even when a telephone is located outside of that district. Second, Mitselmakher's citation to *United States* v. *Glover*, 736 F.3d 509 (D.C. Cir. 2013), is misplaced. As Mitselmakher notes, *Glover* did not address the question at issue in *Rodriguez* and in this case, *see* Mitselmakher Br. 3 ("*Glover* noted the rationale of *Rodriguez* and punted. . . ."). Rather, *Glover* addressed the question of a district court's jurisdiction to authorize the installation of a "bug" (that is, a covert listening device) on a car not located in the authorizing district at the time of authorization. As *Glover* itself acknowledged, that set of facts is wholly separate from the question of where the "interception" of communications over a telephone occur. *Glover*, 736 F.3d at 515.

Neither the text of Title III, nor the admittedly inapposite case cited in support by Mitselmakher, contravene the settled law supporting the jurisdiction of the various judges of this Court who authorized the interception of communications in this case. The Mitselmakher Motion should be denied as meritless.

12

### B. The Authorizing Judges Properly Found that the Title III Applications Satisfied 18 U.S.C. § 2518

#### i.  The Legal Standard

Title 18, United States Code, Section 2518(1)(c) requires that an application for the interception of telephonic communications include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Similarly, Section 2518(3)(c) requires the judge reviewing a wiretap application to determine, as a condition of authorizing the wiretap, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."

These requirements ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). As the Second Circuit has explained:

> [T]he purpose of the statutory requirements of § 2518 is not to preclude the Government's resort to wiretapping until after all other possible means of investigation have been exhausted by investigative agents; rather, the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods.

*United States v. Diaz*, 176 F.3d 52, 111 (2d Cir. 1999) (internal citation and quotations omitted); *accord United States* v. *Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) (Government not "required to exhaust all conceivable investigative techniques before resorting to electronic surveillance"). Thus, Title III's "alternative investigative techniques" sections do not establish a "requirement 'that any particular investigative procedures be exhausted before a wiretap be authorized.'" *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (quoting *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983)); *accord United States v. Miller*, 116 F.3d 641, 663 (2d

Cir. 1997). "The issue of whether a normal investigative method has been exhausted must be tested in a practical and common sense manner." *Diaz*, 176 F.3d at 111; *accord United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir. 1984); *United States v. Trippe*, 171 F. Supp. 2d 230, 236 (S.D.N.Y. 2001) ("[T]he application must be viewed in a practical and common sense manner and need be only minimally adequate to support the issuing judge's determination of necessity.").

Just as with respect to a probable cause determination, substantial deference is owed by the reviewing court to the issuing court's prior finding of necessity. *See United States v. Gigante*, 979 F. Supp. 959, 963 (S.D.N.Y. 1997) ("In subsequently reviewing these determinations [probable cause and necessity], the trial court must accord substantial deference to the findings of the issuing judicial officer, limiting its review to whether the issuing judicial officer had a 'substantial basis' for making the requisite findings.") (citing *United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993)); *see also Concepcion*, 579 F.3d at 217 (agreeing that Second Circuit precedent looks to whether the court that issued the wiretap order abused its discretion, and whether the affidavit was "minimally adequate" to support that judge's decision to issue the order). In a number of instances, the Second Circuit has reversed orders by district courts suppressing wiretap evidence because the suppression orders failed to show the appropriate level of deference to the authorizing judge's finding of necessity. *See Concepcion*, 579 F.3d at 219 (reversing reviewing judge's suppression order because, with appropriate deference paid to issuing judge's initial assessment that alternative investigative techniques failed or were unlikely to be fruitful, the affidavit was "minimally adequate" to support a finding of necessity); *id.* at 217 (citing *Wagner*, 989 F.2d at 74 ("revers[ing] the district court's suppression of evidence because

it had not accorded sufficient deference to the initial decision to authorize a wiretap, on which the Government had relied")).

Because wiretap orders are presumptively valid, the defendants bear the burden of proving that necessity was lacking. *See United States v. Magaddino*, 496 F.2d 455, 459-60 (2d Cir. 1974).

### ii. Discussion

Six different reviewing judges found that the Government's statement satisfied the requirements of 18 U.S.C. § 2518(3)(c). *See* December 12 Order at 6 (Judge Failla); January 12 Order at 7 (Judge Kaplan); February 10 Order at 8 (Judge Engelmayer); March 10 Order at 8 (Judge Cote); April 7 Order at 8 (Judge Daniels); May 17 Order at 8 (Judge Preska).

For good reason. The Title III Affidavits reviewed the investigative attempts undertaken and explained how each of these steps failed to achieve the objectives of interception, or were reasonably expected to fail. As the Second Circuit has repeatedly explained, "the statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Diaz*, 176 F.3d at 111; *accord United States v. Lilla*, 699 F.2d at 103 (application only must "provide some basis for concluding that less intrusive investigative procedures are not feasible"). Here, the Title III Affidavits did just that. In the December Affidavit, for example, Special Agent Hanratty described the progress and limitations of the investigation in detail:

- Confidential sources were "limited in scope of their respective access to the Shulaya Enterprise" generally, and that neither CS-1, CS-2, CS-3, nor CS-4 were in a position to individually or collectively to reveal the full scope of the Enterprise. December Aff. 47-48.

15

- An undercover officer had been used for the specific purpose of "bolster[ing] the credibility of CS-2," but that there was little chance of placing an undercover officer into a prominent role within the Enterprise given "that individuals involved in the Target Offense are reticent to discuss their criminal activity with outsiders." December Aff. 49.

- FBI agents had conducted surveillance of members of the organization but that surveillance "did not reveal the content of conversations," December Aff. 49, or the "activities within" particular buildings, December Aff. 49. In any event, Special Agent Hanratty explained that surveillance would not be an alternative to interception but rather a technique to deploy "in conjunction" with it. December Aff. 50.

- A pole camera would suffer the same limitations a visual surveillance and would not reveal "the identity of further members of the Shulaya Enterprise," "the manner in which the Shulaya Enterprise monetizes illegal contraband," or any evidence of extortion or computer intrusion. December Aff. 50.

- Geolocation information would not reveal the "mean and methods of the Shulaya Enterprise," or the "planning and/or execution of efforts to extort victims, commit computer intrusions, or plan the movement of contraband items." December Aff. 51.

- The FBI had obtained and used telephone records (including to complete the wire affidavit) to show contact between numbers of interest, but those records would not identifying the person involved, especially when, as Special Agent Hanratty

16

stated, many of the telephone numbers encountered in the case "are not affiliated with the true subscriber." December Aff. 51-52.

- The FBI had obtained bank account information but the accounts identified at the time did not "directly reflect[] the proceeds of the Target Offenses." December Aff. 54.

- Arrests and witness interviews were not feasible given that doing so would reveal the existence of the investigation or result in invocations of the Fifth Amendment, or both (December Aff. 52-53), though the FBI disclosed that it had spoken to various historical victims of the Shulaya Enterprise *See, e.g.*, December Aff. 18, 28-29.

- Search warrants would prematurely reveal the existence of the investigation and, in any event, would not have likely to have revealed the scope of the Enterprise or evidence of the cigarette and slot machine scams. December Aff. 53.

These statements "inform[ed] the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods" and, therefore, satisfied 18 U.S.C. § 2518. *See Diaz*, 176 F.3d at 111.

The subsequent TIII Affidavits also comprehensively covered the normal investigative procedures and augmented the initial summary of the investigative progress. The January Affidavit, for example, explained that the FBI had conducted surveillance using GPS location information, but only learned the contents of the observed meetings by intercepting the targets' communications pursuant to the December 12 Order. January Aff. 74. The February Affidavit described how intercepts pursuant to the January 12 Order enabled surveillance and the service of grand jury subpoenas that would otherwise have been impossible without interception.

17

February Aff. 45. The March Affidavit detailed how the arrests of two associates was immediately reported to Dzhanashvili, confirming that other arrests would pose a fatal risk to the investigation. March Aff. 59. The April Affidavit explained that search warrants would risk "the FBI's ability to identity the source of the contraband sold by the Shulaya Enterprise, including the confections and apparel sold to a confidential source . . . ." April Aff. 69. In addition to discussing the investigative progress, the February, March, April, and May Affidavits each attached one or more prior agent affidavits so that the authorizing judge could evaluate the necessity of ongoing interception in context. The Title III Affidavits each include the affiant's conclusion, informed by experience, that traditional investigative methods alone would not achieve the objectives of the investigation.

Based on these sworn statements, Judge Failla—and the five jurists who followed—each had a substantial basis for their decisions that interception was necessary because normal investigative techniques were unavailable to accomplish the investigative objectives. Those decisions were well supported by precedent. *See United States v. Wagner*, 989 F.2d at 74 (rejecting argument that necessity was insufficient because, among other things, surveillance would have been difficult); *United States v. Young*, 822 F.2d at 1237 (approving wiretap because surveillance would have been impractical and telephone toll records would not have uncovered target's partners in crime); *United States v. Martino*, 664 F.2d 860, 868 (2d Cir. 1981) (rejecting challenge to wiretap because, among other things, "telephone toll records and use of pen registers . . . do not identify the participants to a telephone conversation, and hence would be unlikely to uncover [defendant's] partners in crime"). Indeed, this investigation confronted many of the circumstances that, standing alone, would have justified a wiretap: crimes were occurring over the phone, *see United States v. Steinberg*, 525 F.2d 1126, 1130 (2d Cir. 1975)

("[W]iretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation."); it was a conspiracy, *see United States v. Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987) ("[T]he clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques.") *aff'd*, 875 F.2d 857 (2d Cir. 1989); and it was a conspiracy involved sweeping racketeering activity, *Concepcion*, 579 F.3d at 218  (noting that the Second Circuit has "approved the use of wiretaps in complex and sprawling criminal cases involving large conspiracies.").

Dzhanashvili primarily argues that the FBI was too successful at investigating the Shulaya Enterprise to obtain a lawful wiretap. *See* Dzhanashvili Br. 10. Because the FBI had learned a lot about the Shulaya Enterprise through confidential sources and other mechanisms, Dzhanashvili contends, it could not be said that those techniques had failed. *See* Dzhanashvili Br. 10-14. But Dzhanasvhili misapprehends Section 2518's requirements. The statute does not demand investigators to achieve no success whatsoever before applying for a wiretap. Instead, it requires that investigators show that traditional techniques would not "suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). So "[i]f law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003). As Special Agent Hanratty explained in the December Affidavit, the scope of criminal activity in the Shulaya Enterprise far outstretched the reach of routine evidence gathering techniques. Thus, to identify the scope of the Shulaya Enterprise, its members, and their profits, a wiretap was "necessary to reach the ultimate goals of the investigation." *Cf. United States v. Wilson*, 484 F.3d 267, 281 (4th Cir. 2007). At a minimum, these circumstances provided Judge Failla and the other

authorizing judges with a "minimally adequate" basis to find necessity. *See Concepcion*, 579 F.3d at 217.

Dzhanashvili also attacks the December Affidavit for two purported omissions. First, that the Government "had access to a live video feed in the location where illegal gambling was conducted." Dzhanashvili Br. 15. Second, that the Government had obtained information from a fifth confidential source, later disclosed in the January Affidavit. According to Dzhanashvili, these omissions trigger automatic statutory exclusion of the intercepts. Dzhanashvili Br. 6-7.

As a legal matter, Dzhanashvili's claim that any omission triggers automatic suppression has been repeatedly rejected by courts in this Circuit. *See United States v. Levy*, No. 11 Cr. 62 (PAC), 2012 WL 5830631 (S.D.N.Y. Nov. 16, 2012); *United States v. Gupta*, No. 11 Cr. 907 (JSR), 2012 WL 1066817, at *2 (S.D.N.Y. March 27, 2012). Instead, courts assess omissions within the framework of *Franks v. Delaware*, meaning they are only of consequence if there are intentional, material, and misleading. *See* 438 U.S. 154, 171 (1978); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). After all, "[a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *See United States v. Awadallah*, 349 F.3d 42, 67 (2d Cir. 2003) (quoting *United States v. Colkley*, 899 F.2d 297, 300-01 (4th Cir. 1990)). Neither of the purported omissions identified by Dzhanashvili are misleading or material to 2518 analysis. As to the Poker House surveillance footage, the Government received a copy of the internal video surveillance system on or about November 9, 2016, shortly after the system was disabled and the Poker House shuttered. *See* Thomas Decl. ¶ 2. Accordingly, the Government did not have "access to a live video feed" at the time of the wiretap applications, as Dzhanashvili posits in his memorandum. Nor, even if the FBI had been able to maintain access, would a stationary video surveillance system have revealed any aspect

of conspiracy occurring outside the Poker House or the contents of any communications spoken within it. As to the confidential source identified as CS-5, the Government discussed the limitations of confidential sources generally in the initial application, so that technique was not omitted at all. *See* December Aff. 47-48. And the Government discussed CS-5's specific limitations in the January Affidavit, when the Government first expanded its Target Subjects and Target Offenses to encompass matters related to CS-5. The existence of a specific additional confidential source who was "not specifically embedded within the Shulaya Enterprise," *see* January Aff. 71, was not material. None of these facts could conceivably have altered Judge Failla's § 2518 finding or the findings of the five subsequent reviewing judges.

## II.   MAGISTRATE JUDGE PARKER PROPERLY FOUND PROBABLE CAUSE TO ISSUE A WARRANT FOR AFANASYEV'S CELLPHONE LOCATION INFORMATION

### A.   The Legal Standard

A district court "must accord considerable deference to the probable cause determination of the issuing magistrate." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007). Such deference derives not only from the law's recognition that probable cause is "a fluid concept" that can vary with the facts of each case, but also from its "strong preference for searches conducted pursuant to a warrant," *Illinois v. Gates*, 462 U.S. 213, 232, 236 (1983), and its related concern that "[a] grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting," *United States v. Ventresca*, 380 U.S. 102, 108 (1965). Thus, the task of a reviewing court is simply to ensure that the "totality of the circumstances" afforded the magistrate "a substantial basis" for making the requisite probable cause determination. *Illinois v. Gates*, 462 U.S. at 238 (quotation marks omitted). "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [applying for a warrant] should not take the form of de novo review." *United States v. Smith*, 9 F.3d 1007, 1012

(2d Cir. 1993) (quoting *Gates*, 462 U.S. at 236). "[C]ourts should not invalidate [a] warrant by interpreting the [supporting] affidavit in a hypertechnical, rather than a commonsense, manner." *Id.* (quoting *Jones v. United States*, 362 U.S. 257, 270 (1960)).

### B.   Discussion

First, to the extent that Afanasyev challenges the Afanasyev Warrant for lacking probable cause, that challenge should be denied as meritless. For one thing, the courts have held that probable cause is not required to obtain pen register information and historical location information. *See United States v. Graham*, 824 F.3d 421, 424-25 (4th Cir. 2016) (*en banc*); *United States v. Davis*, 785 F.3d 498, 511-13 (11th Cir. 2015) (*en banc*), *cert. denied*, 136 S. Ct. 479 (2015); *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 614-15 (5th Cir. 2013); *United States* v. *Guerrero*, 768 F.3d 351, 358-59 (5th Cir. 2014); *see also United States v. Pascual*, 502 F. App'x 75, 80 & n.6 (2d Cir. 2012), *cert. denied,* 134 S. Ct. 231 (2013) ("general principles" of third-party doctrine "point[ ]" toward this conclusion regarding cell-site records); *but see United States* v. *Ulbricht*, 858 F.3d 71, 97 n.29 (2d Cir. 2017) (declining to express its view as to whether the Fourth Amendment applies to historical cell site location information) *and United States* v. *Carpenter*, 819 F.3d 880, 887-90 (6th Cir. 2016) (cert. granted). For another, and with respect to both historical and prospective location information, the Afanasyev Warrant did establish probable cause to obtain the information it sought. On this point, Afanasyev's tact is to ignore the GPS Affidavit's thirty-seven page discussion of the facts supporting probable cause. *Compare* Afanasyev Br. 9. *with* GPS Aff. ¶¶ 7-25. Among other things, that discussion included that the Shulaya Enterprise existed, the Enterprise pursued numerous crimes, Afanasyev was part of the Enterprise, Afanasyev participated in the Enterprise's scheme to steal cargo shipments, and Afanasyev used his cellphone in connection with his criminal activities. *See* GPS Aff. ¶¶ 7, 8(b), 19, 19 n.14, 19(c). Afanasyev does not

22

challenge the accuracy of those facts. *See* Afanasyev Br. 9 (discussing factual assertions without disputing them). Where an affidavit demonstrates that a particular cellphone has been used by a member of an active criminal organization to further that organization's activities, the affidavit has demonstrated probable cause to believe that the location of the phone would be evidence of criminal activity. *Cf. United States v. Meregildo*, 11 Cr. 576 (WHP), 2012 WL 3834732, at *2 (S.D.N.Y. Aug. 28, 2012). And, at the very least, the GPS Affidavit's facts provide a "substantial basis" to affirm Magistrate Judge Parker's finding of probable cause.

Second, Afanasyev appears to argue that the Government should have made a showing beyond probable cause and that the Court should suppress the location information as a matter of policy. For example, Afanasyev contends that the Government failed to articulate the "use and aims" of the location information and that "[n]othing was offered to substantiate the need for the 45 days of unchecked 24-hour monitoring that followed pursuant to that order." (Afanasyev Br. 10). These arguments are both legally and factually wrong. They are wrong as a matter of law because the Government's burden for a search warrant is probable cause. *See United States v. Travisano*, 724 F.2d 341, 346 (2d Cir. 1983). The Government is unaware of any requirement that it demonstrate "need" or advertise its investigative "aims" for this type of warrant. *Cf. Winston v. Lee*, 470 U.S. 753 (1985) (upholding refusal to issue warrant to extract a bullet from defendant's body when the government had other evidence). Moreover, the arguments rest on an erroneous factual assumption because the Government did not conduct a "prolonged intrusion" of the defendant's privacy. The Government collected prospective location information for approximately five days, from on or about June 2, 2017 to on or about June 7, 2017. *See* Thomas Decl. ¶ 13. Whatever argument a defendant might have about sustained location monitoring, Afanasyev is not the one to raise it.

23

Finally, even if the Court were to find that the GPS Affidavit did not establish probable cause, the FBI relied on the GPS Warrant in good faith. Accordingly, the location information should not be suppressed. *See United States v. Leon*, 468 U.S. 897 (1984); *United States v. Falso*, 544 F.3d 110, 135 (2d Cir. 2008).

### III.    COUNT FOUR PROPERLY ALLEGES A MULTI-OBJECT IDENTITY FRAUD CONSPIRACY

#### A.    The Legal Standard

The law is well-settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956). Accordingly, dismissal of an indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Fed. R. Crim. P. 7(c)(1) (alterations omitted)). "An indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *see also United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007). On a pretrial motion to dismiss pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, the allegations of the indictment must be taken as true. *See Boyce Motor*

*Lines, Inc. v. United States*, 342 U.S. 337, 343 n. 16 (1952); *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Duplicity is a pleading defect in which the indictment "joins two or more distinct crimes in a single count." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). The remedy for a duplicitous indictment before trial is reformulation rather than dismissal. *United States v. Droms*, 566 F.2d 361, 363 n.1 (2d Cir. 1977). A count is not duplicitous, however, if it charges a crime with multiple objectives. *See United States v. Ballistrea*, 101 F.3d 827, 835 (2d Cir. 1996); *Frohwerk v. United States*, 249 U.S. 204, 210 (1919). So "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitious." *Braverman v. United States*, 317 U.S. 49, 54 (1942); *see also United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013).

### B.  Discussion

Count Four properly alleges a multi-object identity fraud conspiracy. Count Four alleges a conspiracy to commit identity fraud, in violation of Title 18, United States Code, Section 1028(f). The particular fraudulent objectives are violations of Sections 1028(a)(1), (2), (3), (7), and (8). Thus, Hovhannisyan misreads the Indictment when he describes Count Four as "lump[ing] together multiple subchapters of 18 U.S.C. 1028(a) in a single count." (Hovhannisyan Br. 2). Count Four charges a single conspiracy—one violation of Section 1028(f)—with multiple objectives. This is not duplicity. *See Braverman v. United States*, 317 U.S. 49, 54. Nor, if it were duplicitous, would Hovhannisyan be entitled to dismissal. *United States v. Droms*, 566 F.2d at 363 n.1.

In any event, to avoid the "multitude of problems" that Hovhannisyan foresees at trial, the Government respectfully proposes to use a special verdict form that solicits a jury verdict as to each of the various conspiratorial objects. Such a form would remove the "possibility of a

non-unanimous jury verdict" and, thus, the potential prejudice to Hovhannisyan. *Cf. Helmsley*,

941 F.2d at 91.

### IV.   DEFENDANTS' ASSORTED DISCOVERY AND PROCEDURAL REQUESTS SHOULD BE DENIED

#### A.   The Government has put the Defendant on Notice of the Charges Against him and no Bill of Particulars is Required

Afanasyev and Hovhannisyan contend that the charging instruments have failed to

provide them with enough information to prepare a defense or to avoid being placed in jeopardy

a second time for the same conduct, and therefore have moved for the provision of a bill of

particulars. Indeed, the Government has already provided much of the evidence sought by the

defense in the form of its detailed Title III Affidavits, Rule 16 discovery, and discussions with

defense counsel. In light of the detailed descriptions of the charged offenses provided in a variety

of documents and on the record at pretrial conferences, coupled with the Government's

commitment to provide notice of the criminal incidents that the Government intends to prove at

trial as direct proof of or background to the charged racketeering conspiracy or as evidence of

uncharged misconduct under Rule 404(b) of the Federal Rules of Evidence (the "Enterprise

Letter") well in advance of any deadline set for motions in limine, this request should be denied.

### i.   Legal Standard

The proper scope and function of a bill of particulars is to provide sufficient information

about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise,

and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States* v.

*Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (abrogated on other grounds by *United States* v.

*Marcus*, 628 F.3d 36, 41 (2d Cir. 2010)); *Bortnovsky*, 820 F.2d at 574. "A bill of particulars

should be required only where the charges of the indictment are so general that they do not

advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234.

 If the information the defendant seeks "is provided in the indictment or in some

acceptable alternate form," no bill of particulars is required. *Bortnovsky*, 820 F.2d at 574.

Accordingly, a "bill of particulars is not necessary where the government has made sufficient

disclosures concerning its evidence and witnesses by other means." *United States* v. *Walsh*, 194

F.3d 37, 47 (2d Cir. 1999). In other words, the defense cannot use a bill of particulars as a

general investigative tool, *United States* v. *Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003),

or as a device to compel disclosure of the Government's evidence prior to trial. *United States* v.

*Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing

*United States* v. *Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)); *see also United States* v.

*Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995).

 Further, supplying evidentiary detail is not the function of the bill of particulars. *Torres*,

901 F.2d at 234. Accordingly, the Government is not required to: (a) "particularize all of its

evidence," *United States* v. *Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise

manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at

233-34; or (c) provide the defendant with a preview of the Government's case or legal theory,

*see United States* v. *Muyet*, 945 F. Supp. 586, 598-599 (S.D.N.Y. 1996). The ultimate test is

whether the information sought is *necessary*, not whether it is helpful. *See United States* v.

*Conley*, No. 00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002); *United

States* v. *Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *United States* v. *Taylor*, 707 F.

Supp. 696, 699 (S.D.N.Y. 1989); *United States* v. *Persico*, 621 F. Supp. 842, 868 (S.D.N.Y.

1985).

In particular, "demands for particular information with respect to where, when, and with

whom the Government will charge the defendant with conspiring are routinely denied." *Trippe*,

171 F. Supp. 2d at 240 (collecting cases); *see, e.g.*, *Torres*, 901 F.2d at 233-34 (demands for

whens, wheres, and by whoms within charged conspiracy are improper attempts at general pre-

trial discovery); *United States* v. *Remire*, 400 F. Supp. 2d 627, 633 (S.D.N.Y. 2005); *United

States* v. *Johnson-Guzman*, No. 98 CR. 350 RWS, 1998 WL 730327, at *7 (S.D.N.Y. Oct. 16,

1998) ("With respect to conspiracy charges in particular, since the Government is not required to

prove exactly when or how a conspiracy was formed or when or how a particular defendant

joined the scheme, and as the circumstantial proof on which the government usually relies to

prove the existence of a scheme often does not reveal such details, the courts have consistently

rejected demands for particulars as to the formation of a conspiracy or the entry into the

conspiracy of a particular defendant or confederate.").

### ii.    Discussion

The Indictment and the Title III Affidavits, together with the Government's multiple

pretrial letter briefs regarding the activities in which Hovhannisyan and Afanasyev, in particular,

are implicated, amply alert the defendants of the charges against them. In this case, the

Indictment itself describes particular telephone calls involving these defendants, complete with

dates and summaries of the content of those calls. Furthermore, the entirety of the Title III line

sheets have been provided, in a searchable form, to all defendants. Those line sheets identify the

telephone number principally associated with each defendant, and provide summaries or (in

many cases) draft verbatim transcriptions of conversations that form the basis of the charges. By

way of further guidance, the content and import of certain of those intercepted communications are specifically discussed in the Government's Title III Affidavits, as well as certain of the letters filed in connection with bail hearings held in this case to date.

To the extent these defendants ask for information that they do not currently possess, their motions should be denied as an improper effort to chart the precise contours of the Government's case. "A defendant may not use a bill of particulars as a general investigative tool. Nor may he use a bill of particulars to preview the government's evidence or trial strategy, or to require the government to specify the minutiae of how it will prove the charges." *United States* v. *Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002). Hovhannisyan, however, demands to know such information as: "the dates for which the government claims Mr. Hovhannisyan was a member of the enterprise;" "the basic facts establishing Mr. Hovhannisyan's participation, conduct, and knowledge [of] the cargo theft scheme;" "the basic facts establishing Mr. Hovhannisyan's participation, conduct, knowledge, agreement, presence, or assistance, directly or indirectly, in any agreement to further the objectives of the racketeering conspiracy;" "[t]he individual or entity that constitutes the victim of the EFS check scheme"; the "exact date, place and conduct wherein Mr. Hovhannisyan entered the conspiracy"; and the "exact date Mr. Hovhannisyan last participated in any overt acts of the conspiracy." Hovhannisyan Br. 5-6. These requests are improper:

> With respect to conspiracy charges in particular, since the Government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme, and as the circumstantial proof on which the government usually relies to prove the existence of a scheme often does not reveal such details, the courts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant or confederate.

*United States* v. *Johnson-Guzman*, No. 98 Cr. 350 (RWS), 1998 WL 730327, at *7 (S.D.N.Y. Oct. 16, 1995); *Trippe*, 171 F. Supp. 2d at 240 (collecting cases). Indeed, whatever remaining

29

detail exists to be learned lies beyond the defendants' reach because they are "not entitled to a bill of particulars setting forth the "whens," "wheres," and "with whoms" regarding" the conspiracy. *See United States* v. *Muyet*, 945 F. Supp. at 599. Similarly, though Hovhannisyan requests details about overt acts, the Government has no burden to prove any overt acts undertaken in furtherance of either of the conspiracies charged against these defendants. *See United States* v. *Bermudez*, 526 F.2d 89, 94 (2d Cir. 1978).

In sum, the defendants are not entitled to the additional information they seek, which is the kind of detail about the Government's case that is squarely foreclosed by case law and constitutes an attempt to disrupt the structured discovery system set forth in Rule 16 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3500. *See Torres*, 901 F.2d at 233-34; *United States* v. *Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have almost uniformly been denied." (quotation marks omitted)). Through the Indictment and various warrant applications, the discovery the Government has produced, and in conversations with counsel, the Government has "identif[ied] with sufficient particularity the nature of the charge pending . . . thereby enabling the defendant[s] to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [they] be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574.

As set forth above, Tthe Government commits to provide still further details regarding specific incidents as proof of the charged conspiracies in the form of an Enterprise Letter to be submitted before *in limine* briefing and trial, as is the custom in this District. This approach has been utilized, to the satisfaction of various judges, frequently without objection, in multiple

recent racketeering case in this District. *See, e.g., United States v. Conyers, et al.*, No. 15 Cr. 537 (VEC); *United States v. Ortiz, et al.*, 15 Cr. 608 (KPF); *United States v. Meregildo, et al.*, No. 11 Cr. 576 (WHP); *United States v. Corozzo, et al.*, 11 Cr. 12 (RMB); *United States v. Krasniqi, et al.*, No. 10 Cr. 464 (RJH); *United States v. Nigro, et al.*, No. 09 Cr. 1239 (PKC). In this letter, the Government will also include notice of any Rule 404(b) evidence sought to be admitted.

Accordingly, the motion for a bill of particulars should be denied.

### B. The Defendants Are Not Entitled to the Identities of Government Witnesses At This Stage

Afanasyev moves the Court to compel the disclosure of the names and addresses of its trial witnesses. (Afanasyev Br. 10-13). The Court should deny that request, too.

As an initial matter, in the event the Government elects to call any confidential informant at trial, the Government will produce material for each such witness pursuant to the Jencks Act, 18 U.S.C. § 3500 *et seq.*, and *Giglio v. United States*, 405 U.S. 150 (1972), sufficiently in advance of trial so as to permit defense counsel adequate time to prepare for cross-examination of the witness. Nothing more is required. It is well-established that the Government is generally not required to disclose the identities of its witnesses substantially in advance of trial. *See, e.g., United States v. Alessi*, 638 F.2d 466, 481 (2d Cir. 1980).

When it comes to confidential informants and cooperating witnesses, the Government enjoys a "privilege" against disclosure of their identities in advance of trial. *See, e.g., United States v. Jackson*, 345 F.3d 59, 69 (2d Cir. 2003); *United States v. Fields*, 113 F.3d 313, 324 (3d Cir. 1997). In order to overcome the presumption against pretrial disclosure of an informant's identity, the "defendant bears the burden of showing the need" for such disclosure, *id.*, and the burden is "heavy," because a defendant must establish that "disclosure is essential to the defense," *United States v. Jimenez*, 789 F.2d 167, 170 (2d Cir. 1986) (quotation marks omitted).

The defendant has not come close to satisfying that burden here. Speculation that an informant's testimony may be relevant and helpful is far from the specific showing required that such disclosure is "essential to the defense." *See United States v. Cannone*, 528 F.2d 296, 298-300 (2d Cir. 1975); *see also Fields*, 113 F.3d at 324 ("[S]peculation that disclosure of the informant's identity will be of assistance is not sufficient," rather "the district court must be satisfied, after balancing the competing interests of the government and the defense, that the defendant's need for disclosure outweighs the government's interest in shielding the informant's identity."); *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988) (it is insufficient "to show that the informant was a participant in and witness to the crime charged"); *United States v. Ojeikere*, 299 F. Supp. 2d 254, 262 (S.D.N.Y. 2004) (denying request for production of confidential informant's identity where the defendant "simply speculate[d] about what further information the informant might be able to provide"). This motion should therefore be denied.

## C. Defendants's Remaining Discovery Requests Should be Denied

First, as stated in the Government's discovery letters to defense counsel, the Government is not aware of any additional *Brady* material in this case. The Government does, however, recognize its continuing obligation to disclose all such material, and to make a diligent search for any relevant material that may be in the possession of the "prosecution team," including investigating agents and officers. The Government will continue to provide timely disclosure of any additional *Brady* material when and if any such material comes to light. Courts in this Circuit routinely deny specific requests for *Brady* material where, as here, the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*. *See, e.g.*, *United States* v. *Gallo*, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of

purported Brady material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States* v. *Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

Second, with regard to impeachment materials, the courts in this Circuit have repeatedly refused to compel disclosure of impeachment or *Giglio* material well in advance of trial, and the defendants have provided no particularized basis for early disclosure here. *See United States* v. *Nixon*, 418 U.S. 683, 701 (1974) ("need for evidence to impeach witnesses is insufficient to require its production in advance of trial"); *Gallo*, 1999 WL 9848, at *7-8 (denying defendants' motions to require the early production of *Giglio* and 3500 material); *United States* v. *Mejia*, No. 98 Cr. 4, 1998 WL 456257 at *1 (S.D.N.Y. Aug. 5, 1998); *United States* v. *Gutierrez-Flores*, 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994). As a threshold matter, all such requests are premature, for the Government has not yet identified which witnesses it intends to call at trial. In any event, the law is clear that the Government is under no obligation under the Jencks Act, 18 U.S.C. § 3500 *et seq.*, to produce prior statements of its witnesses until after each has testified on direct examination. The Jencks Act provides in pertinent part:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. § 3500. Courts in this Circuit have consistently held that the district court lacks the power to mandate early production of Jencks material. *See, e.g.*, *United States* ex rel. *Lucas* v. *Regan*, 503 F.2d 1, 3 n.1 (2d Cir. 1974); *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987). And courts in this District have routinely found that providing this information as little as one day in advance of a witness's testimony is sufficient to avoid unnecessary delay. *E.g.*, *United*

*States* v. *Ruiz*, 702 F. Supp. 1066, 1069-70 (S.D.N.Y. 1989) (approving Government agreement to provide impeachment material along with 3500 material on day before witness testifies), *aff'd*, 894 F.2d 501 (2d Cir. 1990).

Nevertheless, in order to avoid any adjournment or delay in the trial which might conceivably occur if Jencks Act and *Giglio* material were not produced until after the Government's witnesses have testified, the Government will adhere to its customary practice of producing impeachment material at the same time as Jencks Act material. The standard practice in this district is to produce such material shortly before the beginning of trial, or, if additional time is reasonably required to review such material, sufficiently in advance of the witness's testimony so as to avoid any delay at trial. *See, e.g.*, *United States* v. *Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at *10-11 (S.D.N.Y. Aug. 16, 2012) (Swain, J.) (declining to order early disclosures under the *Jencks* Act and *Giglio* where the Government intended to make such material available to defense counsel one week before trial); *United States* v. *Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009) (Sand, J.) ("Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial"); *United States* v. *Tranquillo*, 606 F. Supp. 2d 370, 382-83 (S.D.N.Y. 2009) (Robinson, J.) ("Impeachment material ordinarily need not be disclosed until the witness is called to testify at trial"); *United States* v. *Noble*, No. 07 Cr. 284 (RJS), 2008 WL 1990707, at *9 (S.D.N.Y. May 7, 2008) (Sullivan, J.) (denying request for early disclosure of *Giglio* and 3500 material where the Government agreed to turn over such materials the Friday before trial); *United States* v. *Greyling*, 2002 U.S. Dist. LEXIS 4502, at *15-16 (S.D.N.Y. Mar. 18, 2002) (Casey, J.) (production of *Giglio* material by the Wednesday before the week in which a witness will testify is appropriate); *United States* v. *Trippe*, 171 F. Supp. 230, 237-38 (S.D.N.Y. 2001) (Kram, J.)

("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act Material, that is, at least one day before the Government witness is called to testify."). Accordingly, the defendant's motion for the early production of *Giglio* and Jencks Act material should be denied as premature.

In sum, all of the defendant's assorted requests for procedural and discovery relief should be denied.

## CONCLUSION

For these reasons, the defendant's motion to suppress should be denied without an evidentiary hearing.

Dated:  New York, New York
        December 1, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By: _____
    Andrew C. Adams
    Lauren B. Schorr
    Andrew Thomas
    Assistant United States Attorneys
    (212) 637-2340/-2299/-2106
