*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 16, 2018

**BY ECF**

The Honorable Katherine B. Forrest
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    **United States v. Razhden Shulaya, et al.,**
            S9 17 Cr. 350 (KBF)

Dear Judge Forrest:

    The Government respectfully submits this letter in advance of the June 4, 2018 trial in the above-captioned case. The Government anticipates that two defendants will be present at trial: Razhden Shulaya and Avtandil Khurtsidze. These defendants are each principally charged with participating in a conspiracy to conduct the affairs of a criminal enterprise overseen and directed by Shulaya (the "Shulaya Enterprise") through a pattern of racketeering activity; each is also charged in at least one additional count based on conduct that itself formed a part of the racketeering conspiracy. The Government respectfully submits this letter to notify the Court and defendants of our intention to introduce certain evidence of charged and uncharged crimes committed by these defendants. The evidence described herein is admissible because it constitutes direct substantive proof of the charges in the Indictment; demonstrates the nature, existence, and background of the racketeering enterprise alleged in the racketeering conspiracy charged in Count One, and the additional conspiracy charges alleged in the Indictment; and demonstrates the defendants' membership in the racketeering enterprise and the related charged conspiracies. In addition, some of the evidence described below is admissible pursuant to Fed. R. Evid. 404(b), because it demonstrates the defendants' knowledge, intent, motive, opportunity, identity, and lack of mistake or accident with respect to the charges in the Indictment. Finally, much of the evidence constitutes *Giglio* material for the Government's cooperating witnesses.

### Background

    The S9 Superseding Indictment charges Shulaya and Khurtsidze with participating in and associating with a racketeering enterprise, referred to in the indictment as the "Shulaya Enterprise," led by Shulaya ("Count One'). Other participants in the Shulaya Enterprise included Zurab Dzhanashvili, Mamuka Chaganava, Akaki Ubilava, Mikheil Toradze, Nazo Gaprindashvili, and

Case 1:17-cr-00350-KBF   Document 689   Filed 04/16/18   Page 2 of 13

Page 2

other defendants charged in the originally filed Indictment.[1] Both defendants are also charged together with participating in a conspiracy to commit wire fraud through a scheme to defraud various casinos using electronic devices designed to erase the risk in playing certain models of electronic "slot" machines ("Count Five"). Shulaya is further charged with conspiring to commit interstate sale and transportation of stolen goods ("Count Two"), conspiring to traffic in contraband tobacco ("Count Three"), and conspiring to commit fraud relating to identification documents ("Count Four").

As set forth in the Indictment and the Government's prior submissions, the Shulaya Enterprise pursued a spectrum of criminal activity. Among other things, and as described in more detail below, the Shulaya Enterprise transported and sold stolen property, ran an illegal gambling parlor, extorted debtors to its gambling operations, laundered criminal proceeds, and planned to rig slot machines to defraud casinos. The Shulaya Enterprise was controlled by a "*vor v zakone*." *Vor v zakone* is a Russian phrase that translates to "Thief-in-Law" and refers to "a fraternal order of elite criminals that dates back to the time of the czars."[2] A *vor v zakone*—commonly known as a *vor*—stands at the highest level of Russian organized criminal groups, akin to a Godfather within an Italian organized criminal group. Traditionally, *vors* demand and receive *obshchak,* or tribute, from criminals and laypersons within the *vor*'s protection, license criminal activity by others, and resolve disputes between members of the criminal community. Shulaya himself participated in multiple acts designed to assert and maintain his position as a *vor*, including through public displays or boasts of violence against underlings or potential criminal competitors.

Count One charges that the defendants conspired to violate the federal laws against racketeering, in violation of Title 18, United States Code, Section 1962(d). To prove the charge contained in Count One, the Government must prove at trial:

- First: The enterprise existed;
- Second: The defendants were employed by or knowingly agreed to associate with the enterprise;
- Third: Each conspired with at least one other person to participate in the conduct of the affairs of that enterprise through a pattern of racketeering activity; and
- Fourth: The enterprise affected interstate or foreign commerce.

(from the charges given by the Honorable William H. Pauley in *United States* v. *Meregildo*, 11 Cr. 576 (WHP), and the Honorable Colleen McMahon in *United States* v. *Rudy Mendoza*, 11 Cr. 974 (CM)).

Faced with this burden, the Government must be permitted to prove the existence and nature of the Shulaya Enterprise, as well as the way in which the Shulaya Enterprise was formed,

---

[1] The S9 Indictment is a "trial indictment" focusing on the defendants whom the Government anticipates will proceed to trial on June 4, 2018. The S9 Indictment is substantively identical to the prior indictments concerning Shulaya and Khurtsidze, respectively.

[2] *See generally* Robert L. Friedman, Red Mafiya: How the Russian Mob Has Invaded America (Little Browns & Co. 2000) at 9.

maintained, operated, and expanded. Thus, witnesses (including former Shulaya Enterprise members and associates) should be allowed to testify as to their membership and participation in the Shulaya Enterprise, including the manner in which they committed Enterprise-related crimes and their reasons for committing those crimes. Additionally, these witnesses should be permitted to discuss crimes they saw or heard that their co-racketeers committed as part of the Shulaya Enterprise and to explain the formation, maintenance, operation, and expansion of the Shulaya Enterprise. Similarly, the Government should be permitted to prove various acts committed by the defendants that establish association with the Shulaya Enterprise.

### Acts that the Government Intends to Prove at Trial

Set forth below is a list of certain acts that the Government currently intends to prove at the June 4 trial for the purposes stated above.[3]

**1. Acts Reflecting Shulaya's Status as a *Vor* and Maintenance of that Status**

- On multiple intercepted telephone calls and recorded in-person meetings, Shulaya referred to himself as a *vor* or "thief," or made references to his enjoyment of that status. By way of example (and far from an exhaustive list of Shulaya's self-identification as a *vor*):

  o On or about December 11, 2014, Shulaya asked a confidential source ("CS-1") whether the source knew to whom the source was speaking while discussing Shulaya's role in providing connections and protection in furtherance of the sale of counterfeit and stolen goods. In particular, Shulaya stated, in part, "Do you know who you are talking to? No? Have they told you who I am? . . . I am actually a little different. I am just the one who will make sure you are safe and everything goes smoothly and [I/I], there will be no betrayal, nothing and everything will go seamlessly and smoothly."

  o On or about March 2, 2015, in a discussion with the same confidential source, CS-1, Shulaya described his power over criminals from the country of Georgia, specifically in reference to Shulaya's ability to traffic in contraband tobacco and stolen goods: "With any Georgians [I/I], you tell me, I will tell you right away who is who. I, just mention my name, that I'm gonna be there, they are gonna quietly sit on their asses there."

  o On or about October 26, 2015, in a discussion with a second confidential source ("CS-2") regarding the distribution of proceeds from criminal activities, generally, Shulaya described the requirement of payment of tribute to *vors*: "First of all, money should fucking go to the thief [I/I]. One has to happily run to deliver and fucking say: today we found, we stole, we snatched it, we fucking tricked a dummy.

---

[3] This list does not include each and every crime committed by any of the witnesses we intend to call at trial. We expect to elicit still other crimes as *Giglio* material for certain witnesses, for example, but have focused this list on the most serious conduct, and on conduct in which Shulaya and Khurtsidze directly participated.

> . . . In short, this is the money from the street, brother, how? Isn't it better to share it with the thief?"

- On multiple occasions in 2017, during intercepted telephone calls over Shulaya's various telephones, Shulaya made reference to his status, and enjoyment of that status, as a *vor*, boasting that "*vors* do not sleep"; that he had organized lower-level criminals to respect his status, which he described as keeping his affairs on "thieves' rails" according to the "thief's law"; and complaining that one insubordinate underling had "no idea how to speak to a thief."

- Shulaya used violence and intimidation to assert his authority as a *vor* on multiple occasions, and specifically exhibited such force in the presence of CS-2 for the apparent purpose of impressing CS-2 with demonstrations of power. Khurtsidze was involved in certain of these displays. For example, the Government intends to prove at trial the following incidents:

  - In or about early 2015, CS-2 and another individual were summoned to an apartment in Brooklyn, where Shulaya and a large group of males were surrounding an older Georgian male. The group surrounding the older male included Khurtsidze, Mamuka Chaganava, and Zurab Dzhanashvili. Shulaya physically assaulted the older male and verbally berated him. CS-2 later learned from Shulaya and other members of the Shulaya Enterprise that the victim of this attack had disrespected Shulaya in public, thereby challenging Shulaya's power and status as a *vor*. CS-2 had no prior interaction with the victim in this assault, or prior conversation with Shulaya regarding a plan to assault this victim, and understood that he was summoned to this assault by Shulaya so that CS-2 could witness Shulaya's power firsthand.

  - In or about 2015, CS-2 was present in a restaurant with Shulaya, Khurtsidze, Chaganava, and other members and associates of the Shulaya Enterprise during a confrontation with a lower-ranking criminal associate of the Shulaya Enterprise (not charged in this case) ("CC-1"). Shulaya first accused CC-1 of dealing narcotics (an offense insofar as CC-1 had not reported that activity to Shulaya), and CC-1 initially denied that activity. Shulaya then slapped and berated CC-1, while Chaganava, holding a knife, guarded Shulaya and prevented CC-1's escape. CC-1 eventually admitted his drug dealing and promised that he would respect Shulaya's status in the future, which CS-2 understood to mean that CC-1 would pay tribute to Shulaya from CC-1's criminal activity.

  - On or about October 8, 2015, following the arrest of Artur Vinokurov, Shulaya told CS-1, in substance, that if Vinokurov spoke about Shulaya, Vinokurov "will seal his fate," which CS-1 understood to mean that Shulaya would have Vinokurov killed. This statement was one among several made to CS-1 by Shulaya reflecting Shulaya's willingness to silence potential witnesses through violence, including through lethal violence.

- o In or about February 2016, CS-2, Khurtsidze, CC-1, and others, attended a birthday celebration in honor of Shulaya. At that celebration, CC-1 demonstrated his new allegiance to Shulaya through his presence at that party (despite his previous humiliation at Shulaya's hands) and the provision of an elaborate gift: a crossbow, which was subsequently seized from Shulaya's apartment on the day of his arrest in June 2017. Moreover, photographs of Shulaya at that celebration depict Shulaya wearing a custom-made shirt embroidered or printed with designs typical of the traditional tattoos worn by *vors* (*e.g.*, various stars and elaborate rosate designs reflecting defiance of authority or status as a *vor*).

- o On or about February 22, 2016, CS-2, while inside the Shulaya Enterprise's illegal gambling establishment (the "Poker House") observed Shulaya, Khurtsidze, and others escort Chaganava inside the "office" of the Poker House, *i.e.*, one area of the Poker House in which no security cameras were installed. Shortly thereafter, Shulaya sent Chaganava out of the office. CS-2 observed that Chaganava had been assaulted, and specifically that his eyes and nose were bloodied. Shulaya ordered CS-2 to fetch ice for Chaganava's face, but CS-2 only had a cold can of beer or soda to offer. CS-2 heard Shulaya ask Khurtsidze, in Russian, "why did you hit him so hard?" The Government anticipates that CS-2 will testify that Shulaya and Khurtsidze, when conversing between themselves, would typically speak Georgian, which CS-2 does not speak. CS-2 understood that Shulaya's question to Khurtsidze, spoken in Russian, was a rhetorical question primarily for the benefit and intimidation of CS-2 and others in the Poker House.[4] Additionally, the Government expects that CS-1 will testify that Shulaya later displayed photographs of Chaganava's bloodied face to CS-1 and others after Shulaya had ceased using Chaganava as a courier for stolen and untaxed cigarettes received from CS-1.

- o On or about February 25, 2017, in connection with a dispute with Mikheil Toradze over the proceeds from the sale of cigarettes, Shulaya, in substance, admonished Toradze that he needed to obey Shulaya's command lest what happened to Chaganava—the beating—happen to Toradze.

- o In or about 2016, a witness to be called at the June 4 trial ("Witness-1") was owed a sum of money by the owner and manager of an illegal gambling establishment in Brooklyn ("Owner-1"). Witness-1 was discussing this debt while at a poker game controlled by Shulaya. An associate of Shulaya overheard this complaint and brought Witness-1 to a room adjacent to the area where Witness-1 had been playing poker. At that point, Khurtsidze approached Witness-1 and instructed Witness-1 to enter a room in which Shulaya was seated, but that Witness-1 should keep his hands behind his back at all times while addressing Shulaya. Witness-1 complied and explained the debt owed to Witness-1 by Owner-1. Shulaya and Witness-1 then went with Witness-1 to the gambling parlor controlled by Owner-1. Shulaya

---

[4] The Government expects to offer medical records and statements by Chaganava reflecting that Chaganava visited a physician shortly after this assault, complaining that he had lost vision for two days and continued to have difficulty with his vision as of March 8, 2016.

    instructed Owner-1 to repay Witness-1 immediately, and Owner-1 complied within days of that order. Witness-1 offered to pay Shulaya a portion of the debt that Shulaya assisted in collecting, but Shulaya declined payment, stating that he had granted Witness-1 a "favor" as a fellow Georgian. Witness-1 later acted as a dealer for Shulaya at the Poker House, and participated in a scheme to cheat gamblers at the Poker House for the benefit of Shulaya and Dzhanashvili.

- On or about January 18, 2017, during an intercepted call between Shulaya and Khurtsidze, the two men discuss whether to find and confront Nazo Gaprindashvili as a result of an unspecified dispute. In the course of the conversation, both Shulaya and Khurtsidze discuss "fucking" Gaprindashvili, a reference to physical, and perhaps sexual, violence against her. Furthermore, Shulaya refers to a prior incident in which Khurtsidze threatened to break the legs of another individual, and Khurtsidze confirmed that he was ready to commit acts of violence at Shulaya's direction ("I already told you once and I got it." "[I]t does not make any difference whether she made you mad or me mad.").

- On or about April 26, 2017, Shulaya ordered CS-2 to drive another individual ("CC-2") to the vicinity of Edgewater, New Jersey (where Shulaya's apartment was located at that time). Upon arriving, Shulaya berated and verbally intimidated CC-2 (including through references to Shulaya's use of violence) in connection with an attempt to ensure that CC-2 would provide tribute to Shulaya from CC-2's criminal activities taking place in the New York area. Shulaya further criticized CC-2 for failing to provide tribute to another criminal authority based in Los Angeles (the "LA Associate"), with whom Shulaya had recently met during a trip to Los Angeles with Makashvili, Dzhanashvili, and others. The Government will further present evidence – including video surveillance – of Shulaya, Makashvili, and Dzhanashvili, among others, meeting with the LA Associate. In connection with this meeting, the Government anticipates presenting evidence of a cross-country trip by Shulaya and Makashvili, during which the two discussed (over intercepted calls), among other things, narcotics and their efforts to avoid alerting law enforcement to their presence (specifically in connection with an episode during which the two had car troubles that might normally have required intervention by law enforcement).

• Shulaya received tributes and elaborate gifts from criminal underlings, apart from the proceeds provided to him by CS-1 and CS-2 (at the direction of the FBI) from their roles in the Shulaya Enterprise's gambling and stolen goods schemes, respectively. For example:

- In or about 2015, Shulaya accepted cash tribute payments from CS-2 as CS-2 was beginning to infiltrate the Shulaya Enterprise.

- In or about Spring 2015, CS-1 and a law enforcement officer posing as CS-1's boss ("UC-1") presented Shulaya with multiple cartons of cigarettes and a bottle of liquor.

- o  On or about August 9, 2015, CS-2 provided Shulaya with a bottle of Grey Goose vodka and a case of cigarettes.

- o  On or about October 16, 2015, CS-1 provided Shulaya with 6 bottles of Grey Goose vodka and 30 cartons of cigarettes.

- o  In or about February 2016, Shulaya received a crossbow from CC-1, as described above.

- o  In or about February 2016, Shulaya received a Mercedes sedan as a gift.

- o  On or about October 15 through 17, 2016, Shulaya, Zurab Dzhanashvili, Yuriy Lerner, CS-2, were together in Atlantic City, New Jersey. During that time, Shulaya and Dzhanashvili pressured various debtors to the Shulaya Enterprise's Poker House to make payments on their debts (including debts owed by Lerner). After an elaborate meal (toward the cost of which Shulaya did not contribute), Dzhanashvili and Lerner discussed paying for a prostitute on Shulaya's behalf.

- o  On or about January 6, 2017, Shulaya, Azer Arslanouk, and CS-2 met in New Jersey to discuss, among other things, Shulaya's intention to invest with Arslanouk in various afterhours clubs at which Arslanouk hosted the sale of narcotics. Arslanouk also brokered the protection of a brothel (run by friends of Arslanouk) by Shulaya, in exchange for, among other things, Shulaya's access to that brothel.

**2. The Shulaya Enterprise's Gambling Operation and Related Extortions and Violence**

- Beginning in or about late 2015 and early 2016, Shulaya, Dzhanashvili, two uncharged associates, and others, consulted with CS-2 regarding the establishment of an illegal gambling parlor in a space above a restaurant in Brighton Beach, Brooklyn. (That space became the Poker House.) At various times, Shulaya and others, including Gaprindashvili, threatened the owners of a restaurant located on the same premises in order to secure catering services for the Poker House and, at one point, in an effort to obtain an approximately $100,000 payment from those victims. The meals also offered an opportunity for Shulaya to display his generosity and wealth to others, as he would invite associates and business partners to dine with him for free.

- The Government expects to offer documents reflecting the winnings, losses, profits, and expenses associated with multiple games hosted at the Poker House. Proceeds from those games were paid by CS-2 and others to Shulaya.

- The Poker House had a digital video surveillance system installed in many of the rooms. (excluding the office, where Shulaya and Khurtsidze assaulted Chaganava, and where Shulaya temporarily stored a slot machine used in the casino scheme described in more detail below). The Government expects to offer multiple recordings obtained by CS-2 through that digital surveillance system (to which CS-2 had remote access, granted by Shulaya, during the course of the racketeering conspiracy). That surveillance depicts,

among other things, Khurtsidze's presence at the Poker House, as well as the July 25, 2016, assault of CS-2 by Khurtsidze and Shulaya in connection with a particularly lucrative and long-running game at which CS-2, Witness-1, Dzhanashvili, and others were present. After the incident, Shulaya arranged for the master copy of the surveillance recording to be erased for the time period covering the assault.

- CS-2 and others will describe a crime within a crime at the Poker House, namely a scheme devised by Shulaya, Dzhanashvili, and others to cheat players at the Poker House using an elaborate system of card counting. Proceeds from this cheating scheme were shared between Shulaya and Dzhanashvili, who expressly received Shulaya's blessing to cheat the players at the Shulaya Poker House.

- Following the assault of CS-2 by Khurtsidze and Shulaya on July 25, 2016, CS-2's role changed in connection with his participation in the operation of the Poker House. Rather than host games, CS-2 was tasked, along with Khurtsidze and Akaki Ubilava, with extorting debtors to the Shulaya Enterprise's Poker House. CS-2 collected payments for Shulaya, or was present for others' attempts to extort repayment, on several occasions. These included:

    o On or about September 1, 2016, Khurtsidze, Ubilava, and CS-2, acting at Shulaya's direction, confronted a particular debtor to the Shulaya Enterprise's Poker House ("Debtor-1") at a sidewalk café in Brooklyn. During this meeting, which was recorded using an audio recording device worn by CS-2, Khurtsidze threatened Debtor-1 regarding the debt owed to the Shulaya Enterprise. At the conclusion of this shakedown, Debtor-1 provided CS-2 with over $1,000 in cash, which CS-2 gave to Khurtsidze for onward delivery to Shulaya.

    o On or about September 7, 2016, Khurtsidze again accompanied CS-2 for a meeting with Debtor-1, during which Khurtsidze threatened Debtor-1 unless Debtor-1 repaid the Shulaya Enterprise for Debtor-1's gambling debt.

    o On or about October 15, 2016, during the trip to Atlantic City, described above, Shulaya and Dzhanashvili, in the presence of CS-2, confronted another debtor to the Shulaya Enterprise's Poker House ("Debtor-2"), and together pressured Debtor-2 to make a timely repayment of his debt to the Poker House. Debtor-2 later provided an approximately $3,000 necklace to Shulaya as partial repayment of Debtor-2's outstanding debt.

- On or about September 7, 2016, inside the Poker House, Khurtsidze twice struck Artur Vinokurov's associate, once in the face and once in the abdomen (causing Vinokurov's associate to crumple to the floor).

- On or about November 9, 2016, several individuals associated with another illegal gambling establishment were arrested in connection with that activity. Because those individuals had occasionally rented space from the Poker House for their activities, Shulaya expressed to CS-2 serious concerns about the continued operation of the Poker House

following those arrests. During a series of calls and meetings, Shulaya instructed CS-2 to retrieve and destroy the Poker House's video surveillance system and to dispose of the gambling equipment found inside the Poker House. Although Shulaya and CS-2 continued to discuss repayments of debts from the Poker House, following this incident the Poker House activities effectively ceased.

- The Government will present evidence of another violent scheme orchestrated by members of the Shulaya Enterprise, and in particular by principal lieutenant Dzhanashvili. Witness-1 and others will testify regarding their participation in a scheme devised by Dzhanashvili to use a female co-conspirator to seduce, assault, and extort two men whom Dzhanashvili believed to be wealthy.

### 3. The Shulaya Enterprise's Attempts to Invest in Illegal Afterhours Clubs

- In addition to the Poker House, Shulaya attempted to expand the Enterprise's operations through investment in various after-hours clubs located, or planned for opening in, Brooklyn, Manhattan, and New Jersey. The Downhouse was a Brooklyn-based restaurant at which large after-hours parties were organized by Azer Arslanouk. Arslanouk's operation included the sale of narcotics inside the Downhouse by various dealers, which he protected through the payment of bribes to local law enforcement officers. Shulaya attempted to purchase the Downhouse in order to profit from Arslanouk's after-hours party, but Arslanouk's operations at the Downhouse ceased before Shulaya could obtain the club. Thereafter, however, Shulaya and Arslanouk continued to plan investments in similar clubs and after-hours parties in Brooklyn and Manhattan. It was during one such discussion that Arslanouk brokered Shulaya's protection of a brothel, as described above.

### 4. The Shulaya Enterprise's Receipt and Sale of Stolen Property

- The first of the Shulaya Enterprise's stolen good schemes involved the receipt and resale of purportedly stolen jewelry, provided by CS-1 and represented to have been obtained from victims at hotels in Atlantic City. In his initial meetings with Shulaya and Chaganava, among others, CS-1 offered to obtain such stolen goods for provision to, and resale by, the Shulaya Enterprise. In return, Shulaya offered to provide CS-1 with counterfeit gold jewelry for fraudulent resale.

- The second stolen goods scheme was the Shulaya Enterprise's receipt and resale of a massive quantity of purportedly stolen and untaxed cigarettes. Beginning in or about April 2015, CS-1 (at the direction of the FBI) began selling the Shulaya Enterprise cases of cigarettes purportedly stolen from out-of-state distributors. For approximately four months, Shulaya conducted these deals using Chaganava as CS-1's point of contact (although Shulaya and Dzhanashvili personally participated in certain pick-ups and payments). After Chaganava accrued a debt to CS-1 from underpayment and failure to pay tributes, Shulaya used a series of other Enterprise members and associates to conduct these transactions, including Artur Vinokurov, Mikheil Toradze, Avtandil Kanadashvili, and Hamlet Uglava. In total, the Enterprise trafficked in approximately 509 cases of cigarettes, representing

- approximately 6,000,000 individual cigarettes and $2,097,102 in intended federal, state, and local tax loss.

- As one example of the interconnected nature of the Enterprise's operations, on one occasion CS-2 received a gambling debt repayment from Debtor-2, which CS-2 provided to Shulaya in a distinctive plastic bag. Later on the same day, Shulaya personally paid CS-1 for purportedly stolen cigarettes with cash contained in the same distinctive plastic bag.

- A third stolen good scheme involved the diversion of cargo shipments by members of the Shulaya Enterprise (principally Dzhanashvili, Zurab Buziashvili, Vache Hovhannisyan, and others) using false names and identification documents. Although Shulaya did not participate directly in the orchestration of this scheme, and it will not be a focus of the trial proof, Shulaya ultimately agreed to accept a tribute payment from a confidential source ("CS-3") representing CS-3's "proceeds" from the stolen cargo scheme orchestrated by Dzhanashvili and others.

**5. The Casino Scheme**

- CS-1 will testify that his business relationship with Shulaya and the Shulaya Enterprise was intended to be reciprocal, that is, that Shulaya would offer CS-1 business opportunities just as CS-1 offered Shulaya the opportunity to purchase and resell stolen cigarettes. To that end, in or about August 2015, Shulaya began preliminary discussions with CS-1 about a scheme to defraud casinos using an electronic device and software that could determine when particular electronic "slot" machines were programmed to pay out. Discussions of this scheme, and the means and necessary equipment for its accomplishment, continued between Shulaya and CS-1 throughout much of 2016. These discussions included Shulaya's discussion of a group of individuals who had been arrested for conducting the same casino scam in Singapore, and a separate group that had been arrested and prosecuted for the same scam in Missouri.

- The Government expects that a witness with personal knowledge of the Shulaya Enterprise's casino scam will explain the technical means by which the scam was completed. In brief, this witness is expected to testify that the casino scheme relies on successfully reading the binary (ones and zeros) code on which a particular model of slot machine is based. Using software loaded on two laptop computers belonging to Shulaya (both of which were seized during a search of Shulaya's New Jersey apartment), that code can be used to determine the precise moments that any particular slot machine of that model will make a payment upon a "bet." The technical steps to accomplish that cheat are many. First, the scammers must input the symbols (*e.g.*, cherry, treasure chest, pelican, etc.) that appear on a particular slot machine into a program designed to use that visual information to analyze that particular machine's "place" in the life of the code that controls when the machine will be ready to pay. Using those initial inputs, the scammers can make a relatively rough approximation of the machine's internal code as of the moment that the symbols

were recorded.[5] Armed with that "rough" mirror of a particular machine, the scammers then return to the targeted machine and again provide up-to-the-second information about the visual appearance of the machine, recording particular symbols in real time. Using a different program, the scammers calibrate the "rough" program until they have a near-exact digital replica of the targeted machine. A final program is able to predict, based on its reading of the machine's code, the moment that a given machine is programmed to make a payment upon a bet. A conspirator sitting at the targeted machine either feels a vibration on a cellular device used for that purpose, or receives an auditory signal, indicating that he or she should place a bet. If successfully calibrated, the programs remove all semblance of chance from the "bet," and the player will consistently win.

- The Shulaya Enterprise purchased server space through Amazon's cloud services for use in processing the large amount of data required to run the scam. Later, the Enterprise purchased physical servers, which it attempted to send to a server "farm" in Russia for the purpose of running the scheme. Finally, the Enterprise rented server space from a server "farm" in Russia, which allowed the Enterprise to harness its vast processing power to quickly render "mirrors" of the targeted machines.

- The Government expects that a witness with personal knowledge of the casino scheme will further testify that Shulaya explained the following regarding the origin of the casino scheme:

    o Shulaya had originally obtained certain "seed" files—the roughly calibrated versions of particular targeted slot machines—from a coder whom Shulaya had encountered in Atlantic City in or about 2012 or 2013. Shulaya claimed to have kidnapped that person and extorted him to obtain those seed files.[6]

    o Shulaya had code for European model of slot machine, for which he had previously worked the casino scheme.[7]

    o Shulaya would use his daughter as a "mule" to transport servers to and from Russia during her trips to the United States.

- On or about September 1, 2016, Shulaya, Khurtsidze, and others arranged for the receipt of a "Pelican Pete" slot machine for use in demonstrating the effectiveness of the casino

---

[5] This step requires a conspirator to be physically present in a victim casino and visually observing a target machine. On multiple occasions, members of the Enterprise, including Shulaya himself, Evgheni Melman, Diego Gabisonia, and others, participated in collecting this visual data.

[6] Certain "seed" files dating to this time period were stored on electronic media seized from Shulaya's apartment, consistent with this information.

[7] CS-1 is expected to testify that Shulaya had claimed to have successfully run the casino scheme in Europe for significant revenue. For example, on or about January 12, 2017, Shulaya informed CS-1, in substance and in part, that Shulaya had successfully run the casino scheme in Moscow for a profit of over $1,000,000.

scheme, as described to CS-1.[8] Thereafter, on or about September 22, 2016, Shulaya brought CS-1 to the Poker House (still in operation at that point), where the Pelican Pete machine had been set up in the camera-free office, for a demonstration of the casino scheme.[9]

- On or about December 22, 2016, Shulaya and co-defendant Evgheni Melman accompanied CS-1 to a warehouse in New Jersey where Shulaya and Melman attempted to demonstrate the casino scheme to CS-1 using a sample slot machine.

- On or about January 17, 2017, Melman, at Shulaya's direction and while in frequent (intercepted) telephone contact with Shulaya, traveled to casinos outside of New York for the purpose of locating vulnerable electronic slot machines to advance the casino scheme.

- On or about January 25, 2017, Shulaya instructed CS-1 to meet Shulaya in the vicinity of a particular tire shop in Brooklyn, and to bring the sample slot machine that had been previously returned to CS-1. When CS-1 arrived at the tire shop, Shulaya transported the machine inside the tire shop. On January 27, 2017, CS-1 again met Shulaya at the tire shop. Inside, Shulaya, Khurtsidze, and Melman attempted to demonstrate the operation of the casino scheme, while Makashvili and others waited in the adjacent room. The group could not make the sample machine pay out, and Shulaya and CS-1 left the tire shop as Makashvili entered the room with the sample slot machine.

- In or about March 2017, Shulaya offered CS-1 an interest in the casino scheme in exchange for 100 cases of contraband cigarettes.

- On or about April 7, 2017, Hamlet Uglava drove Diego Gabisonia to casinos in the Philadelphia area, where Gabisonia met with CS-1. Gabisonia then successfully demonstrated the casino scheme to CS-1 on two occasions, while Shulaya and Melman provided support and necessary information regarding the timing of bets from Shulaya's apartment in New Jersey.

- In May 2017, Shulaya, Makashvili, and Melman delivered equipment, including electronic devices, to CS-1 for the purpose of providing CS-1 with the means by which to personally engage in the casino scheme.

---

[8] Throughout the course of testimony regarding the casino scheme, the Government expects that witnesses will make reference to "Pelicans," "Buffalo," "Miss Kitty," and "Lions." Each term is in reference to particular versions of the targeted slot machines, all of which run the same basic software but use different visual images.

[9] CS-2, who had access to the surveillance system at the Poker House, provided the FBI with footage depicting CS-1 and Shulaya inside the Poker House entering the Poker House office on September 22, 2016. Although CS-2 is unaware of the casino scheme, the identity of CS-1, or the purpose of CS-1's visit to the Poker House, he will nevertheless testify regarding the accuracy of the surveillance depicting CS-1's visit to the Poker House on September 22, 2016.

- Also in May 2017, Shulaya, in Las Vegas, spoke with Melman, in New York and New Jersey, regarding the use of iPads and other equipment to run the casino scheme while Shulaya was in Las Vegas.

- The Government expects that a witness with personal knowledge of the slot machine scheme will testify that, in purchasing servers and server space for the conduct of the slot machine, such servers were purchased using false identities and stolen credit card information. In discussing that manner of purchasing server space, Shulaya further described his control of a group of individuals engaged in credit card theft and the creation of credit card accounts using stolen identities, as well as his purchase of other items using stolen banking and credit card information.

**5. The Shulaya Enterprise's Use of Stolen and False Personal and Banking Information**

- In order to finance its operations and Shulaya's lavish lifestyle, the Shulaya Enterprise utilized stolen personal and banking information, and created shell companies for use in laundering criminally derived proceeds.

- Tropport LLC is a money laundering vehicle set up by Shulaya and Enterprise member Nazo Gaprindashvili. One Wells Fargo Tropport bank account, in particular, was largely funded through transfers of stolen funds obtained from Gaprindashvili's employer's bank account.

- Nazo Gaprindashvili, using funds stolen from her employer, paid and attempted to pay for Khurtsidze's retention of counsel in connection with his defense in this case. In particular, on or about July 18, 2017, Gaprindashvili provided a check from her personal bank account, made payable to Vangorodska, P.C., Khurtsidze's retained counsel, in the amount of $5,000. After that check "bounced," Gaprindashvili made payment to Khurtsidze's counsel through the theft of funds from her former employer's bank account.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: ___/s/_____
Andrew C. Adams
Andrew Thomas
Assistant United States Attorneys
(212) 637-2340 / -2106