I64sSHU1

```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
             v.                         17 Cr. 350 (KBF)
4
   RAZHDEN SHULAYA
5  a/k/a "Brother,"
   a/k/a "Roma," and
6  AVTANDIL KHURTSIDZE,
   a/k/a "The Kickboxer,"
7
                 Defendants.
8  ------------------------------x
                                        New York, N.Y.
9                                       June 4, 2018
                                        9:00 a.m.
10 Before:
                 HON. KATHERINE B. FORREST,
11                                      District Judge

12                         APPEARANCES

13 GEOFFREY S. BERMAN
       United States Attorney for the
14     Southern District of New York
   ANDREW C. ADAMS
15 ANDREW M. THOMAS
       Assistant United States Attorneys
16
   ANTHONY CECUTTI
17 JENNIFER R. LOUIS-JEUNE
       Attorneys for Defendant Shulaya
18
   KREINDLER & KREINDLER
19     Attorneys for Defendant Khurtsidze
   BY:  MEGAN W. BENETT
20     -and-
   ZEMAN & WOMBLE
21 BY:  KEN WOMBLE

22 Also Present:
   Yana Agoureev, Interpreter (Russian)
23 Melly Alishaev, Interpreter (Russian)
   Maya Beridze, Interpreter (Georgian)
24 Lasha T. Gegechkori, Interpreter (Georgian)
   Rose Corrado, Paralegal Specialist
25 Special Agent Robert Hanratty, FBI
   Special Agent Nashawn Richards, FBI
```

1            (Case called)

2            MR. ADAMS:  Good morning, your Honor.  Andrew Adams

3    and Andrew Thomas for the government.  With us at counsel table

4    is paralegal specialist Rose Corrado, FBI Special Agent Rob

5    Hanratty, and Special Agent Nashawn Richards.

6            THE COURT:  Good morning, all of you.

7            MR. CECUTTI:  Good morning, your Honor.  Anthony

8    Cecutti and Jennifer Louis-Jeune for Rhazhden Shulaya, seated

9    to her left.

10           THE COURT:  Good morning, all of you.

11           MS. BENETT:  Good morning, your Honor.  Megan Benett

12   with Ken Womble for client Avtandil Khurtsidze, seated to our

13   left.

14           THE COURT:  Good morning, all of you.

15           All right, folks.  We are here to begin jury

16   selection.  A couple of things in that regard.  You received

17   the order on May 30 with a list of individuals who will be part

18   of wave one.

19           I guess they are currently gathering in the hallway.

20           They are on the 26th floor.  They are currently

21   gathering in another room.  As soon as we have them here, the

22   way it works, there will be somebody up there.

23           Do you have a CSO?

24           THE DEPUTY CLERK:  Yes.

25           THE COURT:  We figure out if people have shown up who

1     are supposed to show up, wait a couple extra minutes, see if

2     the other people show up, then we will have them come down here

3     and begin then the more traditional, if you will, voir dire.

4             I don't typically hand out my voir dire, but I got a

5     request for it this morning.  We gave one to each defendant I

6     think.

7             Did we give one?  We will print another one.

8     Mr. Cecutti or Ms. Benett, somebody has got it.  Mr. Womble.

9             MR. WOMBLE:  We have it.

10            THE COURT:  We'll give you a copy of it.  There is

11    nothing really particularly earth-shattering about it.  You'll

12    notice that there is a description of the case.  It is all

13    singular.  Of course it is plural.  That is the kind of thing

14    that I would change, I would make formally as I go.

15            I don't typically docket the voir dire, if you will,

16    because it is part of the transcript, and it is clear what I am

17    asking the document you have wasn't scoured for every possible

18    typo.

19            We do have some wave two people.  We'll see if we have

20    to get to them.  It would be unfortunate.  They both had

21    issues, if you will, that were unclear how deep the issues go.

22    We also would be in the process where we are sort of starting

23    over again.  With those folks, if we end up getting there, we

24    will take it step by step.

25            Let's talk about a couple things in terms of how the

```
 1    day will go.  We will pick 14 total, 12 and two alternates, in

 2    the way in which I had described to you, and then have you

 3    folks -- in terms of the government, first, have you thought

 4    about the duration of your opening, just so I can get a sense

 5    of it?  I think it was 20 minutes what you were thinking of

 6    before.

 7              MR. ADAMS:  It is still about that long.

 8              THE COURT:  All right.  Mr. Cecutti?

 9              MR. CECUTTI:  I think we are at about 20 minutes,

10    your Honor.

11              THE COURT:  Ms. Benett?

12              MS. BENETT:  Under five minutes, your Honor.

13              THE COURT:  It will be about then.  What we are

14    thinking, which was if we get a jury relatively timely, then we

15    will begin witnesses.

16              Then let's go to the witnesses, the government's

17    witness list.  I have one that is dated 6/4/2018 at the top

18    right.

19              Is this alphabetical only or bear any relationship to

20    how they are going to be called?

21              MR. ADAMS:  It is alphabetical.  We have spoken with

22    defense counsel already about the early order of witnesses.  We

23    anticipate that the first person to be called today will be

24    Mr. Nektalov.

25              THE COURT:  OK.  Mr. N-e-k-t-a-l-o-v?
```

1          MR. ADAMS:  Correct.  Followed by John Penza.

2          THE COURT:  All right.

3          MR. ADAMS:  If we still have time in the day, we would

4     call Agent Prendergast, followed by Agent Callahan.

5          THE COURT:  Prendergast, followed by agent?

6          MR. ADAMS:  Callahan.

7          THE COURT:  Whoever you don't get to today, I think it

8     is unlikely you'll get to all of these folks today will they be

9     first up tomorrow or will you rejigger them for testimony?

10          MR. ADAMS:  With one exception.  There is a

11     representative from Harrah's Casino coming up.  His last name

12     is Michelle.  I think we are still debating pronunciation.  She

13     needs to good on tomorrow.  We would try to slot her in early

14     in the day to make sure she gets up.

15          Then we would pick up with Prendergast, Callahan,

16     Brian Greenlaw.  Then I imagine that will be take up the bulk

17     of tomorrow.

18          THE COURT:  All right.  Greenlaw and then Hanratty.

19          That's terrific.  I have a sense as to how things are

20     going to be proceeding.

21          Do you folks have any items that you would like to

22     raise right now before we get going?

23          Mr. Cecutti?

24          MR. CECUTTI:  Your Honor, I have a couple of

25     applications.  The first one is an application for realtime.

1          THE COURT:  Yes.  Granted.

2          MR. CECUTTI:  Thank you.

3          THE COURT:  Ms. Benett made a written application.

4    I granted that over the weekend.  I think it is useful for

5    everyone to be operating with the same mount.

6          MR. CECUTTI:  The second application is for a daily

7    transcript.  I was going to speak with the court reporters.

8          THE COURT:  Yes.  The answer is yes, you can have

9    daily transcript.

10         MR. CECUTTI:  An issue I wanted to raise this morning

11   is with respect to Mr. Shulaya's legal materials and glasses.

12   He was transferred from the MDC to the MCC.  His materials and

13   glasses were not accompanied with him.

14         THE COURT:  Are these government-issued glasses?

15         MR. CECUTTI:  No.  They're his own glasses, glasses

16   that he had had at the MDC.

17         THE COURT:  I'm trying to figure out how easy it would

18   be to have somebody go and replace them during the day.  If

19   they are government-issued glasses, sometimes they are

20   accessible right away through an alternative set while we are

21   waiting for his glasses to arrive.  If they are prescription

22   glasses that were brought in from the outside, then that's

23   something else.

24         MR. CECUTTI:  I understand that that is a

25   complication.  What is still confusing to me is he had his

1    legal materials and he had his glasses at the MDC.  Reasonably,

2    they should have been brought with him and he still doesn't

3    have them.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I64BSHU2

1              THE COURT:  Did the transfer occur?  When did it

2      occur?

3              MR. CECUTTI:  I believe it occurred Friday morning.

4              THE COURT:  It's probably not that unusual.  Sometimes

5      for the possession, it take a couple of days.  I don't know

6      what experience you have had.  So if it's Friday, I would

7      assume they would be back today sometime, hopefully, or

8      tomorrow.

9              But the glasses, what is your view as to how we want

10     to proceed about the glasses?

11             MR. CECUTTI:  I don't know much more than what I can

12     do in terms of informing the Court that he doesn't have his

13     glasses.  I've informed the government.

14             THE COURT:  Tell me what his prescription is, because

15     I want to understand how much of an issue.  He's been in the

16     courtroom before with and without glasses on different

17     occasions.  I don't know the extent to which he has an issue in

18     terms of reading documents.  Can we get him a magnifying glass

19     to be able to use in the meantime, a pair of reading glasses to

20     get him in the meantime, or is there some other issue?

21             MR. CECUTTI:  We'll get that information now, but I

22     think the more pressing issue is the legal materials.  He and

23     Mr. Khurtsidze, after the pretrial conference, were transferred

24     to the SHU.  That would have been last Friday.  I believe that

25     was as a result of their upcoming transfer to the MCC.

I64BSHU2

1  Mr. Shulaya's legal materials were taken from him at that

2  point.  So he has been without his legal materials for over a

3  week.  And when I found out about this, I informed the

4  government.

5          THE COURT:  When did you find out about this?

6          MR. CECUTTI:  Last Friday when he was transferred,

7  informed the government.  I trust the government is doing what

8  they can to try and facilitate the transfer of those materials

9  to Mr. Shulaya.  I understand that they have contacted both the

10 MDC and MCC and may have done so again this morning to

11 effectuate that transfer, but he doesn't still have those

12 materials.  He needs those materials.  So that's the more

13 pressing issue.

14         THE COURT:  A couple of things.  I'd like to get a

15 report from the government on the status of any inquiries

16 they've made.  Secondly, do you have any sense as to what the

17 materials are?  Can they be recreated in terms of additional

18 set?

19         MR. CECUTTI:  Not really.  Most of them are his notes

20 along with materials that we have provided him, discovery

21 materials.

22         THE COURT:  I'm just wondering in terms of discovery

23 materials if there's a particular set or grouping of them, we

24 can get those recopied and get them to him right away.  I

25 understand in terms of his notes, he needs those.  I'm not

I64BSHU2

1    suggesting in any event we're not going to try to find them,

2    but I want to make sure we have a workaround.

3            MR. CECUTTI:  It's mainly his notes.  Certainly we can

4    replace any discovery materials.  That's not a big issue, but

5    he's taken a lot of notes in preparation for the trial.  His

6    discovery materials have notes written on them, at least he

7    doesn't have them.  So we need those.  Again, I trust the

8    government is working to try and make that happen.

9            With respect to his glasses, one moment, your Honor.

10           THE COURT:  Yes.  While you're doing that, let me hear

11   from the government as to what the inquires are that have been

12   made to locate Mr. Shulaya's eyeglasses and his legal

13   materials.

14           MR. ADAMS:  Certainly, your Honor.  On Friday, as

15   Mr. Cecutti said, we received a request from Mr. Cecutti that

16   we tried to effectuate the transfer.  I forwarded that email as

17   soon as I got it to counsel at the MCC and MDC and followed up

18   again this morning.

19           Counsel for the MDC has written me back this morning.

20   He's looking into what the MDC has done on their end to make

21   the transfer happen.  He's also informed me that we should

22   reach out to the marshals as well, which I will do as soon as I

23   sit down.

24           With respect to the glasses, I hadn't appreciated that

25   that was part of the issue, but I just sent an email to the MDC

I64BSHU2

```
 1    alerting them to the need of the glasses as well.  I imagine
 2    where there is one, there will be the other and Mr. Borek at
 3    the MDC has already responded that he's looking into it.
 4            THE COURT:  Here is what I would suggest.  Let's
 5    elevate the conversation with the marshals and with the MDC and
 6    MCC to one that is urgent and tell them that the judge needs
 7    these things to be located right away.  And if they have a
 8    prescription on file for Mr. Shulaya's glasses, presumably it's
 9    in the system and we can get a set of glasses run over from the
10    MCC that will correspond to that prescription right away.
11            I've got clerks.  I'll make my staff available to run
12    over to the MCC.  Presumably the U.S. Attorney's office has got
13    people who can run over to the MCC, but let's see whether or
14    not we can eliminate this as an issue and not have it be
15    something that becomes something it should not be.  So we'll do
16    that.
17            Luckily, what we're doing this morning is picking a
18    jury, where it is the oral answers to the questions that is
19    most important and also there are no written materials that for
20    purposes of this morning's session are of any particular that
21    would help anybody.  Picking a jury is uniquely something that
22    is tough to prepare for.
23            So let's go ahead and see what we can do in that
24    regard.
25            Anything else, Mr. Cecutti, from your perspective?
```

I64BSHU2

| | |
|---|---|
| 1 | MR. CECUTTI:  No, your Honor.  Thank you. |
| 2 | THE COURT:  Ms. Benett and Mr. Womble. |
| 3 | MS. BENETT:  We join the application for the daily |
| 4 | transcripts. |
| 5 | THE COURT:  That is granted. |
| 6 | What we're going to do now, let's take a short break |
| 7 | until Joe tells us we've got our people.  We have to arraign |
| 8 | the defendants on the S9.  Thank you, Joe. |
| 9 | So there has been a superseding indictment that has |
| 10 | been prepared for purposes of this trial and so it is called |
| 11 | the S9.  It only has on the face of it Mr. Shulaya and |
| 12 | Mr. Khurtsidze.  So what I'm going to do now is arraign each of |
| 13 | the defendants on the superseding indictment. |
| 14 | Mr. Cecutti, do you have a copy? |
| 15 | MR. CECUTTI:  Yes.  Your Honor, just to be clear, this |
| 16 | was a superseding indictment that was filed on April 12 of |
| 17 | 2018? |
| 18 | THE COURT:  Yes.  This is not anything that is |
| 19 | particularly new.  It is the indictment we have been working |
| 20 | off of.  It was prepared for purposes of the group A trial, |
| 21 | simply to take off all of the other defendants and allow us to |
| 22 | proceed with something that can be eventually handed to the |
| 23 | jury if we so choose.  Nevertheless, we need to arraign the |
| 24 | defendants on it. |
| 25 | Mr. Womble or Ms. Benett, have you folks handed |

I64BSHU2

1   Mr. Khurtsidze a copy of the indictment?

2           MS. BENETT:  Your Honor, we have gone over it with him

3   previously.  He doesn't have a copy in front of him right now.

4           THE COURT:  You've gone through it with him.

5           MS. BENETT:  Yes.

6           THE COURT:  Let me just ask Mr. Shulaya and

7   Mr. Khurtsidze to please stand.

8           Mr. Shulaya, have you seen or had translated to you a

9   copy of the superseding indictment that contains the charges

10  against you on which you're now going to trial?

11          MR. SHULAYA:  Yes.

12          THE COURT:  I just need to have it translated.  OK.

13          MR. SHULAYA:  Yes.

14          THE COURT:  Mr. Khurtsidze, have you seen a copy of

15  the indictment or had it translated for you?

16          MR. KHURTSIDZE:  Yes, yes.

17          THE COURT:  Mr. Shulaya, do you understand that you

18  are charged in Count One with participating in a racketeering

19  conspiracy?

20          MR. SHULAYA:  I don't understand what it means and I

21  don't know what they charged me with.

22          THE COURT:  Here, I'm going to read it out loud.

23  We're going to read it out loud and have it translated for

24  Mr. Shulaya, the whole thing, so there's never any question as

25  to whether or not it's been fully translated for him.

I64BSHU2

1          MR. SHULAYA:  Maybe I did not express myself
2     correctly.  Whatever it says there, I understand, but I just
3     don't understand what it has to do with me.
4          THE COURT:  Oh, I see what you're saying.  So you
5     understand that the words on the page charge someone with a
6     crime.  You just don't believe you are the individual who's
7     been correctly charged with that crime, not in terms of
8     identity, but you don't believe you participated in these
9     crimes?
10          MR. SHULAYA:  I was never submitted with any materials
11     or facts.  There are some videos.
12          THE COURT:  OK.  So let me do this.  What I want to do
13     right now is very simple.  I have to just do a piece of
14     business, which is to make sure that you understand you have
15     been charged.  Whether or not you have defenses to it, do you
16     understand you've been charged with participating in a
17     racketeering conspiracy?
18          MR. SHULAYA:  Yes.
19          THE COURT:  And Mr. Khurtsidze, do you understand you
20     have been charged with participating in the same racketeering
21     conspiracy?
22          MR. KHURTSIDZE:  Yes.
23          THE COURT:  Would either of you like me to read to you
24     right now Count One, which is the racketeering conspiracy?  Do
25     you want me to read that out loud in open court?

I64BSHU2

1          Mr. Shulaya.

2          MR. SHULAYA:  I don't even know.

3          THE COURT:  Mr. Khurtsidze.

4          MR. KHURTSIDZE:  As you wish, your Honor.  As you

5    think is correct, your Honor.

6          THE COURT:  Wait.  One at a time.  This is very

7    formal.  Do you want me to read this out loud?  Yes or no?

8          MR. KHURTSIDZE:  If it has an importance to me, your

9    Honor, yes.

10          THE COURT:  I'm going to read it out loud.

11          "At all times relevant to this indictment, Razhden

12    Shulaya, a/k/a Brother, a/k/a Roma and Avtandil Khurtsidze,

13    a/k/a the Kickboxer, the defendants, and others known and

14    unknown were members and associates of the Shulaya enterprise.

15    The Shulaya enterprise was an organized criminal group

16    operating under the direction and protection of Shulaya, a *vor*

17    *v zakonei* or *vor*, which are Russian phrases translated as thief

18    in law or thief, and which refer to an order of elite criminals

19    from the from the former Soviet Union who received tribute from

20    other criminals, offer protection, and used their recognized

21    status as *vor* to adjudicate disputes among lower level

22    criminals.

23          As a *vor*, Shulaya had substantial influence in the

24    criminal underworld and offered assistance to and protection of

25    the members and associates of the Shulaya enterprise.  Those

I64BSHU2

members and associates and Shulaya himself engaged in

widespread criminal activities, including acts of violence,

extortion, the operation of illegal gambling businesses, fraud

on various casinos, identity theft, credit card frauds, and

trafficking in large quantities of stolen goods.

The Shulaya enterprise, including its leadership,

membership, and associates constituted an enterprise as that

term is defined in Title 18 United States Code, Section

1961(4).  That is, a group of X!X individuals associated, in

fact, although not a legal entity defined as the Enterprise.

This enterprise was engaged in and its activities affected

interstate and foreign commerce.

The Shulaya enterprise was an organized criminal group

based in New York City that operated in the Southern District

of New York and elsewhere and constituted an ongoing

organization whose members functioned as a continuing unit for

a common purpose of achieving the objectives of the enterprise.

The Shulaya enterprise operated through groups of individuals

often with overlapping members and associates dedicated to

particular criminal acts, tasks.

While many of these crews were based in New York City,

the Shulaya enterprise had operations in various locations

throughout the United States, including in New Jersey,

Pennsylvania, Florida, and abroad.  Most members and associates

of the Shulaya enterprise were born in the former Soviet Union,

I64BSHU2

and many maintained substantial ties in Georgia, the Ukraine, and the Russian Federation, including regular travel to those countries, communication with associates in those countries, and the transfer of criminal proceeds to individuals in those countries.

The Shulaya enterprise was principally led by Razhden Shulaya, a/k/a Brother, a/k/a Roma, the defendant, who coordinated and directed lower level members and associates of the Shulaya enterprise.  Razhden Shulaya, the defendant was at the center of the Shulaya enterprise and, as a *vor*, was entitled to tribute payments and other benefits provided by his loyal subordinates within or associated with the Shulaya enterprise.

Shulaya oversaw the following criminal activities, among others:  Illegal gambling activities; effort to extort those who owed debts to the Shulaya enterprise, gambling association, and others; trafficking contraband cigarettes and stolen merchandise; efforts to defraud casino through the use of electronic devices and software designed to predict the behavior of particular models of electronic slot machines; access device fraud and identity theft; narcotics trafficking; efforts to rob wealthy persons and the use of violence to maintain control over its criminal operations.

The purposes of the Shulaya enterprise included the following:  Enriching the members and associates of the Shulaya

I64BSHU2

enterprise through, among other things, the operation of

illegal gambling businesses; the extortion and control of

businesses, persons, and property, through threats of physical

and economic harm; robbery; the receipt, sale and

transportation of contraband cigarettes; the receipt, sale and

transportation of stolen goods; the use of counterfeit credit

cards and stolen personal identifying information; the use of

electronic devices and software designed to defraud casinos and

narcotics trafficking; preserving and protecting the power and

financial profits of the Shulaya enterprise through

intimidation, violence and threats of physical and economic

harm; promoting and enhancing the Shulaya enterprise and the

activities of its members and associates; and keeping the

victims and citizens in fear of the Shulaya enterprises and

associates by identifying the Shulaya enterprise, its members

and associates with Shulaya, the defendant, and his status as a

*vor*, causing and threatening economic harm and committing and

threatening to commit physical violence.

          Among the means and methods employed by the members

and associates in conducting and participating in the affairs

of the Shulaya enterprise were the following:  To protect and

expand the Shulaya enterprise's business and criminal

operations, members and associates of the Shulaya enterprise

conspired to threaten, assault, intimidate persons who engaged

in activity that jeopardized the power and criminal activities

I64BSHU2

of the Shulaya enterprise, the power of the leaders of the
Shulaya enterprise, and the flow of criminal proceeds to the
Shulaya enterprise.

Members and associates of the Shulaya enterprise
generated income for the enterprise through, among other
things, the operation of illegal gambling businesses; the
extortion and control of businesses, persons, and property
through threats of physical and economic harm; robbery; the
receipt, sale, and transportation of contraband cigarettes; the
receipt, sale, and transportation of stolen goods; the use of
counterfeit credit cards and stolen personal identifying
information; the use of electronic devices and software
designed to defraud casinos and narcotics trafficking.

Members and associates of the enterprise at times
engaged in criminal conduct and coordinated their criminal
activities with leaders, members, and associates of other
criminal associations.  Members and associates of the Shulaya
enterprise used various techniques to avoid law enforcement
scrutiny of the Shulaya enterprise's unlawful criminal
activities.

Members and associates of the Shulaya enterprise
typically used coded language to make arrangements for meetings
and to refer to other members and associates of the Shulaya
enterprise and took over steps to frustrate law enforcement
efforts to overhear their conversations and discussions.

I64BSHU2

1            Members and associates of the Shulaya enterprise also

2       engaged in other evasive conduct, such as the use of particular

3       cellular telephones for the discussions of particular criminal

4       activities; the use of encrypted communications applications

5       and devices when discussing criminal activities in an effort to

6       thwart potential law enforcement eavesdropping, and the owe

7       omission of names about whom they were speaking.

8            Members and associates of the Shulaya enterprise also

9       attempted to thwart potential law enforcement eavesdropping by

10      engaging in in-person meetings to discuss criminal activities

11      and by stating that certain conversations should be conducted

12      in person and not by telephone.

13           From at least in or about 2014, up to and including

14      the date of the indictment in the Southern District of New York

15      and elsewhere, Shulaya and Khurtsidze, the defendants and

16      others known and unknown, being persons employed by and

17      associated with the enterprise described above, namely, the

18      Shulaya enterprise, which was engaged in in the activities of

19      which affected interstate and foreign commerce, willfully and

20      knowingly combined, conspired, confederated, and agreed

21      together and with each other to violate the racketeering laws

22      of the United States; that is, to conduct and participate

23      directly and indirectly in the conduct and affairs of the

24      Shulaya enterprise through a pattern of racketeering activity,

25      as that term is defined in Title 18, U.S.C., Section 1961, (1)

I64BSHU2

1    and (5).

2          Consisting of multiple acts and threats involving

3    extortion in violation of New York State penal law, acts

4    involving robbery in violation of New Jersey Code of criminal

5    justice; acts indictable under the United States Code, Section

6    1951 relating to extortion; acts involving gambling in

7    violation of New York penal law; acts indictable under the

8    United States Code relating to the prohibition of illegal

9    gambling businesses; acts indictable under the United States

10   Code relating to wire fraud; acts indictable under the United

11   States Code relating to interstate transportation of stolen

12   property; acts indictable under the United States Code relating

13   to interstate receipt and possession of stolen property; acts

14   indictable under the United States Code relating to shipping,

15   transporting, receiving, possessing, selling, distributing, and

16   purchasing contraband cigarettes; acts indictable under the

17   United States Code related to fraud and related activity in

18   connection with identification documents; acts indictable under

19   the United States Code relating to access device fraud; and

20   offenses involving the felonious trafficking of contraband

21   substances, controlled substances, including narcotics

22   trafficking, and the use of wire facilities to further narcotic

23   trafficking.

24          It was a part of the conspiracy that each defendant

25   agreed that a conspirator would commit at least two acts of

I64BSHU2

racketeering in the conduct and affairs of the enterprise.

In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts among others were committed in the Southern District of New York and elsewhere.

On or about December 11, 2014, Shulaya in Manhattan, New York negotiated the sale of stolen jewelry to a confidential source working in the direction of the FBI.

On or about March 23, 2015, in Atlantic City, New Jersey, Shulaya negotiated for the purchase and, in fact, received cigarettes that Shulaya understood to have been stolen from a facility in another state.

On or about May 9, 2015, a coconspirator not named herein, at Shulaya's direction, received in the vicinity of Avenue X in Brooklyn, New York, four cases of purportedly stolen cigarettes from CS 1, to whom CC-1 provided approximately $9,440 in payment for purportedly stolen cigarettes.

On or about August 9, 2015, Shulaya received in the vicinity of Cropsey Avenue, Brooklyn, New York, 11 cases of purportedly stolen cigarettes from CS-1.

On or about August 18, 2015, Shulaya received in the vicinity of Cropsey Avenue, Brooklyn, New York 10 cases of purportedly stolen cigarettes from CS-1, and subsequently paid CS-1 approximately $12,000 for the purportedly stolen

I64BSHU2

cigarettes.

On or about January 2016, Shulaya and a coconspirator not named herein, CC-2, attempted to extort approximately $100,000 from the owner of a business located in the vicinity of Brighton Beach, Brooklyn, New York.

On or about February 2016, in the vicinity of Brighton Beach, Brooklyn, New York at an illegal gambling establishment belonging to the Shulaya enterprise, the poker house, Shulaya and Khurtsidze, and others assaulted CC-1 in retaliation for CC-1's failure to remit sufficient tribute payments to Shulaya.

On or about April 7, 2016, in the vicinity of Bay Parkway, Brooklyn, New York Shulaya received 10 cases of purportedly stolen cigarettes from CS-1.

On or about June 23, 2016, in the vicinity of 59th Street, Brooklyn, New York, Shulaya received 10 cases of purportedly stolen cigarettes from CS-1.

On or about July 25, 2016, in the vicinity of Brighton Beach Avenue, Brooklyn, New York, Shulaya and Khurtsidze met at the poker house for the purposes of tallying approximately $70,000 in gambling proceeds from a poker game that took place on or about July 22, 2016.

On or about July 25, 2016, in the vicinity of Brighton Beach Avenue, Brooklyn, New York, Shulaya and Khurtsidze assaulted a confidential source, CS-2, who, at the direction of law enforcement had previously worked as a dealer at the poker

I64BSHU2

1    house.

2              On or about September 1, 2016, in the vicinity of 59th

3    Street, Brooklyn, New York, Khurtsidze, acting at Shulaya's

4    direction, received a Pelican Pete's electronic slot machine

5    from CS-1 and transported that machine to an apartment

6    belonging to CC-2.

7              On or about October 2016, Shulaya invested funds into

8    the operation of an after hours club.  The 59th Street club

9    hosting, among other things, the availability of narcotics for

10   purchase by patrons of the 59th Street club in connection with

11   which a coconspirator, not named herein, CC-3 provided bribes

12   to local law enforcement officers to permit the narcotics

13   conspiracy activity.

14             On or about January 6, 2017, Shulaya and CC-3 in the

15   vicinity of Weehawken, New Jersey, met to discuss the future

16   operation of after hours clubs of the same type as the 59th

17   Street club, hosting, among other things, the availability of

18   narcotics purchasing for patrons of such clubs.

19             On or about January 25, 2015, Shulaya and a

20   coconspirator not named herein, CC-4, on a telephone call

21   intercepted, pursuant to judicial authorization, tested the

22   operability of devices used by the Shulaya enterprise for the

23   purpose of defrauding casinos by predicting the behavior of

24   particular models of electronic slot machines.

25             On or about January 17, 2017, on a telephone call

I64BSHU2

intercepted pursuant to judicial authorization, a

coconspirator, not named herein, CC-5 reported to Shulaya that

CC-5 had completed recognizance of a casino that featured a

particular model of a electronic slot machine susceptible to

the Shulaya enterprise scheme to defraud casinos by predicting

the behavior of that model of electronic slot machines.

On or about January 25, 2017, Shulaya, demonstrated to

CS-1 the means by which the Shulaya enterprise would use

electronic devices and software designed to predict the

behavior of particular models of electronic slot machines in

order to defraud casinos.

On or about January 27, 2017, Shulaya and CC-4, on a

telephone call intercepted pursuant to judicial authorization

arranged the transportation of two devices to be used by the

Shulaya enterprise in preparation for defrauding casinos by

predicting the behavior of particular models of electronic slot

machines.

On or about February 22, 2017, Shulaya and CC-4 on a

telephone call intercepted, pursuant to judicial authorization,

arranged the performance of maintenance of computer servers and

processors certain of which were malfunctioning in furtherance

of a scheme to defraud casinos by predicting the behavior of

particular models of electronic slot machines.

On or about April 7, 2017, CC-5, in the vicinity of

Philadelphia, Pennsylvania, executed the Shulaya enterprise's

I64BSHU2

scheme to defraud casinos by predicting the behavior of

particular models of electronic slot machines and, thereby,

obtained over $1,000 in proceeds from the manipulation of such

machines.

On or about May 3, 2017, CC-6 and CC-4, acting at

Shulaya's direction delivered an electronic slot machine and

other electronic devices to CS-1 for the purpose of training

CS-1 to defraud casinos through the use of electronic devices

and software designed to predict the behavior of particular

models of electronic slot machines.

Count Two, how do you plead, guilty or not guilty to

Count One, Mr. Shulaya?  Guilty or not guilty?

MR. SHULAYA:  Not guilty.

THE COURT:  Mr. Khurtsidze, guilty or not guilty to

Count One?

MR. KHURTSIDZE:  No, I'm not.

THE COURT:  A not guilty plea is entered as to Count

One for Mr. Shulaya and Mr. Khurtsidze.

Count Two, conspiracy to commit offenses against the

United States.  The sale and transport of stolen goods.

From at least in or about 2014, up to and including in

or about May 2017, in the Southern District of New York,

Mr. Shulaya, the defendant and others known and unknown,

willfully and knowingly, did combine, conspire, confederate,

and agree together with each other to commit offenses against

I64BSHU2

1   the United States, to wit, to violate Title 18 United States

2   Code, Sections 2314 and 2315.

3          It was a part and object of the conspiracy that

4   Shulaya, the defendant and others known and unknown would and

5   did transport, transmit, and transfer in interstate and foreign

6   commerce, any goods, wares, merchandise, securities, and money

7   of the value of $5,000 or more, knowing the same to have been

8   stolen, converted, and taken by fraud, in violation of 18

9   U.S.C., Section 2314.

10          It was a further part and conspiracy that Shulaya, the

11   defendants and others known and unknown would and did receive

12   possess, conceal, store, barter, sell, and dispose of goods,

13   wares, and merchandise, securities and money of the value of

14   $5,000 and more, which had crossed a state or United States

15   boundary after being stolen, unlawfully converted, and taken,

16   knowing the same to have been stolen, unlawfully converted, and

17   taken in violation of 18 U.S.C., Section 2315.

18          In furtherance of the conspiracy and to effect the

19   illegal object thereof, the following overt acts, among others,

20   were committed in the Southern District of New York and

21   elsewhere.

22          On or about December 11, 2014, Shulaya in Manhattan,

23   New York negotiated the sale of stolen jewelry to CS-1.

24          On or about March 23, 2015, in Atlantic City,

25   New Jersey Shulaya negotiated for the purpose and, in fact,

I64BSHU2

received cigarettes that Shulaya understood to have been stolen from a facility in Virginia.

On or about August 9, 2015, Shulaya received in the vicinity of Cropsey Avenue, Brooklyn, New York, 11 cases of purportedly stolen cigarettes from CS-1.

On or about April 7, 2016, Shulaya received in the vicinity of Bay Parkway, Brooklyn, New York, 10 cases of purportedly stolen cigarettes from CS-1.

Mr. Shulaya, how do you plead to Count Two, guilty or not guilty?

MR. SHULAYA:  So this actually took place.

THE COURT:  All I want to know, one word, guilty or not guilty?  What do you want to plead?

MR. SHULAYA:  What, with the cigarettes?

THE COURT:  Forget it.  I enter a plea of not guilty on Count Two.

Count Three, from at least in or about 2014, up to and including in or about May 2017, in the Southern District of New York, Mr. Shulaya and others known and unknown willfully and knowingly did combine, conspire, confederate, and agree together with and each other to commit offenses against the United States, to wit, to violate 18 U.S.C, Section 2342.

It was a part and an object of that conspiracy that Shulaya, the defendant, and others known and unknown would and did ship, transport, receive, possess, sell, distribute and

I64BSHU2

purchase contraband cigarettes and contraband smokeless tobacco as defined in 18 U.S.C. 2341, in violation of 18 U.S.C. Section 2342.

In furtherance of the conspiracy and to effect the legal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

On or about March 23, 2015, in Atlantic City, Shulaya, the defendant, negotiated for the purchase and, in fact, received cigarettes that Shulaya understood to have been stolen from a facility in Virginia.

On or about August 9, 2015, Shulaya in the vicinity of Cropsey Avenue, Brooklyn, New York received 11 cases of purportedly stolen cigarettes from CS-1.

On or about April 7, 2016, in the vicinity of Bay Parkway, Brooklyn, Shulaya received 10 cases of purportedly stolen cigarettes from CS-1.

As to Count Three, Mr. Shulaya, how do you plead; guilty or not guilty?

MR. SHULAYA:  Not guilty.

THE COURT:  A plea of not guilty is entered on behalf of Mr. Shulaya for Count Three.

Count Four, conspiracy to commit fraud relating to identification documents.  From at least in or about January 2017, up to and including May 2017 in the Southern

I64BSHU2

District of New York and elsewhere, Shulaya, the defendant and

others known and unknown, willfully and knowingly did combine,

conspire, and confederate and agree together, and with each

other to commit an offense against the United States, to wit,

to violate 18 U.S.C., Section 1028(a)(2) and 1028(a)(7).

It was, further, a part and an object of the

conspiracy that Shulaya and others known and unknown, knowingly

would and did transfer an identification document,

authentication feature, and a false identification document,

knowing that such document and feature was stolen and produced

without lawful authority in violation of 18 U.S.C., Section

1028(a)(2).

It was a further part and object of the conspiracy

that Shulaya, and others known and unknown, knowingly would and

did transfer, possess, and use without lawful authority, a

means of identification of another person with the attempt to

commit and to aid and abet and in connection with any unlawful

activity that constitutes a violation of federal law and that

constitutes a felony under any applicable state and local law

in violation of 18 U.S.C., Section 1028(a)(7).

As to Count Four, Mr. Shulaya, how do you plead?

MR. SHULAYA:  Not guilty.

THE COURT:  A plea of not guilty is entered on Count

Four for Mr. Shulaya.

Count Five, wire fraud conspiracy.

I64BSHU2

1          From at least in or about September 2016, up to and

2     including May 2017, Shulaya and Avtandil Khurtsidze, as well as

3     others, known and unknown, knowingly and willfully did combine,

4     conspire, confederate, and agree, together and with others to

5     commit an offense against the United States, to wit, to violate

6     18 U.S.C, section 1343.

7          It was a part and an object of the conspiracy that

8     Shulaya and Khurtsidze, the defendants, and others known and

9     unknown having devised and intending to devise a scheme and

10    artifice to defraud, and for obtaining money and property by

11    means of false and fraudulent pretenses, representations, and

12    promises, in attempting to do so would and did transmit and

13    cause to be transmitted by means of wire, radio, and television

14    communications in interstate and foreign commerce, writings,

15    signs, signals, pictures, and sounds for the purpose of

16    executing such schemes and artifice in violation of Title 18

17    U.S.C, Section 1343, to wit, a scheme to defraud casinos

18    through the use of electronic devices and software designed to

19    predict the behavior of particular models of electronic slot

20    machines, thereby removing the element of chance from play of

21    those machines.

22               (Continued on next page)

23

24

25

I64Wshu3

1          THE COURT:  How do you plead to Count Five,

2    Mr. Shulaya; guilty or not guilty?

3          DEFENDANT SHULAYA:  Not guilty.

4          THE COURT:  On Count Eight, a plea of not guilty is

5    entered for Mr. Shulaya.

6          Mr. Khurtsidze, how do you plead, guilty or not

7    guilty, to Count Five?

8          DEFENDANT KHURTSIDZE:  I think I'm in a dream.

9          THE COURT:  All right.  A plea of not guilty is

10   entered on behalf of Mr. Khurtsidze.

11         There are also forfeiture allegations that are set

12   forth as to each of the counts for properties and proceeds

13   traceable to the offense.  The defendants have now been

14   arraigned.

15         You may be seated.  Thank you.

16         Joe, how is our jury doing?

17         We're going to bring them up in three minutes.

18   Whoever we have, we'll bring them into the room.  If people

19   want to take a very short break and come back, in three minutes

20   they're going to be filing into the room.

21         (Recess)

22         (A jury of twelve and two alternates was impaneled and

23   sworn)

24         THE COURT:  Ladies and gentlemen, what we're going to

25   do now is Joe is going to take you into the jury room, show you

I64Wshu3

where it is and show you how you get into the jury room, so you
don't actually have to come into the courtroom.  You'll come in
through a different entrance.

What we're going to do then is take a lunch break and
come back at 2:00.  I'll give you some very short instructions,
and then we're going to get right into the opening statements
and then into the evidence.

Today being Monday is a big jury-selection day all
over the courthouse, so give yourselves some extra time to get
through security downstairs if you leave the building, because
it just takes a little bit of time.  You're going to be able to
get passes.  We're going to be able to give you a card that
will help you get through more quickly, but just between now
and lunchtime, for this round, give yourself a little bit of
extra time so we can be in place at 2.

You will see that your ability to be on time is
incredibly important in this case, because we can't start
anything without all of you being present.  We can't wait for
somebody -- I mean, we do wait for somebody.  We can't start
while we're waiting for somebody.  If you're not all here, we
keep everybody in the back, and we only bring you out when
everybody is here.  And that's true for all 14 of you.  I
encourage you as much as possible to be on time.  I know it
requires some extra planning and some juggling, and I'm very
appreciative.

I64BSHU4

1          For now, let's have Joe take you into the back, take

2     your lunch break, and we'll see you at 2:00.

3          Thank you very much.

4          (Jury not present)

5          THE COURT:  All right.  Ladies and gentlemen, is there

6     anything that we should discuss before we take our own lunch

7     break and then come back and are in place for 2:00?

8          Hearing nothing, let's take our own break.  We'll come

9     back.  Hopefully we'll have an on-time jury.  We'll start by my

10    giving some very basic instructions at the end of the voir dire

11    that you've seen on the decision on the evidence, etc., and

12    then we'll go directly from there into the opening statements.

13         MS. BENETT:  Your Honor, will we be able to get in

14    before two?

15         THE COURT:  Yes.  My matter that I have is telephonic.

16    You're welcome to stay here the entire time.  It's up to you.

17         MS. BENETT:  Thank you.

18         THE COURT:  Thanks.  We're adjourned until 2:00.

19         (Luncheon recess)

20

21

22

23

24

25

I64BSHU4

1                    A F T E R N O O N   S E S S I O N

2                              2:00 p.m.

3          (Jury not present)

4          THE COURT:  Ladies and gentlemen, we had a juror who

5    had reported to the same room where she had reported this

6    morning and didn't come down.  That's why we were delayed.  Joe

7    somehow managed psychologically to figure it out and went and

8    found the person.  So we're all set now.  Joe's going to get

9    the jury.

10         Before we do that, let me just say that on the

11   transcript from this morning during the arraignment there was

12   a -- I don't know if it was a misstatement.  It may well have

13   been or a typographical error, but I asked Mr. Shulaya, "How do

14   you plead to Count Five; guilty or not guilty?"  He said, "Not

15   guilty."  I then said, "On count eight, a plea of not guilty is

16   entered."  Of course that should be Count Five.  So that change

17   will be made.

18         Thank you.

19         Let's go ahead and bring out the jury, Joe.

20

21

22

23

24

25

I64BSHU4

1          (Jury present)

2          THE COURT:  All right, ladies and gentlemen.  As you

3    reach your seats, let's all be seated here in the courtroom.

4    As I said, ladies and gentlemen, I'll be giving you a few

5    instructions now at the beginning and then we'll go directly

6    into the opening statements.

7          As I told you previously this morning, your role as

8    the jury in this case is to decide the issues of fact.  It is

9    my role to, at the end of the case, instruct you on the law and

10   to make the legal rulings as we go along.

11         Now, nothing that I say is evidence and it's very

12   important that you understand that and nothing that the lawyers

13   say is evidence.  It's very important that you understand that

14   a question posed is not evidence.  It is the answer to the

15   question that is evidence.  And so you should bear in mind that

16   objections are not evidence.  If there's testimony that is

17   stricken, then that must be eliminated from the evidentiary

18   record in this case and must be disregarded by you.

19         Now, there are two kinds of evidence that you can use

20   in making your determinations of fact in this case and they

21   stand equal before the law.  One is direct evidence.  Now,

22   direct evidence is what you perceive by virtue of one of your

23   senses.  It's what you see, it's what you hear, it's what you

24   touch, it's what you smell.  That's direct evidence.

25         But there's also circumstantial evidence.  Now,

I64BSHU4

circumstantial evidence is not guesswork or speculation, but it is the proof of a fact based upon proof of other facts and reasonable inferences drawn from that.  So let me give you an example.  Let's say that we had our blinds closed here in the courtroom and that you came in this morning and it was dreary outside and that over the course of the day, people came in and they were wearing raincoats and having umbrellas that were dripping.  Now, you haven't seen the rain because the blinds were closed, you didn't touch the rain because it didn't come down on you, you were inside, but you can put together that it's raining outside based upon the fact that these people came in with their raincoat and umbrella.  So that's one type of proof of circumstantial evidence.

Circumstantial evidence, as I said, stands equal with direct evidence and we'll talk about these things more as the case goes on.  You're going to hear a lot from witnesses here in this courtroom.  They're going to be testifying here in front of you under oath and you're going to have to decide what to believe, what to credit, and not to believe, and what you don't credit.

So how do you do that?  Well, the biggest asset of every juror is plain, common sense.  Every single day you go through your life and you decide when you're talking to people, do I believe them or do I not believe them?  Do I believe this part of what they're telling me but not that part.  Sometimes

I64BSHU4

1    people can be credible in one sense and not in another.  It

2    will be for you to apply your common sense to what you hear

3    from the witnesses, to evaluate how they appear to you on the

4    witness stand, their demeanor, do they appear to be

5    forthcoming?  Do they appear to you to be evasive?  You'll

6    evaluate all of that and you will determine how much of their

7    testimony to believe or not believe.  Did they trike you as

8    open, candid, honest?  Did they strike you as somebody who was

9    trying to hide something?

10            Now, let's talk for a moment about the burden of

11   proof.  At the conclusion of this trial, I'll speak more about

12   the burden of proof, but I want to make sure that I remind you

13   what I said already, which is that neither defendant, no

14   criminal defendant ever bears a burden of proof.  The burden of

15   proof here in this case is on the government.  The government

16   has to prove guilt of a defendant beyond a reasonable doubt and

17   you have to consider each defendant individually in that

18   regard.  The defendant, therefore, starts off with a clean

19   slate.

20            Now, the burden of proof, of proof beyond a reasonable

21   doubt is different from the burden imposed on parties in a

22   civil case.  Some of you had said that you had served on civil

23   juries before, where in a civil case there's a burden of proof

24   that's called preponderance of the evidence, which means more

25   likely than not.  That is not the burden of proof in a criminal

I64BSHU4

case.  The burden of proof in a criminal case is proof beyond a

reasonable doubt and we'll talk about that more in a moment,

but as I said earlier, this burden means that the defendant and

his lawyers, or defendants and their lawyers need not present

any evidence in this case if they choose not to do so.  They

could sit in silence throughout all of these proceedings

without ever saying a word, but you can draw no inference

against them because you cannot find a defendant guilty unless

you are unanimously convinced beyond a reasonable doubt of his

guilt based upon the proof that is adduced at trial.

Now, one thing about trials, they don't happen like

they do on law and order.  Things don't come in in a linear

fashion.  It's not as if you hear from one individual and they

tell you the story all up to a certain point then somebody else

jumps up and in they tell you a story after that.  In fact, in

trial, it's like real life.  One person might tell you bits and

pieces of a story, another person tells you bits and pieces of

a story, and you got to keep an open mind throughout, because

it's only when all of the evidence comes in that you're able to

put it all together and say, OK, now that I have all of the

evidence, what is my determination?

A couple of general pointers now.  The lawyers,

everybody at these tables, everybody here is instructed not to

speak to you anywhere in the building or out of the building.

They cannot speak to you.  The reason for that is because we

I64BSHU4

1   learned over the years that sometimes people say just in a

2   friendly way, Hi, how are you?  And somebody might feel

3   uncomfortable and think are they trying to signal something to

4   me, is there like a special something or other, glint in their

5   eye, where they're trying to convey a message.

6        So the way that we do it is we make a hard-and-fast

7   rule, nobody here, none of these counsel or any of their

8   assistants can say a word to you.  So when they look down in

9   the elevator and they pretend that they don't recognize you,

10  even though you sat in the courtroom with them day after day,

11  please do not think that they're being rude.  They're following

12  my instruction to them.  They may not speak to you.  If

13  somebody does speak to you from these two tables, you should

14  let me know.  All right?  The way you'll do that is through

15  Joe.

16       Now, in terms of yourselves, you are not allowed to

17  talk to each other about the case.  I encourage you to get to

18  know each other about who thinks X, Y, or Z about the current

19  baseball season or whatever it is, but do not talk at all about

20  the case or about impressions you have in terms of the lawyers

21  or me or anything else.  Nothing about the case.  OK?  So

22  that's very important.

23       Until all of the evidence is done and then you're

24  instructed on the law and then I'll be very, very clear to you,

25  now you can go and talk to each other about the case, before

I64BSHU4

1    that, you can't talk to each other about the case or anybody in

2    your life.  So at the end of the day when you go home, you can

3    say, I'm on a jury.  Stop.  You should not say what case,

4    anything about the case.  Do not update your Facebook profile,

5    do not send out an Instagram picture at this front of the

6    building where you start talking about the case.  People have

7    actually done this in the past, believe it or not, everything's

8    been done once.  We don't want it to happen in one of my cases.

9    So do not talk about the case.

10           And do not research anything about the case.  Don't go

11   home and start Googling things and trying to become an expert

12   on X, Y, or Z.

13           I told you you can have things like beverages here in

14   the courtroom.  That's fine.  I should say, I also allow --

15   some people like to have an M&M in the afternoon that they can

16   like suck on silently.  I don't want door Doritos or popcorn.

17   This is not that kind of thing, but for some people they are

18   actually uncomfortable by later in the afternoon if they don't

19   have a little bit of something.  I'm not worried about that in

20   terms of feeling like that's rude.  What we want you to be able

21   to do is to be able to concentrate on the evidence.  Whatever

22   we can do to help you with that is fine.

23           The way the procedure is going to work, we're going to

24   start with opening statements.  Opening statements are an

25   opportunity for the lawyers to tell you what they think the

I64BSHU4

1    evidence will show.  It will be up to you to decide at the end

2    of the case whether or not the evidence has shown what they say

3    they think it will show, but it's their opportunity to give you

4    what they believe a road map will be.  Bear in mind, again,

5    that what they say is not evidence.  It will only be what

6    happens here later on with witnesses under oath and documents

7    is which are received into evidence that will be the evidence.

8    So it's their opportunity to lay out the road map.

9         After the opening statements, we'll go directly into

10   witnesses and then at the very end of the case there will be

11   closing statements and they're also called summations.  That's

12   the opportunity for the lawyers to address you again to

13   summarize what they think the evidence has, at that point in

14   time, shown.  So that's the procedure.  We're going to go ahead

15   and get started with opening statements.

16        Let's go ahead, Mr. Thomas

17        MR. THOMAS:  In 2014, a crime business set up shop in

18   New York City.  This business spread across the boroughs

19   seeking profits by any means possible.  It funded itself

20   selling contraband in Brooklyn.  It negotiated for stolen goods

21   outside of a nightclub in Chelsea, it muscled its way above a

22   restaurant in Brighton Beach, and it set up an illegal gambling

23   partnership there, at warehouses in New York and New Jersey.

24   This group plotted and engineered a multi-million dollar plan

25   to cheat casino slot machines.  It paid bribes, it settled

scores, and it meant business.

Now, ladies and gentlemen, this crime business was organized.  It had a leader and followers.  It demanded loyalty from its members, it demanded obedience from the community, and it demanded control of illicit profits, whoever made them. Now, you'll learn that when others stood in its way, it responded with threats, with shows of force, and with violence.

Ladies and gentlemen, you'll hear that this organization was built by this man, Razhden Shulaya.  And you will hear that the man who bloodied others to help him do it was that man, Avtandil Khurtsidze.  This trial is about Shulaya the boss, Khurtsidze, his enforcer, and the crime empire they tried to build in this city.

Now, ladies and gentlemen, the government has charged these men with serious crimes, and it is our burden as the United States to prove those charges to you beyond a reasonable doubt.  This opening statement is our opportunity to talk to you a little bit about the charges, about the case, and about how we will prove it.  So I want to begin with some context.

You'll learn that Razhden Shulaya is what's called a *vor v zakonei*.  It's a Russian phrase.  It translates to thief in law.  The title of *vor*, that's a Russian word spelled *v-o-r*. It's a title that signifies membership in a brotherhood of criminals.  A *vor* has the final word on crime in his territory. He settles disputes between lower level minions, he takes a cut

I64BSHU4

1    of their profits, and in exchange, he offers them opportunity

2    and protection.  You will learn that a *vor*, like Shulaya,

3    stands at the highest rank within the world of Russian

4    organized crime.

5         Shulaya embraced this title.  He used it.  He bragged

6    about it, and he weaponized it.  You will learn that Shulaya

7    surrounded himself with prize fighters from Eastern Europe to

8    act as body guards and enforcers.  The chief among them was

9    Khurtsidze.  He's a well-known boxer, a champion, in fact, that

10   goes by the nickname, "The Hammer."  You'll learn that

11   Khurtsidze was a human weapon and that he pledged himself in

12   service of Shulaya.

13        Empowered by his title, emboldened by the support of

14   Khurtsidze and the other fighters, Shulaya organized a crime

15   business in New York.  At its core, this business united three

16   sources of criminal profits:  Contraband, casinos, and cards.

17   So let's take them one at a time.

18        First, the contraband.  Beginning in 2014, Shulaya and

19   his enterprise sought stolen goods to sell for money.  They

20   dabbled in jewelry, like Rolex watches, and liquor, like Johnny

21   Walker Black.  They even toyed with the scheme to sell

22   knock-off gold watches.

23        But they quickly focused on the sale of untaxed

24   cigarettes.  Untaxed cigarettes are an illegal contraband

25   profit.  Throughout 2015, throughout 2016, and into 2017

I64BSHU4

Shulaya's organization bought and sold a mountain of them.
We're talking here about case loads, not packs, not cartons,
but cases, that's 12,000 cigarettes a box.

        Now, Shulaya and his crew structured these deals to
avoid getting caught by the police.  Often they would load up
cigarettes at night or in an empty parking lot or near a
graveyard.  Sometimes the cigarettes would be transferred at
one place, but the money would pass hands at another.
Sometimes they spoke in code, sometimes he instructed them not
to speak at all.  So it was month after month after month for
roughly two years.

        Now, over the course of the scheme you will hear that
Shulaya and his enterprise received more than $700,000 selling
these contraband cigarettes.  What were they doing with all
that money?  Well that brings us to scheme No. 2, casinos.

        You'll learn that the contraband profits funded an
elaborate plot to defraud casinos around the country.  The
fraud focused on a particular type of video slot machine.  It's
one of the animated games.  If you press a button, reels spin,
and the player wins or loses depending on how the symbol lands.

        You will learn that although slot machines appear to
be entirely random, they aren't.  These games run on computer
software and one of the things that the software does is it
ensures that the game takes in more money than it takes out,
not from every play of the game and not from every player.

I64BSHU4

Some people will win a few bucks and a lucky few will win a
jackpot, but over time, over hundreds of thousands of plays the
games are programmed to earn money.

       Shulaya, Khurtsidze, and their crew worked to steal
that money from these games.  Shulaya, you'll hear boasted of
kidnapping an engineer who held the source code for these
machines and threatened him until he gave up the secret files.
Then using a computer programmer from Eastern Europe, a Russian
IT person flown up from Florida, computer servers in Saint
Petersburg, and scouts who traveled to casinos in New York,
Atlantic City, Philadelphia, and even Las Vegas, the
organization refined a program that would allow them to use the
stolen code to cheat the slot machines and to win every time.

       As you might imagine, that scheme was complex and it
took a lot of effort to build.  So what were Shulaya,
Khurtsidze, and their crew up to while they worked it out?
Well that brings us to scheme No. 3, cards.

       You will hear that while Shulaya and his enterprise
developed their plan to cheat legitimate casinos, they pursued
their own underground gambling operation.  In 2015, in
Brooklyn, New York, there was a network of underground poker
games, not friendly games, but fierce ones with real bets and
real consequences.  These games were tucked above and below
legitimate businesses.  They had no signs.  They advertised
through word of mouth.  They had locked doors to control who

I64BSHU4

could enter and who could leave.  They deployed surveillance
cameras to track what happened and who did it.

          In the beginning, Shulaya and Khurtsidze frequented
games run by others.  Then, in early 2016, the crew established
a poker parlor of their own.  They took over a space above a
restaurant in Brighton Beach.  They equipped it with poker
tables.  They hired servers.  They sold liquor and food.  And
they recruited players, lots of them.  The stakes were high.
Thousands of dollars might be won or lost on a particular hand.
Games sometimes stretched for 12 hours or more and over the
course of a night, the house would rake in thousands of dollars
for itself.

          You will learn, however, that Shulaya and his crew
wanted even more.  So they acted to rig the games at their own
poker house.  They brought in a team of pros, dealers, and
players who could cheat without detection.  That way their
poker business took money from the players once, by raking a
cut of the game, and took it again by cheating them out of
their chance at winning.

          Now, across these schemes you will learn that time and
again Shulaya acted as the boss and Khurtsidze acted as his
sword.  With the contraband, Shulaya appointed the couriers to
buy and sell the goods and ensured that the profits returned to
him personally.  When they did not, he turned to Khurtsidze,
his enforcer, to sort out the problem.

I64BSHU4

1          With the casino fraud, Shulaya recruited the computer

2     techs necessary to pull it off.  Khurtsidze, he hauled the slot

3     machines around and escorted one of the programmers to a casino

4     so they could covertly gather program for the cheating program.

5     For the cards, Shulaya took a cut of the profit, and he

6     approved the plans to cheat players in his own house and he

7     planned to take a cut of those profits too.  Khurtsidze, the

8     enforcer, he collected the debt when the gamers didn't pay up.

9          These three schemes focused on contraband, casinos,

10     and cards, they formed the core the profit engine of a business

11     devoted to crime and you will hear that this engine powered

12     still other schemes.  Some of them were sophisticated.  For

13     example, Shulaya created and used a front company, a liquor

14     importation business in an effort to hide the business's

15     profits and conceal its members.

16          Other schemes were simple.  For instance, the group

17     defrauded an elderly man, a stroke victim, no less out, of

18     hundreds of thousands of dollars by having an associate simply

19     transfer money from his bank account to theirs.  Shulaya, he

20     used the money to pay for clothing and personal expenses.

21     Khurtsidze and others used the man's vehicles to run errands

22     for their crime business.

23          Other plots involved a nightclub, a plan to protect a

24     brothel, stolen credit cards, and even a rivalry with another

25     criminal group.  What all of these rackets have in common is

I64BSHU4

that they were bound together by threats and by violence.

When one man insulted Shulaya, Shulaya commanded him that he be hauled before an audience, including Khurtsidze, and then they were instructing him as others joined in the attack. When another man dared to disobey Shulaya's directives to share the profits of his drug business, he, too, was beaten into submission.  When one cigarette worker attempted to shortchange Shulaya, Shulaya and Khurtsidze held him in a room and battered him until his face swelled beyond recognition.  They took pictures of it while it happened and then Shulaya showed those pictures to other people as a warning and a promise.  Shulaya, the boss, and Khurtsidze, his enforcer, they built a crime business and they did it through violence.

So how do we prove this?

First, will you hear testimony from folks who were on the inside.  You will learn that Shulaya made a critical error when he founded his business because he rested parts of his operation on two confidential sources who were secretly working for the Federal Bureau of Investigation, the FBI.  These sources recorded their conversations, they recorded their phone calls, and they reported in realtime to the FBI agents.

One of those sources posed as the supplier of stolen goods and it was through him that Shulaya and his enterprise obtained their contraband cigarettes.  Another source posed as a manager of part of Shulaya's gambling operation.  He will

I64BSHU4

describe the poker house, how it held high stakes games, and how Shulaya and Khurtsidze collected debts when those games were over.

You will also hear from two cooperating witnesses who were part of the crime business until they, too, were arrested. One witness was the card shark recruited to literally stack the deck in favor of the house.  Another is the computer programmer that Shulaya brought to crack the slot machine software.  He will walk you through the elaborate plan to cheat video slot machines and he will tell you how Shulaya assigned fighters including Khurtsidze to help him as he did.

Make no mistake, these cooperating witnesses were arrested and pled guilty to serious crimes for what they did and they have agreed to testify against Shulaya and Khurtsidze in hopes of receiving leniency at sentencing.  So scrutinize their testimony, match it up against the other witnesses, compare it to reportings and the photographs and the other physical evidence.

That evidence will come to you in many forms.  It will come in the form of photos of Shulaya's minions picking up cigarettes, photos of bags of cash, Shulaya himself delivered to a confidential source, sometimes stuff with five or ten or even more than $30,000.  It will come in the form of ledgers documenting poker games, who won, who lost, and who owes the house.  It will take the form of electronic memory chips,

computer files, and videos of members of the organization
working to put the casino cheat into practice.  You'll even see
a video of Khurtsidze loading up the slot machine used to test
the fraud and we're going to bring the machine here so you can
see that same machine for yourself.

          And the violence, well, you'll see and hear that too.
You'll see video of Khurtsidze leaving the poker house to
collect poker debts.  You'll read the transcript where
Khurtsidze, the Hammer, tells the debtor in effect, Pay up or
you'll have big problems.  And you'll see on video, Khurtsidze
report back to Shulaya, his boss.  You'll see a video where
Khurtsidze and Shulaya each strike the confidential source they
believed had cheated them out of poker profits.  You'll see a
second video where Khurtsidze punches twice an associate of the
organization where he sat next to one of the cigarette
couriers, and while other members of the group simply looked
on.

          You'll see photos of still another bloodied and beaten
member of this enterprise who Khurtsidze and Shulaya assaulted
because Shulaya believed that man had pocketed the cigarette
profits for himself.

          And the series of transcripts made from intercepted
calls and recordings, you will hear threat after threat after
threat, uttered by these men here, about what they would do to
protect each other, to protect their crime business, and to

I64BSHU4

1   silence the witnesses against them.

2           From these witnesses and photos and recordings, a

3   criminal underworld will emerge, a world of poker rooms and

4   parking lot deals, a world where bags of cash are a regular

5   occurrence, a world ordered by loyalty to Shulaya, a *vor*, and

6   enforced through violence by Khurtsidze, his hand, a world

7   where the crime business attempted to run its rackets right

8   here in New York.

9           Now, at the end of the case, we'll have another

10  opportunity to come before you to explain why the defendants

11  were guilty.  Until then, however, we ask that you do three

12  things.  First, follow Judge Forrest's instructions on the law;

13  second, pay close attention to the evidence; third, use your

14  common sense, the same common sense you use in your everyday

15  lives as New Yorkers.  If you do these three things, the

16  defendants will receive a fair trial, the United States will

17  receive a fair trial, and when it is all over, I expect that

18  you will arrive at the only conclusions supported by the law

19  and the facts, and that's that Razhden Shulaya, the boss; and

20  Khurtsidze, his enforcer, ran a crime empire in New York and

21  they are guilty as charged.

22           THE COURT:  Thank you.

23           Ms. Cecutti.

24           MR. CECUTTI:  Actually, Ms. Louis-Jeune will be doing

25  it.

I64BSHU4

1          MS. LOUIS-JEUNE:  The so-called Shulaya enterprise,

2     transported stolen goods, trafficking in contraband cigarettes,

3     identity fraud, and an elaborate casino scams all ran by a *vor*,

4     a Russian phrase that, as the government told you, translates

5     to a thief in law.  It refers to violent criminals with

6     extensive criminal histories who earned the title of the gulags

7     in the former Soviet Union, people who commit their entire

8     lives to crime to the exclusion of all else, including family,

9     and they tattoo themselves to make their status known to

10    others.  It's a relic of a time gone by.  It has little meaning

11    in the 21st century.  Ladies and gentlemen, we're not in the

12    Soviet Union anymore.

13          After listening to all of the testimony in this case,

14    I expect you will find that there is no so-called Shulaya

15    enterprise.  If an enterprise existed, it was the government

16    enterprise.  The government will present evidence about *vors*

17    and threats and cigarettes and gambling, but life in the Wizard

18    of Oz where the wizard is revealed to be nothing more than an

19    old man behind the curtains, we'll ask you to pull back the

20    curtain and what you will see is the government is pulling all

21    the strings here.  They created the so-called Shulaya

22    enterprise, they funded it, they maintained its operations

23    through their informants, and they've created a rouse and sat

24    back and watched to see what Mr. Shulaya would do.

25          The government has accused Mr. Shulaya of purchasing

and selling stolen untaxed cigarettes.  However, the evidence

will show that the government through its informants was both

the supplier and the purchaser of those cigarettes.  The

evidence will clearly show that these cigarettes were not

stolen.  Federal agents supplied cigarettes to one informant

who then sold those cigarettes to Mr. Shulaya, who then sold

those cigarettes to a second government informant, and that

second informant purchased those cigarettes with money given to

him by those same federal agents.

       I expect that the evidence will show that the most

prolific members of the so-called "Shulaya enterprise" were

acting as agents of the government while engaging in shady

conduct themselves.  You've heard government's opening

statement, and although it may have been persuasive, it is not

evidence.  In fact, what I tell you in my opening statement

isn't evidence either, but you must remember that we are all

here because Mr. Shulaya has pled not guilty to each and every

element of each and every crime that he is charged with.

       The government told in its opening that this is a case

about a criminal empire based on contraband, casinos, and

cards.  And while that makes for an interesting story, we have

not all gathered here for the next two to three weeks to listen

to a story that's a figment of the government's imagination.

You are here to listen and evaluate the evidence as it is

presented to you.  Don't be distracted by their tales of war.

I64BSHU4

 1    Pull back the curtain.  See who's really behind the alleged

 2    Shulaya enterprise.

 3          One of the first witnesses you will hear from in this

 4    case is an expert on organized crime, Special Agent Penza.

 5    You're going to hear that he studied the Italian mafia, also

 6    known as La Cosa Nostra for over ten years.  He will explain to

 7    you his extensive knowledge of La Cosa Nostra.  Special Agent

 8    Penza will also tell you his understanding of how Russian

 9    organized crime is structured, how it works, and how one

10    becomes a member.  Special Agent Penza will explain to you

11    words like *vor* and *obsha*, and tribute.

12          And when he tells you about Russian organized crime,

13    listen very carefully to when and where he gained his expert

14    knowledge.  Listen carefully when he tells you the rules and

15    protocols that govern the conduct of *vors*.  You will learn from

16    Special Agent Penza that being a *vor* turns on how a person

17    looks, how they act, their words, and their actions.  Indeed,

18    you will hear very soon Mr. Shulaya in his own words telling

19    others that he is a *vor*, but that alone does not make him one.

20          Being friends with boxers doesn't make you a vor

21    either.  You will learn that driving a fancy car, hanging out

22    with women, not paying your tab at restaurants and bars,

23    doesn't make you a *vor* either.  You will learn that receiving

24    gifts from your friends, especially on your birthday, doesn't

25    make you a *vor*.  Mediating disputes among people who share your

I64BSHU4

background and culture and your language while in a foreign

country does not make you a *vor*.  Wearing a shirt with fancy

special symbols also doesn't make you a *vor*.  Not even speaking

on the phone to reputed *vors* can make you one.

The government will present evidence as you were told

of intercepted calls of Mr. Shulaya and others.  You will hear

recordings made by people who made deals with the government in

exchange for very important benefits.  There were hours and

hours of surveillance, hundreds of photographs.  You will hear,

as I said earlier, Mr. Shulaya tell people that he's a *vor*,

that he's someone special.  You'll hear him ask people if they

know who he is, and when you hear these words and you read them

on the transcripts, ask yourself, does a person with real power

need to go around asking people if they know who they are?

You will also hear Mr. Shulaya speak in extremely

vulgar terms about women.  You will hear him speak about how he

thinks he's a tough guy.  You'll hear him use foul language

with his friends.  These were all meant to be private

conversations.  We have all said things we don't really mean.

We have all called a friend to vent.  And while some of his

words may be offensive, they are words, nothing more.

The evidence will show that Mr. Shulaya knew people

who were committing crimes.  He talked to people who were

committing crimes.  He even boasted.  But knowing someone or

associating with someone doesn't make you part of an

I64BSHU4

enterprise.  For the government to meet its burden, it is not

enough for them to show you some of this conduct.  Were some of

Mr. Shulaya's activities wrong?  Perhaps.  But that's not

enough.  You need to be able to answer the question, was it

illegal?  Was it a crime?  You are going to have to answer the

question, when Mr. Shulaya was involved in certain conduct, was

he involved as part of an enterprise?  And I suggest to you

that the evidence will not reach that level.

     The government will not be able to prove beyond a

reasonable doubt that Mr. Shulaya acted as part of or head of

any enterprise in this case.  Simply engaging in certain

conduct, even illegal conduct does not in and of itself make

you part of an enterprise or make you a *vor*.  For example,

buying untaxed cigarettes, gambling, offering to help open or

promote a nightclub doesn't make you part of an enterprise.

While Mr. Shulaya may be involved in these acts, he may have

known other people, he's not a member of an enterprise.

     Now, in attempting to prove its burden, the government

will call other witnesses besides Special Agent Penza, there

will be other law enforcement witnesses, and you will also hear

from four witnesses who made deals with the government in

exchange for benefits.  So let's pull the curtain back a little

and look at the two main characters in the government's tale,

Slava and Kutsenko.

     Mr. Shulaya came to the United States in 2014.  He

lived in Queens.  In that same year, Mr. Shulaya was introduced

to Volodymyr Oliynyk, who he knew as Slava.  Now, by the time

Mr. Shulaya met Slava, Slava had already been cooperating with

the government for many years.  He was arrested in 2005 and

pled guilty to firearm and fraud offenses.  Slava faced many

years in jail, but he made a deal with the government.  He

cooperated with them and he received probation.  When his

sentence was over, with no cases pending, he reached out to the

government.  He signed up to work with them.  His job was to

create criminal cases against others.

        But why?  Why would Slava want to give information to

the same government that had just prosecuted him?  He wasn't

doing it out of goodness of his heart.  Slava had a powerful

motive for wanting to work for the government.  He wanted to

help himself.  There is no place like home and Slava considered

this to be his home, although he's not a citizen, and he was

facing mandatory deportation.

        However, he knew if he was able to make a deal with

the government in exchange for telling them elaborate tales

based on the myths of the *vor* and help build cases against

other people, the government would allow him to stay in the

country and continue being who he is and do the work that he

loves.  Slava got to cheat, gamble, steal, and it was all paid

for by the U.S. government.

        The other main character I mentioned earlier who the

I64BSHU4

government will call is Alexander Kutsenko.  He was known to
Mr. Shulaya in this case as Sasha or Kutsy.  So who was
Kutsenko?  Kutsenko is the main character in this story.  He
pushes the action along.  He plays his role.  In that role he
lies repeatedly and convincingly.  Khurtsidze has more than a
25-year history of sheer violence, terror, and mayhem.  He has
never hesitated to use force or cause injury to others.  He has
been involved in the use of firearms and other violent
activities.

In 1998, Kutsenko was arrested and served
approximately 15 years for a violent crime.  So how does
Kutsenko end up being called as a witness by the government, a
witness for the United States of America?  Well, Kutsenko made
a deal, and like any deal, each party agreed to give the other
party something they wanted.

And this deal, what does the government get?  The
government gets to use Kutsenko to create their enterprise.
You will hear that Kutsenko asked Mr. Shulaya over and over
again to extort people.  You will hear that Kutsenko kept the
books at the poker house and he was supposed to be paying the
rent.  He was a dealer at card games where he cheated players.
You will hear that Kutsenko told stories to agents about
Mr. Shulaya where Kutsenko is the only source of that
information.  There will be no corroboration.  You will hear
that Kutsenko placed people into extreme debt so he that he

I64BSHU4

could later extort them, all for the sake of helping himself.

So what does Kutsenko get in return?  By making a deal with the government, Kutsenko gets to stay in the United States after his prison sentence.  Without making a deal with the government, he would face mandatory deportation.  But if he keeps his end of the bargain, if he works with the government, if he works Mr. Shulaya, if he continues to play his part, he's paid by the government and they apply for deferred action status for him with immigration.  He gets to continue living in the United States and being who he has always been, a criminal. He gets to continue living his version of the American dream funded by your hard earned tax dollars.

When Kutsenko tells you about acts of violence and extortion in this case, I ask you to carefully consider the source of this information.  Ask yourselves why, with all of the video surveillance and all of the recordings, certain incidents are conveniently not recorded.  I expect that Kutsenko will be the only witness to testify about some of these violent incidents.

Listen carefully and ask yourselves, if you can trust Kutsenko to tell you the truth.  When you evaluate the testimony of Kutsenko, part of what you should consider is who he is and his criminal character.  And at the end of this case, it is ultimately up to each of you as individuals to decide if Kutsenko is telling the truth, and if Kutsenko's evidence rises

I64BSHU4

1    to beyond a reasonable doubt for the purpose of your verdict.

2            There are also two other witnesses in this case who

3    made a deal with the government.  These people pled guilty to

4    crimes and faced substantial prison sentences.  However, if

5    they help the government by providing what's called substantial

6    assistance, the government will write what's called a 5K letter

7    to Judge Forrest.  This letter is critical for these witnesses.

8    With that letter they can receive a sentence as low as time

9    served.  If these witnesses don't come here and tell you their

10   stories about Razhden Shulaya, they would have no deal with the

11   government.  They would have no value to the government.

12           I expect the government's first cooperating witness to

13   be a man whose last name is Melman.  I'll call him Melman.  The

14   government will present to you evidence consisting of wire

15   intercepts and testimony from Melman.  But pay close attention

16   to his motives for testifying in this case.  He is a young man

17   who is not a citizen.  He came to the United States illegally,

18   worked while on a tourist visa, and then lied to obtain another

19   visa so he could remain in the country.

20           He was charged by the government of being a part of

21   the so-called Shulaya enterprise and participating in a casino

22   fraud scheme.  He's the supposed brains of the operation, the

23   computer programmer.  He tried to fix a program to help predict

24   when slot machines would pay out.  He purchased servers and he

25   shipped them to Russia.  I expect Melman will tell you that

I64BSHU4

Mr. Shulaya boasted to him about former successes he had with a similar casino scheme, but ask yourself, if Mr. Shulaya had already successfully pulled off this scheme, why would he need help from a college student?  Melman is in his early 20s, facing a maximum sentence of 40 years.  At the time of his arrest and now he faces mandatory deportation.

Faced with these prospects, Melman made a deal with the government.  In exchange for the stories he will come here and tell you about Mr. Shulaya, the government offered him a cooperation agreement.  He could get a sentence of as little as time served if he plays his role.  I expect the evidence will show you that this casino scheme was nothing more than a fantasy.  As the government told you, it was nothing more than just an elaborate plot.  No actual casino machines were physically manipulated and they invested thousands of dollars into this dream, but made very little in return.

The evidence will show that Melman and Mr. Shulaya did not operate these machines like ATMs, earning an endless supply of cash.  There was never any guarantee that the program would work and I expect the evidence to show you that, in fact, it didn't work very well.  Much like card counting, they sought to increase their odds alone.  It may have been wrong to try to better their chances at the slots, but that's not the question you have to answer.  The question you must answer is whether it was illegal, whether it was a crime.

I64BSHU4

1          The other cooperating witness in this case is Semyon

2     Saraidarov, also known as Sam.  Sam pled guilty to, among other

3     things, conducting an illegal gambling business.  He faces a

4     25-year sentence.  So he made a deal with the government.  Sam

5     was a dealer and a player in several different poker houses,

6     including the one he will tell you was managed by Kutsenko.  I

7     expect he will tell you that he rigged the games he was dealing

8     so he could make more money for himself.

9          He will also tell you that he brought a man to a

10    meeting knowing that the purpose of the meeting was to

11    facilitate the extortion of that man.  I expect Sam will also

12    tell you that Mr. Shulaya helped him get money back for a debt

13    he was owed and Mr. Shulaya asked him for nothing in return.

14          (Continued on the next page)

1              MS. LOUIS-JEUNE:  I and my cocounsel, Anthony Cecutti,

2       are the assigned attorneys for Razhden Shulaya.  This is a

3       serious case with serious consequences.  You as the jury have

4       an awesome responsibility, and we ask that you take that

5       responsibility seriously.

6              Now, we all want to be able to trust our government.

7       We want to trust that the FBI is on our side, but we all know

8       that sometimes they go just a little too far.  That's what

9       happened in this case.  They found criminals willing to tell

10      them stories about Mr. Shulaya, and they gave them all the

11      resources they needed to create their enterprise.  There's only

12      one check on the government when it overreaches in criminal

13      cases, and that is you, the jury.  You, not the government,

14      will decide what evidence is credible, reliable and

15      trustworthy.  Each of you as individuals will decide whether

16      the government has proven beyond a reasonable doubt the charges

17      that are brought against Mr. Shulaya.

18             Mr. Shulaya is presumed innocent.  He sits here before

19      you today cloaked in the mantle of the presumption of

20      innocence, and that presumption of innocence, which Judge

21      Forrest will instruct you on, will remain with Mr. Shulaya

22      throughout the trial.  It will go with you when you retire to

23      the jury room to deliberate at the end of this case.

24             Mr. Shulaya's presumption of innocence can only be

25      destroyed if you find that the government has met its burden

1  and proved each and every element of each and every crime

2  beyond a reasonable doubt.

3        Again, the government has the burden of proof.  Even

4  if we present evidence, that burden never shifts.  It always

5  remains with the government.  They are always responsible for

6  proving the charges in this case.

7        I ask you to remember the oath that you just swore to.

8  Keep an open mind until you've heard all of the evidence, both

9  the direct and the cross-examinations, and importantly, Judge

10  Forrest's instructions of the law in this case.  Hold the

11  government to what our Constitution demands, proof beyond a

12  reasonable doubt.

13        Don't rely on or jump to conclusions based on

14  assumptions, biases or stereotypes.  Don't just accept what you

15  see and hear.  Pull back the curtain.  Analyze the evidence.

16  Analyze the transcripts of the recordings.  Scrutinize the

17  witnesses and their motives.  Be the type of juror you would

18  want if you or a loved one was seated at the defense table in

19  federal court in a criminal trial.

20        After you hear all of the evidence in this case and

21  you examine the lack of reliable evidence presented to you by

22  the government, we will ask you to do one thing.  We will ask

23  you to conclude that the government has failed to meet its

24  burden to prove to you, beyond a reasonable doubt, that

25  Mr. Shulaya was involved in any crime that he is charged with.

1            Thank you.

2            THE COURT:  All right.  Thank you.

3            Ms. Benett.

4            MS. BENETT:  Good afternoon, members of the jury.

5            I'm Megan Benett.  And together with Ken Womble, we

6    represent Avtandil Khurtsidze.  Much of my client's role in the

7    case and my opening statement will be much shorter than what

8    you just heard.

9            I want to thank you for your service in the case.  You

10   just heard the government describe what they expect the

11   evidence to show, and you heard Mr. Shulaya's attorney describe

12   their defense.  We are asking you to keep an open mind when

13   listening to the testimony and the evidence presented at trial.

14           Avtandil Khurtsidze is accused of very serious crimes.

15   He's accused of joining a racketeering conspiracy.  He's

16   accused of conspiring to commit wire fraud.  The evidence that

17   will be elicited during this trial, however -- not just the

18   quantity of evidence but the quality of the evidence -- about

19   Avtandil Khurtsidze will, we have confidence, leave you with

20   doubts, not just doubts but reasonable doubts about Avtandil

21   Khurtsidze's role about what the government calls this vast

22   Shulaya criminal enterprise, a reasonable doubt about what Mr.

23   Khurtsidze knew about the operation of these rigged slot

24   machines, reasonable doubts about Mr. Khurtsidze's relationship

25   with conspirators.

1            And briefly, about the critical relationship here, the

2    relationship between Avtandil Khurtsidze and Razhden Shulaya,

3    we expect that the evidence will demonstrate that the two of

4    these people, these two people, knew each other from their

5    earliest days in post-Soviet Georgia.  They were both born and

6    spent their youths within a tightknit community near Tbilisi,

7    but their paths diverged, and while Razhden Shulaya went to

8    Moscow and then to the United States, becoming, in the

9    government's description, a *vor*, thief-in-law, and developing

10   multiple criminal schemes, Avtandil Khurtsidze remained in the

11   Republic of Georgia, remained living there with his mother,

12   focused from the time he was a boy on becoming a boxer.

13           He trained and built a successful career as a

14   middleweight fighter.  He had many winning bouts within the

15   World Boxing Organization, and he came to the United States in

16   order to be closer to his trainer, who operated out of a

17   world-renowned gym in Brooklyn, to be closer to the

18   professional management organization, which is based here in

19   Manhattan, and to be closer to his friends and his girlfriend

20   and now his infant son herein New York.

21           So you will hear that Avtandil Khurtsidze and Razhden

22   Shulaya had a relationship.  You will hear that they knew each

23   other.  You will hear that they socialized together.  You will

24   hear that Razhden Shulaya liked boxers, liked fighters, liked

25   MMA athletes.  But as Judge Forrest will instruct you at the

1    end of the case, the mere fact of their relationship is not a

2    crime.  The fact that Avtandil Khurtsidze was associated with

3    Razhden Shulaya was not a crime.  The fact that Avtandil

4    Khurtsidze may even have associated around other conspirators

5    in this case is not itself a crime.

6          When you weigh the government's case, with an open

7    mind, looking at Avtandil Khurtsidze not by the company at the

8    defense table but instead scrutinizing the quality and quantity

9    of evidence against him, against him individually, we are

10   confident that the government's case is going to leave you with

11   reasonable doubts about Avtandil Khurtsidze's membership --

12   knowing membership -- in a racketeering conspiracy, and about

13   his membership -- his knowing membership -- in a wire fraud

14   conspiracy.

15         Members of the jury, when you consider that evidence

16   with an open mind and when you hold the government to its

17   burden of proof here, we're confident that you will conclude

18   that the government has not presented sufficient facts to

19   establish that Avtandil Khurtsidze knowingly joined a criminal

20   racketeering enterprise, that he knowingly joined a wire fraud

21   conspiracy, and we are confident that you will return a verdict

22   of not guilty with respect to Avtandil Khurtsidze.

23         Thank you.

24         THE COURT:  Thank you.

25         Would the government like to call its first witness,

I64Wshu4                        Nektalov - Direct

1   please.

2              MR. ADAMS:  Yes, your Honor.  The government calls

3   Mark Nektalov.

4              THE COURT:  All right.  Ladies and gentlemen, while

5   we're waiting, let me give you another piece of information.

6   You'll see that I have two screens here.  One of these screens

7   is like your screen; only my screen will have things on it

8   before I authorize them to be shown onto your screen, so you'll

9   see me looking at things sometimes before you actually can see

10  it.  But I also have a laptop here.  The laptop is not being

11  used for anything other than what we call a Live Note feed.  I

12  have a direct feed from the court reporter, where I can see the

13  transcript in real time.  So when I'm looking at this screen,

14  it's because I'm following or sometimes rereading something

15  that was said, so when you see me look over at it, that's what

16  it's doing.

17             If I have to tap it, it means it's gone to sleep.  I'm

18  not answering email.  All right?  That's what that's about.

19   MARK NEKTALOV,

20       called as a witness by the government,

21       having been duly sworn, testified as follows:

22             THE COURT:  You can proceed, sir.

23             MR. ADAMS:  Thank you, your Honor.

24   DIRECT EXAMINATION

25   BY MR. ADAMS:

I64Wshu4                    Nektalov - Direct

1   Q.  Good afternoon, sir.  Mr. Nektalov, where were you born?

2   A.  I was born in former Soviet Union, in city of Samarkand,

3   Uzbekistan.

4   Q.  When were you born?

5   A.  19 -- 9/19/76.

6   Q.  When did you first move to the United States?

7   A.  1990, April 2.

8   Q.  And in 1990, when you moved to the United States, where did

9   you move to originally?

10  A.  Queens, New York.

11  Q.  How long did you live in Queens?

12  A.  About ten years.

13  Q.  Did there come a time that you moved elsewhere within New

14  York City?

15  A.  Yes, I did.  I moved to Brooklyn, Sheepshead Bay area.

16  Q.  After you moved to the United States, did you go to school?

17  A.  I did.  Went to middle school, eighth grade, but in a few

18  weeks, I dropped out because I didn't fit in.  It was in --

19  closer to Jamaica Estates, Jamaica, New York.  So I didn't fit

20  in in school, so I dropped out and I went to study in the

21  jewelry industry, manufacturing.

22  Q.  Did you also work in the jewelry business?

23  A.  Yeah, I studied for about, like, six months.  Then we

24  started up our own business on 47th Street manufacturing

25  jewelry goods.

I64Wshu4                         Nektalov - Direct

1   Q.  And when you say we, who did you work with?

2   A.  My father and my uncle.

3   Q.  How long did you work on 47th Street as a jeweler?

4   A.  About eight or nine years.

5   Q.  And after you left the jewelry business, what did you do?

6   A.  After I left jewelry business, I moved out to Brooklyn.

7   This was when I moved out, and I started doing apartment

8   rentals in the Sheepshead Bay area.

9   Q.  Let me direct you to mid-2008.  What was your business at

10  that time?

11  A.  Auto brokerage, leasing vehicles.

12  Q.  Where was that business located?

13  A.  1808 Jerome Avenue.

14  Q.  And did you own that business, or were you an employee

15  there?

16  A.  I owned that business.

17  Q.  Can you just talk generally about what kind of things you

18  did?

19  A.  We would provide services for local community.  Basically,

20  if people in need of car deals, and we provided them with

21  special pricing on the market and we drove, you know, delivered

22  the cars to their house and basically contracted them.

23  Q.  Did you deal in any particular kind of car, or was it any

24  kind of car?

25  A.  No.  Absolutely any request.

I64Wshu4                    Nektalov - Direct

1   Q.  And did that business wind down at some point?

2   A.  After Sandy, Hurricane Sandy.

3   Q.  Mr. Nektalov, are you familiar with someone named Razhden

4   Shulaya?

5   A.  Yes, I am.

6   Q.  Do you see that person in court today?

7   A.  Yes, I am.

8   Q.  Could you please point to that person and just describe an

9   article of clothing?

10  A.  I don't see him -- the clothing.  He's sitting right there

11  behind the computer, I guess.

12          MR. ADAMS:  Your Honor, for the record, indicating the

13  defendant, Mr. Shulaya.

14          THE COURT:  Yes, so reflected.

15  Q.  Mr. Nektalov, approximately when did you first meet

16  Mr. Shulaya?

17  A.  First I met Mr. Shulaya, I believe, in 2014, upon his

18  arrival.  They had a get-together in one of the places on

19  Emmons Avenue.

20  Q.  When you say one of the places on Emmons Avenue --

21  A.  Restaurants.

22  Q.  Do you recall the name of the restaurant?

23  A.  I believe it was Fusion at that time.  I'm not --

24  Q.  Who introduced you to Mr. Shulaya in the first instance?

25  A.  One of the persons that I know from 47th Street.  His name

I64Wshu4                     Nektalov - Direct

1   is Zurab.  I don't remember his last name.

2              MR. ADAMS:  Ms. Corrado, could we please, for the

3   witness only, and of course the defense, display Government

4   Exhibit 54, please.

5   Q.  Mr. Nektalov, do you see --

6   A.  Yes.

7   Q.  -- an image in front of you?

8        Do you recognize that person?

9   A.  Yes.

10  Q.  Who is that?

11             MR. ADAMS:  Your Honor, the government offers Exhibit

12  54.

13             THE COURT:  Any objection?

14             MR. CECUTTI:  No, your Honor.

15             THE COURT:  Received.  Ms. Benett.

16             MS. BENETT:  No objection, your Honor.

17             (Government Exhibit 54 received in evidence)

18  BY MR. ADAMS:

19  Q.  You said you don't know this individual's last name, is

20  that correct?

21  A.  No, I never --

22  Q.  How did you know the person you know as Zurab?

23  A.  That's how I got introduced, and that's how everybody

24  called him, so it's just --

25  Q.  Did you know him from working with him previously or from

I64Wshu4                    Nektalov - Direct

1   some other place in your life?

2   A.   Just from 47th Street, making -- I never dealt anything --

3   I mean, I never had any business with him.   Just hi and bye

4   kind of thing.

5   Q.   Do you know what his business was?

6   A.   He was kind of doing purchasing goods, selling goods on

7   47th Street, so like kind of a broker, jewelry broker.

8   Freelance.

9   Q.   And what, if anything, did he tell you about working in the

10  artistic field?

11  A.   He told me he was, he had some special skills of being an

12  artist, a painter, like painting pictures of stuff.

13  Q.   And when you first met Shulaya, for how long had you known

14  Zurab?

15  A.   I met, I believe, Zurab somewhere in mid-'90s and I met

16  Shulaya in 2014, so you would think about -- what?

17  Q.   Let me turn back to that first meeting with Shulaya for a

18  moment.   You said it was at a restaurant on Emmons Avenue?

19  A.   Correct.

20  Q.   Approximately how many people were with you at the

21  restaurant on that day?

22  A.   About 15, 20 people at that time.

23  Q.   Can you describe the interactions you had with Shulaya at

24  that first meeting?

25  A.   There was no straight interaction.   It was just, it was

I64Wshu4                    Nektalov - Direct

1   loud music.  It was a loud place, actually, so we were just

2   having drinks, having food, and there was a time he introduced

3   himself, I introduced myself, and I believe in an hour or so,

4   everybody, you know, split.

5   Q.  Was that the last time you saw Mr. Shulaya?

6   A.  No.

7   Q.  Can you describe the next time you met Mr. Shulaya?

8   A.  About a week or so, Mr. Shulaya called me, actually,

9   requesting for specific car options, to purchase -- to lease,

10  actually, a car, and I told him that I cannot -- he asked me if

11  I could meet him someplace.  I told him I cannot leave my house

12  at that point; I had some relations going on in my house.  So I

13  told him to come by, by my house and I told him I could meet

14  him and I could explain to him the situation, what the, how the

15  financing or leasing structure work, what kind of credit

16  history you have to have, and how the leasing options are

17  established in the United States.

18  Q.  When he met you, was he alone, or was he with other people?

19  A.  Other individual.

20  Q.  Do you recall how he came to your house?

21  A.  No, I didn't -- doesn't -- I don't recall a specific

22  vehicle.  It wasn't that --

23  Q.  And when he arrived, what, if anything, did he ask you for?

24  A.  He asked me if he can get -- purchase a lease in any way,

25  what did he need to purchase a lease.  So I give him all the

1    instructions what he needs, that the best way for him to do,

2    without having any credit history in the United States, because

3    if he's freshly arrived, he would need a cosigner, or -- and

4    substantial down payment on the car.

5    Q.   What kind of car was he thinking of leasing, if you recall?

6    A.   He was thinking about high-end cars, like something, a

7    Range Rover, a Mercedes or a Maserati.

8    Q.   And did there come a time that you went someplace else with

9    Mr. Shulaya?

10   A.   Yes.  We -- I told him at that point when I was talking to

11   him, when he came to the house, I told him whenever he's going

12   to be ready with whatever decision he's going to make, we can

13   go out to the dealership and I try to get the vehicle for him.

14   Q.   Did you agree to go?

15   A.   Yes.

16   Q.   Can you describe the trip you took with Mr. Shulaya?

17   A.   Well, it was, I believe, a week or so later or a few days

18   later.  I don't recall right now.  He called me and then he

19   told me he's ready, he wants to take some action, he has a

20   cosigner, and I told him I will pick him up personally from his

21   hotel in the city, which I did, and I took him straight to

22   downtown Maserati dealership, I believe, somewhere on Canal

23   Street, somewhere in that area.  And we spent several hours

24   there trying to submit his paperwork to the bank and getting

25   him finance or lease options, but he's -- his situation, he had

I64Wshu4                          Nektalov - Direct

1     no substantial funds, and the cosigner he allegedly can get

2     didn't go through as well.

3     Q.  Approximately how long did you spend with Mr. Shulaya on

4     that afternoon?

5     A.  About three hours, three, four hours, something like that.

6     Q.  When you say you picked him up in the city, you mean

7     Manhattan?

8     A.  Excuse me?

9     Q.  You mean Manhattan when you say --

10    A.  Manhattan, correct.  Downtown Manhattan.

11    Q.  And did Mr. Shulaya end up buying or leasing a vehicle?

12    A.  No.

13    Q.  After that day, did there come a time that you saw Zurab

14    speak with Mr. Shulaya?

15    A.  After that date, directly, yeah.  I mean, there was

16    situation that I end up with that --

17    Q.  Did you ever provide a telephone for speaking to

18    Mr. Shulaya?

19    A.  Yes.

20    Q.  To whom?

21    A.  Zurab.

22    Q.  Can you describe providing that phone and the conversation

23    that you had?

24    A.  I was having dinner --

25              MS. BENETT:  Objection.

1      THE COURT:  Hold on.  All right.  Why don't we take

2  the question in two pieces.

3      Mr. Adams, why don't you take the description of

4  providing the phone first, and we'll see about the second

5  piece.  Take it step by step.

6      MR. ADAMS:  Certainly.

7  Q.  Mr. Nektalov --

8  A.  Yes.

9  Q.  -- why were you providing your phone for this conversation?

10 A.  Because Zurab's, Zurab's cell phone died and he didn't had

11 the number.  He didn't remember the number.  So I told him that

12 I have the number in my phone; if he wishes to contact him, I

13 could give him my cell phone.

14 Q.  And did you do that?

15 A.  Yes I did.

16 Q.  Did you see a conversation ensue after that?

17 A.  Well, I don't exactly -- what you mean?

18 Q.  Did you see Zurab use your phone after you provided it?

19 A.  Of course.  I handed to him personally, after dialing

20 Mr. Shulaya.

21 Q.  Without telling me the words that you heard, what did you

22 see of that conversation?

23 A.  I see very emotional and disrespectful conversations

24 towards Mr. Shulaya, and it was very unpleasant, but I was

25 concentrating on my dinner at that time, and --

1  Q.  When you say disrespectful, what, if anything, did you hear

2  Zurab say to Mr. Shulaya?

3          MS. BENETT:  Objection.

4          MR. CECUTTI:  Objection, your Honor.

5          THE COURT:  I'll allow that in that way for state of

6  mind.

7          You may proceed.

8  A.  Basically what I would have overheard, because he was in

9  and out, walking around, because he was so emotional and

10  distressed, that he didn't like the way he was running the

11  crew.

12  Q.  Approximately how long was that telephone call?

13  A.  About five, seven minutes, or so.

14  Q.  After that call was over, did you get your phone back?

15  A.  Yes.

16  Q.  Did you speak with Shulaya directly after that?

17  A.  After that phone call?

18  Q.  Yes.

19  A.  A couple hours later, I received a call, phone call from

20  Mr. Shulaya, asking me to meet with him.

21  Q.  Where did he ask to meet?

22  A.  East Fifth And Avenue X.

23  Q.  Mr. Nektalov, do you recall the phone number from which

24  Mr. Shulaya called you?

25  A.  That's the only phone number for him I have in my cell

I64Wshu4                    Nektalov - Direct

1    phone, saved from the date I -- he called me, so --

2    Q.  Do you recall it offhand right now?

3    A.  No.  I mean, if I see it, I would definitely recognize the

4    number.

5              MR. ADAMS:  Ms. Corrado, if we could display the final

6    page of 3523, page 003, for Mr. Nektalov.  Or if we don't have

7    that electronically, I can walk it up.

8              Your Honor, may I approach?

9              THE COURT:  Yes.

10             Thanks.

11   A.  Yes, this picture's taken from my cell phone.  This is the

12   number that --

13   Q.  Having looked at that number, does it refresh your

14   recollection as to what the number was?

15   A.  Yes.

16   Q.  What was the number?

17   A.  929-247-6909.

18   Q.  Where did Mr. Shulaya tell you to go after he spoke with

19   you?

20   A.  He told me that he would meet me on East Fifth and Avenue

21   X.  When I approached, I waited for a few minutes, and then he

22   came out to the car and asked me if I don't mind getting

23   upstairs to the building.

24   Q.  The building that you were directed towards, had you ever

25   been inside that building before?

 1    A.  No.

 2    Q.  Did you recognize it as anybody's residence or business?

 3    A.  No.

 4    Q.  Was Mr. Shulaya by himself or with other people at that

 5    time?

 6    A.  He came out of a BMW, which I saw in my, in my mirror, and

 7    approached me.  So I don't know who he was with, so I cannot

 8    say.  And then he asked me to come up.  I parked the car and I

 9    came up with him to the apartment.

10    Q.  Regardless of whether you knew anyone, was Mr. Shulaya by

11    himself or with other people?

12    A.  By himself.

13    Q.  Did you still have your phone on you at that point?

14    A.  Correct.

15    Q.  And did you go anywhere else with Shulaya at that point?

16    A.  No.

17    Q.  Did there come a point that you went inside the building?

18    A.  Yes.

19    Q.  Can you describe where you went within the building?

20    A.  We went in.  We took stairs.  I don't recall the floor, but

21    once we went up the stairs, we came into the apartment.

22    Q.  What, if anything, were you asked to do with your phone at

23    that point?

24    A.  When we came in?

25    Q.  Yes, sir.

I64Wshu4                    Nektalov - Direct

1   A.  I was patted down and they took my phone.

2   Q.  Did you know the person who patted you down?

3   A.  Excuse me?

4   Q.  Did you know the person who patted you down?

5   A.  I don't remember that point, that situation that I was

6   with.  It was very distressful situation.

7   Q.  When you walked into the room, approximately how many

8   people did you see?

9   A.  Oh, about 10 to 15 people, maybe more.  I'm not sure,

10  because some of the people was in the dine -- living room.

11  Some of the people was -- so much movement going on there, I

12  really don't know.

13  Q.  Were there any women around --

14  A.  No.

15  Q.  I'm sorry?

16  A.  No.

17  Q.  Was there any food on offer?

18  A.  I don't recall that.  I didn't pay attention to that.

19  Q.  Did it appear to you to be a social gathering?

20          MR. CECUTTI:  Objection, your Honor.

21  A.  It was --

22          THE COURT:  Hold on.  Let me think about this for a

23  moment.

24          Sustained.  Rephrase.

25  BY MR. ADAMS:

I64Wshu4                    Nektalov - Direct

1    Q.  Let me ask a few additional questions, Mr. Nektalov.  Was

2    there music playing?

3    A.  No.

4    Q.  Had you been invited there for purposes of a party?

5    A.  No.  It was just -- he wanted to discuss something, and I

6    didn't know what was that, so it wasn't a party.  It wasn't

7    nothing going on like that.  It wasn't a social event.

8    Q.  Approximately how big was this apartment?

9    A.  I believe like one-bedroom apartment.

10   Q.  Did you have an opportunity to walk around the apartment at

11   all and --

12   A.  There was one time an opportunity when I asked for some

13   water, and I walked into the kitchen to get some, from the

14   fountain -- from the kitchen faucet.

15   Q.  How was the apartment furnished?

16   A.  I mean, it's not liveable apartment.  I didn't see any

17   framed pictures, or anything like that.  I mean, it was just a

18   basic apartment, where you see just a mattress on the floor,

19   and stuff like that.  There was no covers on it, nothing.

20          MR. ADAMS:  Ms. Corrado, can we please, for the

21   witness, publish Government Exhibit 2, for the witness only.

22   Q.  Mr. Nektalov, do you recognize that image?

23   A.  Yes.

24   Q.  Who is that?

25   A.  This is Zurab.

I64Wshu4                          Nektalov - Direct

```
 1   Q.  Is that a different Zurab than the first Zurab you're
 2   talking about?
 3   A.  Correct.
 4   Q.  And where, if anywhere, had you seen this person before?
 5   A.  I seen him in Sheepshead Bay a lot, in different locations,
 6   and different, like --
 7            THE COURT:  I'm sorry.  I didn't hear the last part of
 8   the answer.
 9            THE WITNESS:  It was different locations in Sheepshead
10   Bay area.  Could be at a restaurant or outside, different
11   businesses.
12            THE COURT:  All right.
13   BY MR. ADAMS:
14   Q.  Had you ever seen this person with Mr. Shulaya?
15   A.  Yes, at that time, when he was in an apartment.
16            MR. ADAMS:  Your Honor, the government offers Exhibit
17   2.
18            THE COURT:  Any objection?
19            MR. CECUTTI:  No objection, your Honor.
20            THE COURT:  All right.  Received.
21            (Government Exhibit 2 received in evidence)
22            THE COURT:  Ms. Benett, I'm going to assume that you
23   join in the objection unless you tell me otherwise.
24            MS. BENETT:  OK.
25            THE COURT:  All right.
```

I64Wshu4                        Nektalov - Direct

1   BY MR. ADAMS:

2   Q.  You said you saw this person in the apartment that you were

3   just describing, correct?

4   A.  Correct.

5   Q.  Where in the apartment did you see this Zurab?

6   A.  I don't recall exactly, because everybody was, like, moving

7   around the apartment, and all that stuff.  It was in the living

8   room.

9          MR. ADAMS:  Could we please publish to the witness

10  only Government Exhibit 27.

11  Q.  Do you recognize that person?

12  A.  Yes.

13  Q.  Who is that?

14  A.  I don't know his name, but I do recollect his face and I

15  believe he's a UFC fighter.

16  Q.  And where, if anywhere, had you seen that face?

17  A.  As well in the living room.

18         MR. ADAMS:  Your Honor, the government offers Exhibit

19  27.

20         THE COURT:  Any objection?

21         MR. CECUTTI:  No objection.

22         THE COURT:  Received.

23         (Government Exhibit 27 received in evidence)

24  BY MR. ADAMS:

25  Q.  Mr. Nektalov, do you see the person displayed in Government

I64Wshu4                          Nektalov - Direct

1    Exhibit 27 in the courtroom today?

2    A.  Not really.

3            MR. ADAMS:  OK.  And can I show you Government Exhibit

4    9 just for the witness, please.

5    Q.  Do you recognize that person?

6    A.  Yes.

7    Q.  Who is that?

8    A.  Artur Vinokurov, I believe so.

9    Q.  And on the date that we're talking about, when and where

10   did you see this person?

11   A.  Sheepshead Bay area, like around the different restaurants

12   and different locations in Sheepshead Bay area.

13   Q.  Was this person in the apartment that you were just

14   describing, if you recall?

15   A.  I believe so.  I'm not sure, but I think so, because --

16           MR. ADAMS:  Your Honor, the government offers Exhibit

17   9.

18           THE COURT:  Any objection?

19           MR. CECUTTI:  No objection.

20           THE COURT:  Received.

21           (Government Exhibit 9 received in evidence)

22   BY MR. ADAMS:

23   Q.  Mr. Nektalov, what was happening in the apartment when you

24   walked in?

25   A.  I seen so many people in there, standing.  I seen Zurab on

1   his knees, beat up, with bruises and blood on his face.

2   Q.  When you say Zurab, are you referring to the person in

3   Government Exhibit 54?

4           MR. ADAMS:  Can we put that back on the screen,

5   please.

6   A.  Correct.

7   Q.  Could you describe what his face looked like when you first

8   saw him that day?

9   A.  Well, he had a bruise -- bruise here on top of his -- I

10  mean, his eyes was bruised up.  His nose was bleeding, so --

11  Q.  And what was his posture when you walked into the room?

12  A.  He was on his knees, hands behind his back.

13  Q.  Was anyone striking him at the time that you walked in the

14  room?

15  A.  No, sir.

16  Q.  Who was standing closest to Mr. -- to Zurab?

17  A.  Mr. Shulaya.

18  Q.  And what, if anything, was Shulaya saying at that point?

19  A.  He was trying to figure out what happened, why did this

20  situation occur when Zurab would start disrespecting him over

21  the phone.  So basically he was unhappy because, you know, of

22  Zurab for disrespectfully in front of actually other people

23  talking about Mr. Shulaya.

24  Q.  When you say he was trying to understand something about a

25  situation, which situation are you talking about?

I64Wshu4                        Nektalov - Direct

1    A.   The situation that occurred when I gave my phone number to

2    call Mr. Shulaya to Zurab.

3              THE COURT:   When we reach a logical breaking point,

4    Mr. Adams, why don't we take our midafternoon break.

5              MR. ADAMS:   Thank you, your Honor.

6              THE COURT:   Is now a good time?

7              MR. ADAMS:   Now is fine.

8              THE COURT:   Terrific.   Ladies and gentlemen, we'll

9    take our midafternoon break now.   We'll take about 12 minutes,

10   or so.   Somewhere between 10 and 15 is what I'm trying to

11   signal.   Don't go too far.   Don't talk to each other or anybody

12   else about the case, and we'll see you in a few minutes.   Thank

13   you.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  I'll just ask the witness to step out for

3    a moment.  I have one thing before we continue, when the

4    witness is gone.

5           (Witness not present)

6           THE COURT:  I want to just suggest to some people who

7    are in the audience that smirking, laughing, body language,

8    which is suggestive of not believing the witness's testimony,

9    or otherwise having views as to the testimony doesn't help

10   anyone.  The jury is aware of everything that happens in this

11   room, and if I start to see body language that is suggestive of

12   commentary on the witness, I will throw you out of the

13   courtroom.  That's your only warning.

14          Let's take a break.

15          MR. ADAMS:  Thank you.

16          (Recess)

17          THE COURT:  Thank you, ladies and gentlemen.  We have

18   the jury ready.  We were also trying to get the temperature

19   adjusted both here in the courtroom and also in the jury room

20   and the robing room.  We're being frozen out, but we think

21   we've fixed it.

22          All right.  Joe, let's go ahead and bring out the

23   jury.

24          (Continued on next page)

25

I64Wshu4                         Nektalov - Direct

 1                (In open court; jury present)

 2                THE COURT:  All right.  Ladies and gentlemen, let's

 3     all be seated.  As soon as you reach your seats, we'll all be

 4     seated.

 5                We have tried to get the temperature adjusted.  It's

 6     really because the temperature outside was really hot and then

 7     the air-conditioning came on, and then it got cool, so it's

 8     been hard to keep an entire large building adjusted just right,

 9     but we've had the engineering folks in here and they fiddled

10     with some things.  Hopefully it will be a little bit better.

11                You can continue, sir.

12     BY MR. ADAMS:

13     Q.  Mr. Nektalov, can you do me a favor and keep close to the

14     microphone and keep your voice up, and I'll try to do the same.

15     A.  All right.

16     Q.  Just before we took a break, we were discussing the inside

17     of this room that you had walked into.  Could you describe how

18     the 15 or so people that you saw inside the room were standing

19     when you walked in?

20     A.  There was a long, like, oval table in the dine -- living

21     room, so they all gathered around the table.  Some of them were

22     behind me, so it was like a big circle, with Mr. Shulaya.

23     Zurab was the one that was on his knees, and I was basically --

24     basically all three of us were in the middle of this circle.

25     Q.  And were the other people surrounding the three of you?

I64Wshu4                        Nektalov - Direct

1   A.  Correct.

2   Q.  When you arrived in the middle of this circle, what, if

3   anything, did Shulaya say to you?

4   A.  Nothing.  He sat next to Zurab and start asking me

5   questions, whether -- he said, What's going on?  How --

6   why's -- how can I let Zurab disrespect him in this, such a

7   manner that he was disrespectful and all that stuff.  So

8   basically, he asked me a question, How can I let Zurab talk

9   about Mr. Shulaya like this in front of other people?

10      And I answered to him that I was introduced by Zurab to

11  you, so I know you guys are friends -- or grew up together; I

12  have no idea -- and why should I go in the middle of you guys'

13  relationship.  I think it's none of my concern how you guys

14  approach each others in whatever way you want to approach each

15  other.

16  Q.  What, if anything, did Mr. Shulaya say about why it was a

17  problem that Zurab had disrespected him?

18  A.  Excuse me?  Can you repeat that again?

19  Q.  Sure.  What did Mr. Shulaya say about why it was a problem

20  that Zurab --

21  A.  Why it was a problem?

22  Q.  I'm sorry.  If I could just finish so the court reporter

23  can get the whole question.

24      -- why it was a problem that Zurab had disrespected him?

25  A.  Because he was a thief-in-law, and it's against the rules

I64Wshu4                    Nektalov - Direct

1   for -- to approach him like this, to talk about him like this,

2   and certain -- I mean, certain people, they cannot talk about

3   him because he's a thief-in-law is.

4   Q.  Did you know what a thief-in-law was?

5   A.  I watch movies.  I got an idea.

6   Q.  And what language was this happening in?

7   A.  Russian.

8   Q.  In Russian, what is the word for thief-in-law?

9   A.  *Vor v zakonei*.

10  Q.  The first part of that, is that *vor*?

11  A.  *Vor*.

12  Q.  Had you ever met a *vor* before this day?

13  A.  Not that I know of.

14  Q.  What was your response to this direction from Shulaya?

15  A.  My response, I told him, You guys have more relationship

16  than I -- than me being in between you, so I mean, I don't know

17  these rules.  I don't know what the -- how should I manage

18  myself.  I'm not nobody -- I am nobody to this circle, so I

19  don't know all the manners, and all that stuff.  And basically

20  I made a statement that what -- it's none of my concern.

21  Q.  While you were making this statement, where was Zurab?

22  A.  Zurab was in the same place, on the knees, with hands

23  behind his back, and Razhden, Mr. Shulaya, was next to him and

24  tried to explain to him that he was disrespectful towards him

25  in front of a lot of other people that were standing there, and

1    he made a point that he should never be such a disrespectful,

2    so Mr. Zurab said he was under alcohol influence and drug

3    influence; that's why all this happened, so --

4    Q.  Did anyone in the room come to Zurab's aid as far as you

5    saw?

6    A.  There was one gentleman, started talking about, you know,

7    It happens, like trying to help out the situation to, for

8    Zurab, so -- He made a mistake, it happens, you know.

9    Q.  Did anybody come to clean Zurab's face off?

10   A.  No, not at that point.

11   Q.  Did you see Zurab leave in any way?

12   A.  Not at that point.

13   Q.  Did there come a time that you were allowed to leave the

14   apartment?

15   A.  After they made up, I guess, he was -- Zurab apologized to

16   Mr. Shulaya, and he -- after that, it was like -- I took off.

17            MR. CECUTTI:  Objection, your Honor.  It's

18   unresponsive to the question.

19            THE COURT:  Hold on.

20            I'll allow it.

21   Q.  Mr. Nektalov, were you allowed to leave?

22   A.  Yes.

23   Q.  Were you given your phone back?

24   A.  Yes.

25   Q.  Did you ever see Shulaya again after that day?

1    A.  No.

2           MR. ADAMS:  Nothing further, your Honor.

3           THE COURT:  All right.  Thank you.

4           Mr. Cecutti.

5    CROSS-EXAMINATION

6    BY MR. CECUTTI:

7    Q.  Good afternoon, sir.

8    A.  Hey there.

9    Q.  You and I have never met before, correct?

10   A.  Correct.

11   Q.  Never had a meeting, correct?

12   A.  Correct.

13   Q.  Never had a meeting to discuss this case, correct?

14   A.  Correct.

15   Q.  Or your testimony, correct?

16   A.  Correct.

17   Q.  You have met with members of the United States government

18   to discuss this case, correct?

19   A.  Correct.

20   Q.  You met with Mr. Adams, the gentleman who was asking you

21   questions?

22   A.  Correct.

23   Q.  You met with Mr. Thomas, is that correct?

24   A.  Correct.

25   Q.  You met with Special Agent Hanratty, is that correct?

I64Wshu4                        Nektalov - Cross

1   A.   Correct.

2   Q.   And you met with them multiple times, correct?

3   A.   One.

4   Q.   You met with them last year, in 2017, correct?

5   A.   No.

6   Q.   You met with them this year, correct?

7   A.   I met with them yesterday.

8   Q.   And you also met with them on May 25, is that right?

9   A.   I spoke to them over the phone.  I was -- Mr. Rob -- I

10  don't remember the last name.

11  Q.   So that we're clear, you spoke with the government

12  approximately a week ago about this case, correct?

13  A.   Correct.

14  Q.   And you met with them yesterday, correct?

15  A.   Correct.

16  Q.   You spoke to them yesterday, right?

17  A.   Correct.

18  Q.   And a year ago, you spoke with them as well, right?

19  A.   No.

20  Q.   The only time that you've ever met with the United States

21  government was recently, about a week ago?

22  A.   Correct -- no, not a week ago.  I mean -- I don't remember.

23  It was, was a few weeks ago, when they called me, Mr. Rob

24  called me.  I don't, I don't remember the exact date, but it

25  was, it was last month, somewhere last month that I had a phone

I64Wshu4                      Nektalov - Cross

1    call.

2    Q.  Now, in terms of your meetings with them, you went over the

3    questions that were asked of you today by Mr. Adams, correct?

4    A.  Come again?

5    Q.  The questions that were asked of you this afternoon by

6    Mr. Adams, you've heard those questions before, correct?

7    A.  Yes.

8    Q.  You've gone over them, right?

9    A.  Yes.

10   Q.  Now, your testimony is that you walked into an apartment

11   and you saw a man on his knees, correct?

12   A.  Correct.

13   Q.  And he, in your opinion, had been beaten, correct?

14   A.  Not an opinion.  It was obvious on his face.

15   Q.  That he'd been beaten?

16   A.  Correct.

17   Q.  And this man was Zurab, right?

18   A.  Correct.

19   Q.  This man you had known for how long?

20   A.  Since mid-'90s.

21   Q.  About 20 years, correct?

22   A.  Somewhere in that.

23   Q.  And you knew each other from work, correct?

24   A.  We, we seen each other, from work.

25   Q.  You socialized?

I64Wshu4                    Nektalov - Cross

1   A.  No.

2   Q.  Consider yourselves acquaintances?

3   A.  Hi and bye occasions.  Sitting at a table somewhere, we

4   definitely shared a drink.

5   Q.  You socialized with him?

6   A.  Not that close.

7   Q.  You've known him for 20 years, though, correct?

8   A.  Seen him for 20 years, yeah, here and there.

9   Q.  And here's this man who is in this room surrounded by all

10  these men, correct?

11  A.  Correct.

12  Q.  And you believed he'd been beaten, right?

13  A.  Correct.

14  Q.  And during this time, while you were in this apartment, you

15  were scared, correct?

16  A.  Correct.

17  Q.  Frightened, right?

18  A.  Yes.

19  Q.  And during this time, you went to the kitchen and got

20  yourself a glass of water, correct?

21  A.  Not during this time.  With all the escalation, after --

22  after communicating and after Zurab apologized and everything

23  else, then I asked for water, because everything, all the

24  escalation just came down, and I realized that everything's --

25  you know, I'm going to be getting out of here alive.  That's

1   when I asked for water.

2   Q.   You went to the kitchen yourself and poured it, correct?

3   A.   Actually, Mr. Shulaya went to the kitchen.  OK?  And I

4   followed him there.  OK?  He gave me water, and then we came

5   out together.

6   Q.   You didn't call for help?

7   A.   Never, sir.

8   Q.   You didn't call 911, right?

9   A.   No.  I didn't have my phone.

10  Q.   Well, you got your phone after you left the apartment,

11  correct?

12  A.   No.

13  Q.   But you didn't try to call 911 about it?

14  A.   I called Mr. Zurab about 30 minutes after I left, and I

15  asked him if he needed to be escorted to hospital.

16  Q.   Sir, that wasn't my question.  My question was, did you

17  call 911?

18  A.   No, I never did.

19  Q.   And you never tried to help Zurab in the apartment either,

20  correct?

21  A.   How can I help?

22  Q.   My question, sir, is you didn't try and help Zurab inside

23  the apartment, correct?

24  A.   How can I help?

25  Q.   My question, sir, is you didn't try and help --

I64Wshu4                    Nektalov - Cross

1              MR. ADAMS:  Objection, your Honor.

2    Q.  -- Zurab, correct?

3              THE COURT:  Sustained.

4    A.  I cannot answer this question, because I --

5              THE COURT:  Hold on.

6              THE WITNESS:  Sorry.

7              THE COURT:  When I sustain, it means actually

8    everything sort of stops.

9              THE WITNESS:  Got it.

10             THE COURT:  Go on to a different question or rephrase

11   the question.

12   BY MR. CECUTTI:

13   Q.  Sir, you've heard about the term "thieves-in-law," right?

14   A.  Here and there.

15   Q.  And your knowledge is from the movies, correct?

16   A.  Correct.

17   Q.  You never actually met a *vor*, correct?

18   A.  I don't understand your question.  What is it?

19   Q.  You've never met a *vor*, correct?

20   A.  Maybe I did.  I don't know.

21   Q.  No one ever told you, correct?

22   A.  Correct.

23   Q.  Now, you testified that you worked in the auto leasing

24   industry.  Is that right?

25   A.  Correct.

I64Wshu4                    Nektalov - Cross

1    Q.  And before that, you worked at a brokerage, correct?

2    A.  No.  That was the brokerage.

3    Q.  And before that, you worked in the jewelry industry?

4    A.  Correct.

5    Q.  Now, you participated in the selling of stolen checks,

6    correct?

7    A.  Correct.

8    Q.  In fact, you were involved in selling 71 stolen checks to

9    somebody, correct?

10   A.  Correct.

11   Q.  And those stolen checks were real people, right?

12   A.  Correct.

13   Q.  Involving real money, correct?

14   A.  Correct.

15   Q.  And your intention was to rip them off, correct?

16   A.  I never met these people.  That's No. 1, and I never stole

17   those checks, personally.  OK?  And I did my time.  I paid my

18   time to the society, and I'm really sorry about the situation,

19   and I don't wish to discuss this anymore, because I did a

20   mistake and I'm still paying for that mistake emotionally and

21   psychologically.

22   Q.  These stolen checks that you sold, you sold them for

23   $5,200, correct?

24   A.  I refuse to answer any questions about this prior --

25            THE COURT:  No, actually.  It's a question that he can

I64Wshu4                        Nektalov - Cross

1    ask you, and so --

2              THE WITNESS:  Do I have to answer this question?

3              THE COURT:  You should answer his questions truthfully

4    and honestly, and we'll take it step by step.  I'm sure

5    Mr. Cecutti will not belabor it beyond what he needs to do.

6              Mr. Cecutti, why don't you reask the question.

7              MR. CECUTTI:  Thank you, your Honor.

8    Q.  Sir, again, you sold stolen checks to somebody, correct?

9    A.  Correct.

10   Q.  And you sold 71 of those stolen checks, correct?

11   A.  Correct.

12   Q.  And you sold those checks for $5,200?

13   A.  Correct.

14   Q.  And you pleaded guilty to fraud, correct?

15   A.  Correct.

16   Q.  And you were sentenced to 18 months in prison, correct?

17   A.  Correct.

18   Q.  And you served your time, right?

19   A.  Correct.

20   Q.  And you were released when; in what year?

21   A.  2007, I believe.

22   Q.  Now, sir, you were born in Uzbekistan?

23   A.  Correct.

24   Q.  You're not a United States citizen, correct?

25   A.  No.

I64Wshu4                        Nektalov - Cross

1   Q.  You are a green-card holder, correct?

2   A.  No.

3   Q.  You're not a permanent resident?

4   A.  No.

5   Q.  What is your status here in the United States?

6   A.  I lost my status after my, after I did my time, and I was

7   actually in ICE holding.  OK.  They actually deported me to

8   former Soviet Union, and since Soviet Union doesn't exist, I'm

9   stateless, and I live in the United States.

10  Q.  So you're not a citizen, right?

11  A.  Correct.

12  Q.  You're not a permanent resident any longer, right?

13  A.  Correct.

14  Q.  Because you lost that as a result of your fraud conviction?

15  A.  Correct.

16  Q.  What is your status?

17          MR. ADAMS:  Objection.  Relevance.

18          THE COURT:  I'll allow a limited amount of this.

19          You can give your understanding of it if you have any

20  further understanding other than what you've already said.

21  A.  I'm stateless, status-less.  I don't know.  I have no

22  answer to that.  I have no other answer for that.

23  Q.  So it's fair to say the government could deport you,

24  correct?

25          MR. ADAMS:  Objection.

I64Wshu4                          Nektalov - Cross

1          THE COURT:  What you should do is if you have an

2   understanding of that, then you can give your understanding.

3   If you don't, we're not asking for you to opine right now on

4   the nuances of immigration law.

5   A.  I guess so.

6   Q.  Now, prior to your sale of the stolen checks, you also

7   participated in forgery, correct?

8   A.  Correct.

9   Q.  You, in fact, possessed forged checks, right?

10  A.  Correct.

11  Q.  You took those forged checks and you went to a bank,

12  correct?

13  A.  No, that's not correct.

14  Q.  You attempted to cash those checks, correct?

15  A.  No.

16  Q.  What did you do with the checks?

17  A.  I purchased items with those checks.

18  Q.  So you purchased items with forged checks, correct?

19  A.  Correct.

20  Q.  And you were convicted of forgery, correct?

21  A.  Correct.

22  Q.  Multiple convictions of forgery, correct?

23  A.  Correct.

24  Q.  Now let's turn to -- let's go back to auto leasing.  You

25  ran a company called Superb Auto Leasing --

```
 1   A.  Correct.

 2   Q.  -- is that correct?

 3       And that business was here in New York City, correct?

 4   A.  Brooklyn, New York.

 5   Q.  That's New York City, right?

 6   A.  Correct.

 7   Q.  And as part of your work, you would lease cars to

 8   customers, right?

 9   A.  Correct.

10   Q.  And I believe you testified that these customers were

11   people in need, correct?

12   A.  People that were looking for cars, deals on leases --

13   need -- I mean, I don't understand your question.  Need?

14   Q.  People who need a car --

15   A.  Yeah.

16   Q.  -- right?

17       You didn't charge to help them out, correct?

18   A.  Yeah.

19   Q.  You gave them special pricing, right?

20   A.  Correct.

21   Q.  And you would even arrange for the delivery of the vehicle

22   to their home, right?

23   A.  Correct.

24   Q.  And you would tell customers that you can make any request

25   happen, correct?
```

I64Wshu4                          Nektalov - Cross

1    A.  Not every.  As long as it's a law-abiding request and

2    something that, you know, goes with the law and the market

3    pricing, whatever I get, with, of course, a profit margin

4    included there.

5    Q.  A customer would come and see you, and you would help them

6    lease a vehicle, correct?

7    A.  Correct.

8    Q.  They would bring a down payment, right?

9    A.  Correct.

10   Q.  They would give you that down payment?

11   A.  Correct.

12   Q.  And you would help them with their financing of that

13   vehicle, correct?

14   A.  I work with the franchise dealerships and I process

15   everything with them, correct.

16   Q.  And there were times when customers were unhappy with your

17   services, correct?

18   A.  Well, you have -- any business have some bad reviews as

19   well.

20   Q.  You have had many bad reviews, correct?

21   A.  Maybe.  We have a big -- we have sometimes substantial

22   value of customers that came in there.

23   Q.  And isn't it true, sir, that these customers that would

24   come in and they would complain about the fact that you did not

25   follow through on your end of the deal and you withheld and

I64Wshu4                          Nektalov - Cross

1   kept their money, correct?

2   A.   There was an incident, yeah.  We did have that, because of

3   a release and the customer did not supply me with the

4   stipulations for the bank.  He refused to cooperate.  Got lost

5   for couple of months.  Yes, there were situations like that

6   too, and I released the car on my end without --

7   Q.   And never --

8   A.   Trusting the customer that he would bring stipulations to

9   me so I could get funded.

10  Q.   And you never gave them their money back; you never gave

11  them their money back, correct?

12  A.   We went through a lawsuit with them, and I believe there

13  was -- it was settled there, at court, so --

14  Q.   Which lawsuit was this?

15  A.   It was -- I think it was on TV.  It was on TV, I believe.

16  OK?  So there was a situation there.

17  Q.   Who was on TV?

18  A.   TV court, or something like that, so -- I don't remember.

19  Q.   And this occurred while you were running Superb Auto

20  Leasing?

21  A.   Probably.  I think so.

22  Q.   Now, you ran a company called Nekta Auto Group, correct?

23  A.   Correct.

24          THE COURT:  Was that like Judge Judy or something?

25          THE WITNESS:  Something like that, yeah.

I64Wshu4                         Nektalov - Cross

1    Q.  You ran a company called Nekta Auto Group, right?

2    A.  Correct.

3    Q.  And that was after Superb leasing, correct?

4    A.  Correct.

5    Q.  And as part of your work with this company, you were

6    involved in exporting cars outside of the United States,

7    correct?

8    A.  There was couple cars that I shipped out, yeah.  Not

9    shipped out.  I mean, like I sold these cars to a company here

10   in United States.  OK?  And whatever they did with that, I have

11   no idea.  Did they ship them?  Did they keep them?  I have no

12   idea.

13   Q.  You had a client named Golden World International, correct?

14   A.  Correct.

15   Q.  And they were based in Taiwan?

16   A.  I don't know where they were based on.

17   Q.  They were based outside the United States, correct?

18   A.  Correct, somewhere there.

19   Q.  And they were involved in exporting cars from the United

20   States to China, correct?

21   A.  Not sure.  That's what they were saying, but yes.

22   Q.  That was your understanding, right?

23   A.  That was my understanding.

24   Q.  And you contacted them in April of 2014 about exporting

25   vehicles, correct?

1   A.  They contacted me.

2   Q.  And you had a conversation with them about exporting

3   vehicles, correct?

4   A.  Correct.

5   Q.  And specifically, they were looking for luxury cars to be

6   exported, correct?

7   A.  Correct.

8   Q.  And you entered into a contract with them, correct?

9   A.  There was no contract.  There was just make sure -- they

10  were, they were in the market and I gave them whatever I had,

11  you know, whatever I can get my hands on.

12  Q.  You're saying to this jury that there was no written

13  contract, correct?

14  A.  Correct.

15  Q.  But there was an actual agreement between you and this

16  company, right?

17  A.  Well, if.  If.  Everything was understanding if, because

18  there's -- it's not easy to provide.

19  Q.  Did you finish your answer?

20  A.  Yes.

21  Q.  The agreement was they would give you money and you would

22  export five Mercedes-Benzes, correct?

23  A.  Correct.

24  Q.  And for them to get their Mercedes-Benz vehicles, they had

25  to wire money to you, right?

I64Wshu4                        Nektalov - Cross

1   A.  Correct.

2   Q.  And they wired money to you, right?

3   A.  Correct.

4   Q.  They wired a lot of money to you, correct?

5   A.  Correct.

6   Q.  On April 19, they wired $10,000, correct?

7   A.  Correct.

8   Q.  On May 13, they wired $43,000, correct?

9   A.  I believe so.  I don't recall that, but maybe it is.

10  Q.  About that, right?

11  A.  About that.

12  Q.  And then on May 14, the day after, they wired $19,000 to

13  you, correct?

14  A.  Correct.

15  Q.  And then that same day, you showed them photos and stickers

16  of these five Mercedes-Benz vehicles, correct?

17  A.  Correct.

18  Q.  And in response, they then sent you $350,000, correct?

19  A.  Correct.

20  Q.  So they sent you approximately $425,000, correct?

21  A.  Correct.

22  Q.  And you never provided those vehicles, correct?

23  A.  Well, the situation, actually, that I got screwed.

24  Q.  Sir, it's yes or no.

25  A.  No.

I64Wshu4                         Nektalov - Cross

1   Q.  You never provided the vehicles --

2   A.  No.

3   Q.  Correct?

4   A.  No.

5   Q.  In fact, you shut down Nekta Auto corporation or auto

6   group, and you went to Arizona, right?

7   A.  I didn't shut down.  I lost everything, whatever I had.  I

8   lost my family.  I lost my business.  Even that, with those

9   five Mercedeses, I got screwed, OK?  And before I left, I did

10  something good for my community as well.  I donated my kidney

11  to my family members.

12  Q.  Sir, I'm not asking you about kidneys.

13  A.  I'm just saying whatever happened in between that time, so

14  I'm giving you the --

15               (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MR. CECUTTI:

2    Q.  Sir, this company gave you $450,000 as part of a deal for

3    five Mercedes Benzes?

4    A.  Correct.

5    Q.  Did not give them the cars, correct?

6    A.  Correct.

7    Q.  You lied to them?

8    A.  I never lied to them.

9    Q.  You promised them they would get their cars and you never

10   delivered?

11   A.  I never lied to them.

12   Q.  You absconded, you left this company, and you fled to

13   Arizona, correct?

14   A.  No.

15   Q.  And now you're sitting here telling this story about your

16   friend Zurab?

17          THE COURT:  What we'll do, we'll take down the voice

18   an octave or two and you'll rephrase the question.

19   Q.  Sir.

20   A.  Yes.

21   Q.  You're now telling this story to this jury about whatever

22   happened to Zurab, correct?

23   A.  Correct.

24   Q.  You're not a citizen, right?

25   A.  No.

```
 1              MR. ADAMS:  Objection.

 2              THE COURT:  Sustained.  The reference right there to

 3     the immigration status I think is irrelevant in the way it was

 4     just used.  So that is struck.

 5              Go ahead.

 6     Q.  Sir, you don't want any problems with government, correct?

 7     A.  Correct.

 8              MR. CECUTTI:  Nothing further.

 9              THE COURT:  Thank you.

10              Ms. Benett.

11     CROSS-EXAMINATION

12     BY MS. BENETT:

13     Q.  Good afternoon, Mr. Nektalov.

14     A.  Good afternoon.

15     Q.  I'm Megan Benett.  I represent Avtandil Khurtsidze from the

16     CJA.

17              Very briefly, you testified about the incident with

18     Zurab Neshevniov in 2015, 2014, something like that?

19     A.  Somewhere there.

20     Q.  And you spoke with the government about three times, right?

21     A.  Yes, somewhere about that.

22     Q.  A phone call in 2017, right?

23     A.  No, it was this -- about a month ago that they contacted

24     me.

25     Q.  So your first meeting with him was when?
```

1    A.  Yesterday.

2    Q.  The very first time you met with him?

3    A.  Correct.

4    Q.  You never talked to them in 2017?

5    A.  No.

6    Q.  And you met with him in person yesterday?

7    A.  Correct.

8    Q.  And that's the day before trial, obviously?

9    A.  Correct.

10   Q.  And for the first time they showed you some photographs,

11   correct?

12   A.  Correct.

13   Q.  Hadn't looked at pictures before that?

14   A.  No.

15        MS. BENETT:  Could Ms. Corrado, just for the witnesses

16   and parties and Court, pull up Government Exhibit 20.

17   Q.  And you were shown that picture yesterday, right?

18   A.  Correct.

19   Q.  And you said that that individual was at the apartment on

20   Avenue X, correct?

21   A.  I'm not sure at this point.

22   Q.  You remember pointing out -- you remember being shown about

23   27 photos, right?

24   A.  Somewhere there.

25   Q.  And some you recognized, right?

1    A.  Yes.

2    Q.  And some you didn't?

3    A.  Yes.

4    Q.  And you did remember that there was a UFC fighter that was

5    at the apartment that day, right?

6    A.  Correct.

7    Q.  An MMA guy, right?

8    A.  I'm not sure at that time.  I didn't know who they were,

9    but their faces, once I read the news, that's when I found out.

10   Q.  So you learned who was there when you read the news?

11   A.  Yes.

12   Q.  And when you spoke with the government, you described there

13   being a UFC MMA fighter present, correct?

14   A.  Correct.

15   Q.  You connected who that was after you saw photographs in the

16   news, right?

17   A.  Correct.

18          MS. BENETT:  Nothing further.

19          THE COURT:  Thank you.

20          Mr. Adams, anything further?

21          MR. ADAMS:  Just briefly, your Honor.

22   REDIRECT EXAMINATION

23   BY MR. ADAMS:

24   Q.  Mr. Nektalov, did you ever broker the lease of a Mercedes

25   to Shulaya?

1    A.  No.

2    Q.  Did you ever broker the lease of a BMW to Shulaya?

3    A.  No.

4    Q.  Did you ever broker the lease of an Audi to Shulaya?

5    A.  No.

6    Q.  When Shulaya came to you, that was after you had finished

7    your time in jail for the check fraud previously, correct?

8    A.  Correct.

9    Q.  And at that time when Mr. Shulaya later took you to the

10   apartment that you described earlier, do you recall Mr. Cecutti

11   asking about whether you helped Zurab when you saw him?

12   A.  I didn't get your question.

13   Q.  Do you recall questions from Mr. Cecutti the defense

14   counsel?

15   A.  Yes.

16   Q.  With whether you helped Zurab when you walked into the

17   apartment?

18   A.  Yes, I recall that.

19   Q.  Did you feel able to assist Zurab at that time?

20   A.  No.

21   Q.  Why not?

22   A.  Because of all the pressure around me.  I was worried for

23   my safety.

24            MR. ADAMS:  Nothing further, your Honor.

25            THE COURT:  Thank you.  You can step down.  You're all

1    set.

2            Would the government like to call its next witness,

3    please?

4            MR. ADAMS:  Yes.  The government calls Special Agent

5    John Penza.

6            THE COURT:  All right.  So Special Agent Penza,

7    please.

8     JOHN PENZA,

9        called as a witness by the government,

10        having been duly sworn, testified as follows:

11            THE COURT:  All right, special agent.  Please be

12    seated, sir.  It will be important for you to speak into the

13    mic.

14            Mr. Adams, you can go ahead and proceed.

15            MR. ADAMS:  Thank you, your Honor.

16    DIRECT EXAMINATION

17    BY MR. ADAMS:

18    Q.  Good afternoon.

19    A.  Good afternoon.

20    Q.  Where do you work?

21    A.  The FBI.

22    Q.  And what is your current title?

23    A.  Supervising special agent.

24    Q.  Do you work for a particular squad or with a particular

25    squad?

1    A.   Yes.

2    Q.   What squad is that?

3    A.   Squad C-24.

4    Q.   And can you describe the mission of squad C-24?

5    A.   To investigate the activities of individuals associated

6    with Eurasian organized crime who operate in the New York area

7    of responsibility.

8    Q.   How long have you worked at the FBI?

9    A.   Since January of 2001.

10   Q.   Can you briefly walk us through your assignments at the FBI

11   since joining in 2001?

12   A.   Upon graduation of Quantico in May of 2001, I was assigned

13   to the New York office.  From approximately May of 2001 until

14   July of 2002, I was assigned to the Joint Terrorism Task Force

15   in a surveillance capacity.  From approximately July of 2002 to

16   July of 2003, I was assigned to another Joint Terrorism Task

17   Force squad in an investigative capacity.

18        In July, approximately July of 2003, until

19   approximately November of 2010, I was assigned to the criminal

20   division of the New York office investigating the Genovese

21   organized crime family.  And within that time period of July of

22   '03 to November of 2010, I also spent six months working in

23   Rome, Italy, from July 2005 to January of 2006.

24        From approximately November of 2010 to June of 2011, I

25   was assigned to our White Plains resident agency working in

I64BSHU6                         Penza - Direct

1    gangs and bank robberies.  And in June of 2011, I was assigned

2    to my current squad, C-24 and I've been there ever since.

3    Q.  Now, as a supervisory special agent, what are your duties

4    on just a day-to-day basis with C-24?

5    A.  Essentially, it's to lead and mentor agents and task force

6    officers assigned to the squad as it relates to investigative

7    matters; as it relates to personnel matters, making sure people

8    get paid, making sure the agents and task force officers are

9    accountable for their actions, somebody is out sick, things

10   like that.

11   Q.  In the course of your work with the FBI, you've become

12   familiar with the term "traditional organized crime"?

13   A.  Yes.

14   Q.  Have you ever been assigned to a squad focusing on

15   traditional organized crime?

16   A.  Yes.

17   Q.  Which squad or squads were that?

18   A.  It was C-5, the Genovese organized crime squad.

19   Q.  And what's the mission of that squad?

20   A.  The mission of that squad was to investigate members of the

21   Genovese crime family who were engaging in criminal activities

22   within the New York area of responsibility.

23   Q.  Is traditional organized crime a term that the FBI uses to

24   describe certain kinds of squads and certain kinds of

25   investigations?

1    A.   Yes.

2    Q.   Does the FBI also refer internally to something called

3    nontraditional organized crime?

4    A.   Yes.

5    Q.   Is C-24 a traditional or nontraditional organized crime

6    unit?

7    A.   C-24 is a nontraditional organized crime squad.

8    Q.   And within the FBI, what's the distinction drawn between

9    traditional and nontraditional organized crime in the squads?

10   A.   Traditional organized crime squads are, I guess, what

11   anybody thinks of when they think of organized crime here in

12   New York City, organized crime in the United States, the mafia.

13   There is a hierarchy.  You have a boss an underboss, a

14   counselor, or *consigliere*, capos, soldiers and associates.

15   There is a true hierarchy and structure.

16   Q.   During your career at the FBI, approximately how many

17   organized crime investigations have you been involved in, both

18   traditional and nontraditional?

19   A.   I would say well over 50.

20   Q.   And if we could talk for a moment about certain kinds of

21   investigative techniques.  Can you describe, generally, some of

22   the investigative techniques that you personally have been

23   involved in in investigating organized crime with the FBI?

24   A.   The use of both electronic surveillance and physical

25   surveillance, the use of cooperating witnesses and confidential

human sources, the use of the grand jury, looking at people's

bank records, getting telephone records.  Just a whole host of

different techniques.

Q.  Let me walk through a couple of those.  With respect to

surveillance.  Have you personally engaged in physical

surveillance as an investigative technique?

A.  Yes.

Q.  How has conducting physical surveillance contributed to

your understanding of traditional and nontraditional organized

crime members?

A.  In its most basic sense, physical surveillance is following

somebody.  If I obtain information, whether from a source or

from a tipster, that individual as it relates to traditional

organized crime is engaged in criminal activity in a certain

area, I will follow that individual, see who he meets with or

who she meets with, what type of activities, what do they do on

a daily basis.  Do they go to work?  Do they have a girlfriend?

Do they have a boyfriend?  Do they go to the bank?  Do they

have a job?  Basically it establishes a daily routine for an

individual.

Q.  Have you also engaged in the execution of search warrants?

A.  Yes.

Q.  Approximately how many search warrants on physical premises

have you executed in the course of your career at the FBI?

A.  Approximately 25.

Q.  And can you describe the types of evidence that you

gathered through the execution of search warrants on physical

locations?

A.  Sure.  Gambling records, weapons, drugs, jewelry.  One

search we came across a "how to be a hitman" guide.  Pretty

much anything.

Q.  And how have those kind of items contributed to your

understanding of both traditional and nontraditional organized

crime networks?

A.  So if I'm following or the squad is following an individual

who is involved in illegal gambling, for example, and we come

across a ledger indicating bets that that individual, he or she

was running a bookmaking operation, that would be crucial to

our investigation.

Q.  Have you also executed search warrants on electronic

devices?

A.  Yes.

Q.  What kind of electronic devices?

A.  Cell phones, computers, tablets.

Q.  Similarly, how has the execution of search warrants on

electronic devices of those kinds contributed to your

understanding of traditional and nontraditional organized crime

networks?

A.  The contact information on those cell phones, tablets, and

computers are a treasure trove of information.

1    Q.   What kind of information?

2    A.   All types.  Who does this individual talk to, the frequency

3    of which they talk to, how were they identified in the phone.

4    For example, John Penza may be referred to as something else in

5    the phone, something of a respectable name, not John Penza or a

6    nickname, which is pretty important to our investigations.

7    Q.   Are you also familiar with electronic surveillance

8    techniques?

9    A.   Yes.

10   Q.   What kind of electronic surveillance have you been involved

11   in throughout your career with the FBI?

12   A.   The monitoring of telephones, as well as the monitoring of

13   what we refer to as MISUR, M-I-S-U-R, devices.  It's a

14   microphone that's installed in a restaurant, a bar, a social

15   club, any place that members and associates of both traditional

16   and nontraditional organized crime engage in criminal activity.

17   Q.   And you mentioned monitoring of telephones.  Are you

18   familiar with something called a Title III wiretap?

19   A.   Yes.

20   Q.   What is a wiretap?

21   A.   It's an order signed by a judge, which gives the U.S.

22   government authority to monitor someone's telephone.

23   Q.   Have you participated in Title III wiretap monitoring

24   throughout the course of your career at the FBI?

25   A.   Yes.

Q.  And similar question, how has participating in Title III

monitoring contributed to your understanding of traditional and

nontraditional organized crime networks?

A.  Essentially, you're listening to the target engage in

conversations with his or her, in some cases coconspirators,

how they -- how the target may refer to somebody, maybe they

may refer to them as boss, something like that which has

happened in cases that I've monitored, titles that I've

monitored.

        So these organizations are not open to me as an FBI

agent or maybe to any of you, as, like me, regular people, and

often cases as it relates to traditional organized crime, these

are people that have a relationship and are accepted members or

associates of those organizations.  So the conversations that

take place over those phones are probably some of the best

evidence that we ever get.

Q.  Are you familiar with the phrase "confidential human

source"?

A.  Yes.

Q.  What is a confidential human source?

A.  It's an individual that provides information to the U.S.

government, the FBI, to law enforcement for a myriad of

reasons.

Q.  And what kinds of information have you obtained through the

course of your career from confidential human sources regarding

1  the structures of traditional and nontraditional organized

2  criminal networks?

3  A.  All types of information.  As it relates to traditional

4  organized crime, confidential human sources have told me who a

5  made member is, who a capo is, who is a boss is, who an

6  underboss is, what types of criminal activities that the

7  members are involved in, where they bank, all types of things,

8  that is, looking at it individually may not be important, but

9  taken as a whole is very, very important.

10 Q.  Approximately how many confidential sources have you

11 personally debriefed or been involved in debriefing throughout

12 the course of your career?

13 A.  That I've met and debriefed or that I have operated?

14 Q.  Met and debriefed.

15 A.  Well over 100.

16 Q.  About how about how many confidential human sources have

17 you personally directed through the course of your career at

18 the FBI?

19 A.  At least 20.

20 Q.  And in your current role at the FBI, did you have

21 supervisory authority over the investigation of someone named

22 Razhden Shulaya?

23 A.  Yes.

24 Q.  In your role, did you participate in surveillance in

25 connection with that investigation?

1   A.  No.

2   Q.  Did you debrief witnesses in connection with that

3   investigation?

4   A.  No, I did not.

5   Q.  Did you monitor wiretaps?

6   A.  No.

7   Q.  In connection with that investigation?

8   A.  No.

9   Q.  Did you execute search warrants in connection with that

10   investigation?

11   A.  No.

12   Q.  In the course of your other investigations, that is, not

13   the investigation of Razhden Shulaya, have you become familiar

14   with the structure of both traditional and nontraditional

15   organized criminal groups?

16   A.  Yes.

17   Q.  Have you become familiar with the terminology and symbols

18   used by members of such organizations?

19   A.  Yes.

20          MR. ADAMS:  Your Honor, the government offers

21   Supervisory Special Agent Penza as an expert witness on

22   organized crime.

23          THE COURT:  All right.  Let me hear Mr. Womble.

24          MR. WOMBLE:  Your Honor, we would object at this time.

25          THE COURT:  As previously noted in the *in limine*?

I64BSHU6                        Penza - Direct

1          MR. WOMBLE:  No.  Based upon --

2          THE COURT:  Hold on.  Anything else?

3          MR. CECUTTI:  No, your Honor.  We join in that

4    application.

5          THE COURT:  Let's go over to sidebar very briefly.

6    Let's have counsel over here.  Thank you.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At sidebar)

2            MR. CECUTTI:  Just to be clear, I'm joining in the

3    objection, not the application.

4            MR. WOMBLE:  Good point.

5            THE COURT:  You're joining in the objection of

6    Mr. Womble?

7            MR. CECUTTI:  I'm join in the objection, not the

8    application.  I think I said application.

9            MR. WOMBLE:  Your Honor, I think this was a much

10   different situation than what was placed in the motions *in

11   limine*.  Mr. Penza so far has testified to extensive experience

12   in organized crime, but I believe we've gotten maybe the last

13   three or four questions in his experience with C-24.  It's

14   unclear as to his supervisory nature in this investigation.  I

15   know we received that information previously from papers, but I

16   think it was left fairly unclear if there was any clarity is

17   that he was a supervisor of Razhden Shulaya investigation.

18           And notwithstanding that, as far as basically

19   certifying him as an expert in nontraditional organized crime,

20   we didn't really hear anything about his experience with

21   nontraditional organized crime.  It was almost exclusively

22   about his experience in his previous work with traditional

23   organized crime, which, as your Honor is well aware, this case

24   is not about.

25           MS. BENETT:  Can I step in?  As far as I can tell from

I64BSHU6                          Penza - Direct

1    his testimony, every crime that is not organized crime is

2    nontraditional organized crime.

3             THE COURT:  Is there something else you wanted to add

4    to this?

5             MS. BENETT:  No, just, yes.

6             THE COURT:  I think there are two issues here,

7    analytically.  One is that I think that the government should

8    build up a bigger foundation for Eurasian organized crime.  The

9    way he had been presented in the motions *in limine* as an expert

10   in Eurasian organized crime and for the purposes of his

11   testimony here, where I understand he's going to be talking

12   about the structure, particularly of Russian or Eurasian

13   organized crime, I think that is a useful thing for you to

14   build up.  To be an expert in organized crime, generally, may

15   or may not have particular utility in this case where the issue

16   has to do not just with general organized crime but with

17   Eurasian.  So I'd ask you to go back and build up a further

18   foundation for that.

19            MR. ADAMS:  Certainly, your Honor.  I had avoided

20   asking too sharp a question about his information about

21   nontraditional organized crime before qualifying him as an

22   expert, but I'm happy to dive into it.

23            THE COURT:  What I'd ask you to do is build up his

24   expertise.

25            Now there's a separate issue.  Then that will be open

1    for you folks to then cross-examine if he's able to build up

2    the expertise in a way that allows him to be qualified as an

3    expert in, I think, Eurasian organized crime, which is really

4    what I think he was originally proffered as, as opposed to just

5    a broad expert in organized crime, writ large.

6              MR. ADAMS:  Yes, but also as the letter to defense

7    counsel sets out, that he draw distinctions between the two and

8    can, thus, his expertise on both is relevant to his testimony.

9              THE COURT:  Well, then what I would suggest is that

10   you build up Eurasian and then what we'll call traditional

11   organized crime, then he can be separately qualified as an

12   expert in that, if it works.

13             MS. BENETT:  Your Honor, when you referred to defense

14   counsel having a chance to cross-examine, do you mean voir dire

15   him on his expertise?

16             THE COURT:  We're not going to have you voir dire him

17   on his expertise if I feel that the expertise is sufficient.

18   I'll have you cross-examine him.

19             MS. BENETT:  After you've qualified him.

20             THE COURT:  After I've qualified him, unless there's

21   something unusual coming out, but if it's coming in in the way

22   which we had suggested.

23             MS. BENETT:  If we still, for the reasons that we put

24   in our motions, believe that he's not qualified, putting aside

25   the sort of too broad scope, which I would call this discussion

1   we're having, we had put in our motions that we had no CV,

2   there were no publications, we heard nothing about him training

3   other people with respect to this area of expertise.  So that's

4   all in our motion.

5           THE COURT:  That's preserved.

6           MS. BENETT:  We just want to note it for the record.

7           THE COURT:  Correct, and that is preserved.

8           And there's a separate issue, which is the supervisory

9   responsibility, which Mr. Womble, you had mentioned.  As you

10  folks know, there is case law that has developed in this area.

11  The case law is very careful to suggest that when you're

12  talking about the sociological aspects of organized crime

13  expertise, that is allowed.

14          In other words, the nonspecific to a particular

15  investigation aspects, that is allowed.  So if you're talking

16  about John Gotti, and there's an expert in Italian-American

17  organized crime, that individual who is an expert in that type

18  of organized crime would not be pointing to particular

19  individuals in the "Gotti" investigation as an example, and

20  saying my information leads me to believe that X-person happens

21  to be a capo or a made member or something like that.  They

22  can, however, talk about the structure of organized crime and a

23  sociological manner.

24          I say this because the fact that this individual has

25  some supervisory responsibility here raises a question which I

1    have considered but I do not find to be preclusive, but raises

2    a question as to whether or not the kind of personal knowledge

3    he has, if any, regarding this particular investigation causes

4    him to move over the line from the sociological into the

5    specific.

6           Counsel for the government was careful, I think, to

7    both bring out, fairly that he had some supervisory

8    responsibility, but also to immediately follow it up with a

9    lack of particular involvement in the particular aspects of

10   this investigation.  I would caution counsel for the government

11   that I would expect and I have no reason to believe otherwise,

12   that Mr. Penza will not be asked questions such as, was

13   Mr. Shulaya a *vor*, was Mr. Khurtsidze a soldier, or anything

14   that is specific to this particular investigation.

15          What, instead, I understand his testimony will be will

16   be of the sociological nature.  So I just want to acknowledge

17   is that aspect from that is slightly different from what was in

18   the *in limine*s, given if you hew to the line that is set forth

19   in the case law, that that would prevent any issues.

20          MR. ADAMS:  Absolutely.  We don't intend to ask

21   anything about the specific --

22          MS. BENETT:  Your Honor, I do think there is a problem

23   that Agent Penza just testified to jury that he supervised this

24   investigation.

25          THE COURT:  That's exactly what I said.

1           MS. BENETT:  I understand, but the jury is now going

2      to be looking at him as a an expert.

3           THE COURT:  I'm happy to give a limiting instruction.

4           MS. BENETT:  Our objection, we believe he should not

5      be allowed to testify as an expert.  There's no reason to

6      elicit that testimony.  We had the issue briefed, we had

7      written to the Court.  There is no reason for the jury to

8      believe he had any role in the Shulaya investigation.  I don't

9      think we would have ever cross examined him.

10          THE COURT:  Here's what I'm going to do.  I don't find

11     there is a reason to preclude.  I think it is something that

12     can be cured with a limiting instruction.  What I will do

13     tomorrow morning first thing, if you'd like -- since it's a

14     quarter to five.  We won't do it today -- is give an

15     appropriate limiting instruction on that.  Why don't we think

16     about that?  In the meantime, see if we can get over the

17     qualifications and we'll take it step by step.  Probably we'll

18     end at that point for the day.

19          MR. ADAMS:  OK.

20

21

22

23

24

25

1              (In open court)

2      BY MR. ADAMS:

3      Q.  Agent Penza, we've been discussing in the series of

4      questions both traditional and nontraditional organized crime,

5      and I think I asked you earlier whether each was used within

6      the FBI as a term of art.

7              THE INTERPRETER:  Excuse me.  I'm sorry, your Honor.

8      The microphone is not.

9              THE COURT:  All right.  That's fine.  Let's make sure

10     it works first.

11             (Pause)

12             THE COURT:  What we're going to do, ladies and

13     gentlemen, is we're going to end for the afternoon.  We're not

14     going to have you sit through any more of our attempt to get

15     the equipment going.  What we'll do is pick up tomorrow morning

16     promptly at 9:30.  I'll ask that you be here in the jury room

17     here in advance of that so that we can be able to get started

18     on time.

19             All right.  We'll see you tomorrow morning.  I'll

20     remind you not to talk to anybody about this case, including

21     each other.

22             (Continued on next page)

23

24

25

I64Bshu6

1          THE COURT:  All right.  Special Agent, you can step

2     down as well.

3          Let's all be seated here in the courtroom.  We'll get

4     ourselves organized for tomorrow.

5          What was the issue with the equipment?  It was running

6     out of battery at the end of the day?

7          THE INTERPRETER:  It was the battery.

8          THE COURT:  That does happen.  And so what we should

9     just do is you folks know how to handle that.  We'll get the

10    batteries all charged up, and if we need to bring up some extra

11    headsets, let's go ahead and do that.  And whoever needs to

12    coordinate that on either side of counsel, go ahead and

13    coordinate that.  Just make sure that we've got enough to get

14    going tomorrow so that we don't run into any issues.

15         We're going to be picking up tomorrow morning first

16    thing with Special Agent Penza.  What I'd ask you folks to do,

17    Ms. Benett, if you've got particular language, share it with

18    the government.  It can be handwritten.  It doesn't have to be

19    anything sort of formal:  Special Agent Penza testified that he

20    is a supervisor -- after he is qualified, you should understand

21    that he is not providing any opinion or any expertise about any

22    of the matters in this particular case.

23         You'll figure out how to word it so it doesn't say too

24    little or too much, but I'm happy to give an instruction.  I'd

25    prefer if you folks arrive at the language.

I64Bshu6

1          Anything that you folks would like to raise right now

2     before we break this afternoon ourselves?

3          MR. ADAMS:  I just have an update on eyeglasses.

4          THE COURT:  OK.

5          MR. ADAMS:  My understanding is the MCC will have a

6     substitute pair of reading glasses for tomorrow.  The MCC and

7     the MDC are looking for the items we discussed earlier today.

8          THE COURT:  What I would like to have is his

9     information which indicates to me what the prescription is of

10    the defendant so I can determine whether or not the

11    prescription is for reading glasses.  I don't want to run into

12    a problem later on where it turns out that there is some issue

13    where reading glasses is not going to be appropriate or whether

14    that's needs an assertion.  Somebody needs to find out and

15    present that to me, what the prescription is and what the

16    workaround is going to be, so we can then judge its

17    sufficiency.

18          Mr. Cecutti.

19          MR. CECUTTI:  Your Honor, just on the eyeglasses

20    issue, I may be able to close the loop on it.  I may be given a

21    pair of eyeglasses to assist Mr. Shulaya.  I might be receiving

22    them this evening.  Can I bring them tomorrow?

23          THE COURT:  I'll tell you, it depends, because are

24    very specific rules about whether or not they'll allow a

25    particular type of material to be in the eyeglasses.  I don't

I64Bshu6

1  know that they will.  I don't know that they won't, but I leave

2  it up to the marshals because it's a safety issue.  If it's OK

3  with the marshals, it's OK with me.

4          What I would like to do is solve the issue, and if we

5  have a government-issued set of glasses -- for instance, I'm

6  not sure that glass lenses are going to work.  You folks will

7  figure that out with the marshals, but I'd like to know what

8  the prescription is, if we have a workaround set of glasses,

9  which is not Mr. Shulaya's set, so we can figure out if it's

10  astigmatism or whether it's just a matter of nearsightedness or

11  farsightedness, because those are easier to solve.

12          MR. CECUTTI:  Yes, your Honor.

13          The more pressing issue with the legal materials, I

14  trust the government is working on that and I appreciate the

15  Court instructing the government, making this an urgent issue.

16          THE COURT:  Any update on that, Mr. Adams?

17          MR. ADAMS:  There have been a number of emails back

18  and forth, but I don't have this located as of yet.

19          THE COURT:  Well, there's always a matter of sending

20  somebody over to stroke on the doorstep.  We can do that next.

21  We'll do that tomorrow if we're not able to otherwise locate

22  them, but hopefully they'll be found.

23          Folks, anything else?  We are adjourned until tomorrow

24  morning.  Meet here at 9:00.  If you have any applications that

25  you want to put in writing, you can always email letters to

I64Bshu6

chambers.  File letters on the docket for chambers; that way we
can have an agenda for the morning.

            MS. BENETT:  Is it OK to leave everything here?

            THE COURT:  OK to leave everything here.  There won't
be anybody in the courtroom between now and then.

            (Adjourned to June 7, 2018, at 9:00)

INDEX OF EXAMINATION

Examination of:                                    Page

MARK NEKTALOV

Direct By Mr. Adams  . . . . . . . . . . . . .69

Cross By Mr. Cecutti . . . . . . . . . . . . .94

Cross By Ms. Benett  . . . . . . . . . . . . 112

Redirect By Mr. Adams  . . . . . . . . . . . 114

JOHN PENZA

Direct By Mr. Adams  . . . . . . . . . . . . 116

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

  54    . . . . . . . . . . . . . . . . . . .73

  2    . . . . . . . . . . . . . . . . . . .84

  27    . . . . . . . . . . . . . . . . . . .85

  9    . . . . . . . . . . . . . . . . . . .86