LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
Fax: (212) 962-5037
anthonycecutti@gmail.com


September 9, 2018

**BY EMAIL & ECF**
The Honorable Katherine B. Forrest
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

<u>**SENTENCING MEMORANDUM**</u>

**Re: United States v. Razhden Shulaya; 17 Cr. 350 (KBF)**

Dear Judge Forrest:

Days before his arrest, Razhden Shulaya collapsed on the bed in his hotel room at Caesar's Palace in Las Vegas. His heart was racing. His body was shaking. He thought his head was going to explode and that he was going to die. A woman he had met at the casino downstairs was also in his room. The two had been up for days. They met while Razhden was playing blackjack and poker when he lost a lot of money and then won it all back and thousands more. When not gambling, they had sex, drank and snorted lines of cocaine.

Half-naked, Razhden feared that the prior months and years of drug abuse, partying and gambling had brought him to the brink of death. He had one desire. He wanted to speak with his daughter, S.S., a final time. He wanted to hear her voice. He looked for his phone. Disoriented and unable to move, he decided not to try and contact her. Through their close relationship, they shared many good memories. Ultimately, however, Razhden did not want their last experience together to be under these circumstances. He wanted her to remember the good times – birthday celebrations in St. Petersburg, laughing and dancing together at home, trips to museums, playing games and walks through Central Park. Rather than contacting S.S., Razhden called a friend, who arranged for medical assistance. In the days that followed his first drug overdose, Razhden could not eat or drink. He needed help to get dressed and use the bathroom. He stayed in regular contact with a Georgian woman from Brooklyn. She discussed with Razhden some medications and remedies to help him recover so that he could travel back to New York. His return never happened as he was arrested at a Walgreens in Las Vegas.

Razhden Shulaya came to the United States in 2013.  In 2014, boasting about his status as a "vor," law enforcement arranged for meetings between him and a seasoned confidential informant, Volodymyr Oliynyk, a/k/a "Slava."  Slava told Razhden that he had stolen jewelry and offered to provide them to Razhden for resale.  In return, Razhden offered to provide Slava with counterfeit gold jewelry for resale.  Their dealings soon increased in frequency and they built a friendship.  Slava, at the direction of the FBI, began providing cases of untaxed cigarettes to Razhden.  In return, Razhden, resold the cigarettes and was able to make a lot of money.  This money was primarily used to finance criminal activities, primarily a casino fraud scheme; a scheme which was financed by the Government with hundreds of thousands of dollars, yet only yielded $6,500.  Also, during this time, the Government plugged another veteran and violent criminal and confidential informant, Aleksander Kutsenko, into their investigation in their aim to build their case against Razhden.[1]  To finance the casino scheme and bring it to maturation, the Government, through Slava, sold hundreds of cases of cigarettes to Razhden, often at reduced prices.  The Government also provided cases of cigarettes to Razhden for free.  This was all aimed by the Government to try and create the casino fraud scheme through Razhden's efforts.

Through the resale of untaxed cigarettes, Razhden was able to earn substantial sums of money, which fueled further criminal activity and a wild lifestyle.  He felt powerful, far bigger than he is.  Some were attracted to his success.  Others were intimidated.  In time, his ego ballooned and blinded him, as evidenced by his loud, yet hollow, words.  Through the resale of the untaxed cigarettes, he and others were able to generate the necessary capital needed to try and finance the casino fraud scheme, which Razhden touted could make "millions and billions."  He used the money to support his growing substance abuse and gambling problems and engage in partying and prostitution.  To further do so, he also borrowed money from family and friends.  For Razhden, money, cocaine, gambling and women made him feel alive, boosted a fragile ego, and provided an escape from the traumas he had experienced.  By 2015, Razhden was deep in criminal activity and soon became addicted to gambling and cocaine.

Razhden Shulaya was raised in loving and supportive family in St. Petersburg.  He and his father, Bondo, were extremely close.  Following the fall of the Soviet Union, Bondo operated a successful restaurant that catered to the community, and acquired land which was used for a farm.  Bondo became an admired and respected businessman and community leader.  He was known for his generosity, gregariousness and hospitality.  Unfortunately, Bondo's success came with a price.  During the 1990s and early 2000s, a time of "lawlessness" in St. Petersburg, he was repeatedly extorted by organized crime groups ("brigades").  In addition, such brigades sought to take Bondo's success from him.  He resisted.  In turn, the brigades burned down the family farm, kidnapped Razhden and held him for ransom for a week, and shot Razhden in the head which required brain surgery.  However, for Razhden, the greatest trauma that he sustained was learning of his father's bloodied body in the lobby of his apartment building following a near fatal attack by a brigade, and experiencing the loss of his father a year later.  Following the death of his father in 2008, Razhden was devastated.  He began to drift away from his family, community and the values in which he was raised.  He was never the same.  By the time he was

---

[1] Kutsenko was sentenced to 168 months' imprisonment for his participation in kidnappings, hostage-takings, abductions, shootings, robberies and other violent crimes as part of his leadership in a "brigade" that tormented the Brighton Beach community during the late 1990s.  As a confidential informant in this case, he was paid thousands of dollars and received other benefits.

in the United States, Razhden had lost his relationship with Natalia Zolotova, S.S.'s mother, his successful career as a boxing promoter and his community and family. Most importantly, Razhden had lost himself.

"Thank God I was arrested." In discussing his cocaine overdose, Razhden shared with us that his arrest on June 7, 2017, brought his self-destructive lifestyle to a halt. He acknowledges that other than death, only his arrest could have stopped him. He acknowledges that he engaged in wrongdoing, participated in instances of violence, associated with negative influences and lived a life contrary to the values, expectations and example set by his family, namely, Bondo.

It is against this backdrop that we ask Your Honor to consider before a sentence is imposed. *See Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (recognizing the underlying principle of sentencing is that "the punishment should fit the offender and not merely the crime."); *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.").

It is our hope that this memorandum, along with the attached exhibits, specifically, the letters from family and friends, and video of interviews of those living in St. Petersburg, Russia, provide the Court with a more complete understanding of who Razhden Shulaya is and the profound and detrimental impact that a lengthy sentence will have on him, and his family. We respectfully submit that a sentence of 180 months' imprisonment is "sufficient but not greater than necessary" based on the factors set forth in 18 U.S.C. § 3553(a).

## 1. Procedural History and Sentencing Guidelines Analysis

Razhden Shulaya proceeded to trial on June 4, 2018, and was convicted on all counts on June 19, 2018. The Presentence Report ("PSR") calculates a Guidelines range of life imprisonment. This range fails to consider and account for Razhden's life history of traumas and addictions. Nor does the range account for the Government's proactive resourcing of criminal activity. In addition, the Guidelines range is driven primarily by financial loss; a factor driven by the Government's efforts. The application of USSG § 2B1.1 and its enhancements, produces a grossly excessive Guidelines range that does not assist the Court in determining a fair and just sentence for Razhden Shulaya.

### a. *The Sentencing Guideline Range of Life Imprisonment Fails to Consider and Account for the Individual Circumstances of Razhden Shulaya's Life History, Namely, his History of Trauma and Addictions, and the Government's Actions in this Case*

As the Supreme Court declared in *Nelson v. United States*, 550 U.S. 350 (2009), "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Id.*, at 351. *See also United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. 2010) ("[i]n conducting this review [of the § 3553(a) sentencing factors], a district court needs to be mindful of the fact that it is 'emphatically clear' that the Guidelines are guidelines – that is, they are truly advisory'"), quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (requiring district

courts not to presume that a Guidelines sentence is reasonable for any particular defendant and to conduct an "independent review of the sentencing factors" in all cases for each defendant). A sentencing court must also consider 18 U.S.C. § 3553(a) which requires that judges "impose a sentence sufficient, but not greater than necessary" to satisfy the purposes of sentencing, including, punishment, deterrence, incapacitation and treatment and rehabilitation, and mandates consideration of the individual offender and their life history and background. In this case, Razhden's serious history of trauma and addictions are vital for the Court to consider pursuant to 18 U.S.C. § 3553(a), along with the Government's actions in contributing to an exaggerated and excessive Guidelines range, in fashioning a sentence that is "sufficient but not greater than necessary."

Notwithstanding the Supreme Court's clear mandate that a sentencing court must consider the individualized circumstances of a defendant's life history and background, the Guidelines are too often relied upon as a talismanic measure by which to impose a sentence. Courts continue to utilize the Guidelines and their policies even where, as here, they discourage, admonish and fail to accord any numerical value to an offender's trauma history, addictions and the circumstances in which the offense was committed. Simply put, the directives of *United States v. Booker*, 543 U.S. 220 (2005), *United States v. Crosby*, 397, F. 3d. 103 (2d Cir. 2005), and § 3553 make clear that courts must consider all of the factors in § 3553, many of which the Guidelines either reject or ignore, or demand to an "extraordinary" degree. Indeed, in some cases, the Guidelines clash outright with § 3553's primary directive: "to impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing. As Justice Stevens put it, the Commission "has not developed any standards or recommendations" for many individual characteristics, but "[t]hese are . . . matters that § 3553(a) authorizes the sentencing judge to consider," even though they are "not ordinarily considered" under the Guidelines. *Rita v. United States*, 551 U.S. 338 (2007) (Stevens, J., concurring).

Rather than embracing the sentencing philosophy espoused and articulated by Congress in § 3553(a), sentencing courts are vulnerable to allowing the Guidelines to be the predominate focus. This has been described by academic scholars as the "anchoring effect."[2] The "anchoring effect" is recognized by psychologists as a cognitive shortcut that has a strong tendency to undermine judgments in making difficult and complex decisions. Through an earlier disclosed range of punishment, the "anchor," a judgment by a decision-maker is undermined. Although *Booker* granted judges great discretion, the length and severity of sentences of federal sentences, has not changed. This is because judges' sentences are "anchored" by the particular Guidelines range in a case.

District courts are given broad discretion to determine a sentence pursuant to § 3553, and are not bound by a Guidelines range. A sentencing court must engage in individualized sentencing and avoid the "anchoring effect." This conforms with 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See also United*

---

[2] Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 101, 132 (2014) (citing United States v. Newhouse, 919 F. Supp. 2d 955, 958 n.1 (N.D. Iowa 2013) (Bennett, J.).

*States v. Murillo*, 902 F.2d 1169, 1172 (5th Cir. 1990).  In *Pepper*, the Supreme Court cited § 3661[3] as an important means of achieving just sentences: "[p]ermitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" 562 U.S. at 488, quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984); *see also Cavera*, 550 F.3d 180 at 189 (requiring district courts to conduct an "independent review of the sentencing factors" in all cases); *Rita*, 551 U.S. at 367  (noting that the Guidelines are "truly advisory"); *Gall v. United States*, 552 U.S. 38, 50 (2007) (sentencing courts must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented"); *United States v. Johnson*, 567 F.3d 40, 50-51 (2d Cir. 2009) (same).

Additionally, judges "may vary [from the Guidelines ranges] based solely on policy considerations, including, disagreements with the Guidelines." *Kimbrough v. United States*, 522 U.S. 85, 101-02 (2007); *see also Pepper*, 562 U.S. at 501 ("[O]ur post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views."); *Spears v. United States*, 555 U.S. 261, 264-67 (2009); *United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009) (*Kimbrough* authorizes sentencing courts to vary a sentence due to a policy disagreement with the Guidelines "even where a guideline provision is a direct reflection of a congressional directive."); *United States v. Mondragon-Santiago*, 564 F.3d 357, 367 (5th Cir. 2009) ("In appropriate cases, district courts certainly may disagree with the Guidelines for policy reasons and may adjust a sentence accordingly."); *United States v. Carr*, 557 F.3d 93, 106 (2d Cir. 2009) ("*Kimbrough* stands for the proposition that the sentencing court has discretion to deviate from the Guidelines-recommended range based on the court's disagreement with the policy judgments evinced in a particular guideline."). Whether a judge may draw any useful advice from a guideline depends first on whether the Sentencing Commission in promulgating or amending it, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 552 U.S. at 109-11.  As described in *Rita*, the exercise of this role has two basic components: (1) reliance on empirical evidence of pre-guidelines sentencing practice, and (2) review and revision in light of judicial decisions, sentencing data, and comments from participants and experts in the field.  *Rita*, 551 U.S. at 349-51.

b.   *The Loss Enhancement Under the Sentencing Guidelines is Greater than Necessary to Satisfy the Purposes of Sentencing in this Case*

More than any other factor, loss amount in this case, contributes to a Guidelines range of life imprisonment.  Probation calculates the aggregate loss to be $3,292,102. PSR ¶ 99.  As such, there is a 16-level enhancement, pursuant to USSG §2B1.1(b)(1)(I).  The loss enhancement in the Guidelines, however, is excessive and should not be applied in this case.  It is not the product of empirical data or past practice.  Accordingly, this Court is free to disagree on policy grounds

---

[3] We would like to thank the Court for authorizing our travel to St. Petersburg, Russia last month.  We interviewed more than 20 people from many facets of Razdhen's life over 6 days.  Consistent with the principles and spirit of §§ 3553(a) and 3661, we sought to gather and present the "widest possible breadth of information" about Razdhen Shulaya in traveling to St. Petersburg and conducting interviews, parts of which are captured in our video submission, attached as Exhibit B.

with the loss table, reject the applicable enhancements, and apply a more reasonable enhancement that is more in line with the sentencing objectives as set forth in 18 U.S.C. § 3553(a).

There is a "widespread perception that the loss guideline is broken." *United States v. Corsey*, 723 F.3d 366, 378 (2d Cir. 2013).  There has been a "factor creep" in USSG §2B1.1, which has increased sentences "by more than 300 percent in the past 24 years since the original version of the Guidelines was issued." *United States v. Schmitz*, 717 F.3d 536, 539-40 (7th Cir. Ill. 2013).  Loss is the predominant sentencing characteristic used to determine the sentencing Guidelines range under §2B1.1. This single factor is given more weight than any other factor in determining the offense levels assigned for each loss amount.  In *United States v. Adelson*, 441 F.Supp.2d 506 (S.D.N.Y. 2006), the sentencing court gave a critique of the confluence of factors that resulted in a recommended sentencing range of life for a defendant whose actual loss calculation was millions of dollars:

> What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss.  As many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective," tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors.

*Id*. at 509.

With respect to other specific offense characteristics, applicable under USSG § 2B1.1, the court noted that "the Sentencing Commission has never explained the rationale underlying any of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic." *Id.* at 510.  The court pointed out that the guideline is "the kind of 'piling-on' of points for which the guidelines have frequently been criticized." *Id.*  The court criticized the guideline as "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *Id.* at 511.  Other courts and scholars have agreed with the *Adelson* court's sentiments.  *See United States v. Watt*, 707 F.Supp.2d 149, 155-156 (D. Mass 2010); *United States v. Parris*, 573 F.Supp.2d 744 (S.D.N.Y. 2008); James E. Felman, *The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23 Fed. Sent. R. 138 (2010)(explaining why "reliance on loss to drive the sentencing outcomes is simply out of control"); Andrew Weissman & Joshua Block, *White-Collar Defendants and White-Collar Crimes*, 116 Yale L.J. Pocket Part 286 (2007) (asserting that "Federal Sentencing Guidelines for fraud and other white collar offenses are too severe" and are greater than "necessary to satisfy the traditional sentencing goals of specific and general deterrence – or even retribution").

The trend in this Circuit is toward sentences significantly below the advisory Guideline range in cases involving high loss amounts.  Scholars argue that the predominant reason for the

large variance rate is "the role 'loss' plays in sentencing." "[L]oss has taken on a role in the sentence calculation that dwarfs most of the other important factors." *See*, Mark H. Allenbaugh, *Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent. R. 19, 25 (2013); David Debold & Matthew Benjamin, *Losing Ground—In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. PA L. REV. RENNUMBRA 141, 151 (2011). "Not only do these cases demonstrate the willingness of district judges to exercise their discretion over sentencing, they also may suggest increasing discontent with the impact that the loss calculations have on the Sentencing Guidelines…" Alan Vinegrad and Gretchen Hoff Varner, *Non-Guideline Sentences for White-Collar Defendants*, N.Y.L.J., October 14, 2009. The authors note that "[i]ronically, the staggeringly high numbers produced by the loss (and other) enhancements of the fraud guidelines may in fact result in the guidelines becoming even less useful to sentencing courts" who are compelled to reply upon § 3553(a) factors to determine an appropriate sentence "without the aid of the guidelines." *Id.* Therefore, in fraud cases, with high loss amounts, "the guidelines provide little meaningful guidance to sentencing judges." *Id.*

In the instant case, the Court is faced, from the outset, with an exaggerated and excessive guideline calculation. The loss calculation, as defined by paragraph 3(A)(ii) of the Commentary to USSG § 2B1.1, and driven by the Government's actions in this case, grossly overstates a reasonable punishment for Razhden Shulaya. Since the original Guidelines were adopted in 1987, the Sentencing Commission has repeatedly increased prison sentences for fraud, theft and financial crimes offenses by raising the number of points imposed for the amount of loss. The Commission has also an extensive list of specific offense characteristics. The Commission has undertaken these actions without any empirical data or evidence to support the increases.

In *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), the court explored the ramifications of another guideline that grossly inflated sentences of imprisonment—the child pornography guideline. The *Dorvee* court noted that rather than relying on its institutional experience and analysis, the Sentencing Commission had amended the child pornography guidelines at Congress' request to provide for harsher sentences. *Id.* at 184-185. Due to stacking of specific offense characteristics, the court found that the child pornography guideline could result in "unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct," and that "unless carefully applied, [it] can easily generate unreasonable results." *Id.* at 188; *accord United States v. Tutty*, 612 F.3d 128, 132-33 (2d Cir. 2010). By reversing a within-Guideline sentence on these grounds, the court effectively recognized a de facto presumption of unreasonableness in the child pornography guidelines. USSG § 2B1.1, like the pornography guidelines, allows for stacking of specific offense characteristics that can produce unreasonable results. This guideline is a "catchall" for all types of offense involving theft, fraud or deceit. Thus, the guideline contains an extensive list of specific offense characteristics that often overlap and drive the advisory sentencing range to unreasonable levels. This is demonstrated here, where the application of USSG § 2B1.1 and its enhancements, produces a grossly excessive Guidelines range of life imprisonment.

**2. A Sentence of 180 Months' Imprisonment is "Sufficient But Not Greater Than Necessary" Based on the Factors Enumerated in 18 U.S.C.§ 3553(a).**

### a. The Nature and Circumstances of the Offenses

In 2014, the FBI began investigating Razhden Shulaya. At the time, Razhden was participating in the sale of stolen goods. However, through the use of confidential informants, specifically, Slava, the Government financed and fueled Razhden and allowed him to engage in a wild and lavish lifestyle and a variety of criminal activity; activity well beyond what he was doing prior to the FBI's investigation of him. Slava, at the direction of the Government, provided Razhden, and others associated with him, untaxed cigarettes that proved to generate significant sums of money. Slava sold them at full and reduced prices, and gave away, over 500 cases of untaxed cigarettes to Razhden and others. Through their resale, Razhden was able to access the necessary capital to pursue other criminal activity, primarily a sophisticated casino fraud scheme. Once federal agents learned of this, they sought to see the scheme come to pass. They arranged for the regular supply of untaxed cigarettes so that the necessary resources were available to make the casino fraud scheme succeed and reach what Razhden boasted – "millions and billions" of dollars. While the Government invested hundreds of thousands of dollars into the casino fraud scheme, it only yielded $6500.

Razhden acknowledges wrongdoing in this case and that he hurt people while committing those crimes. He acknowledges that his crimes were wide in scope and without minimizing their impact, the Court should consider not only Razhden's actions in this case but also the Government's considerable involvement in creating this case. Beginning in 2015, the Government created opportunities for Razhden to engage in criminal activity and enticed him. Razhden undisputedly decided to engage in them. Aside from participating in the resale of untaxed cigarettes and the casino fraud scheme, he also participated in illegal gambling, acts of violence and other criminal activity. Such conduct relates to the traumas he experienced while living in St. Petersburg. Razhden was raised in a family that was surrounded by criminality, targeted by brigades and exposed to significant and ongoing violence. Following the savage and brutal attack of his father in 2007, Razhden sought to find his father's attackers and others who wanted to inflict harm upon his family. Depressed and distraught, he left St. Petersburg in 2010 and lived in Thailand and Europe before coming to the United States in 2013. After he left St. Petersburg, he developed associations with those involved in crime. He did so to identify his enemies, believing in the importance of keeping them "close." However, in doing so, and isolated from his family, he developed connections with those involved in crime, and proclivities for criminal activity. The loss of his father, the loss of his career as a boxing promoter and loss of his relationship with Natalia, along with his new associations in crime ultimately resulted in Razhden losing himself.

Through his pronouncement as a "vor," and engagement in crime in the United States, he discovered a false sense of power. He was naïve and exercised poor discernment and decision-making. He wanted to prove to others that he was as great as his father. Yet, in distancing from his family and losing himself and the values he was raised with, he proved himself to be an amateur criminal; a "faux vor." His ego inflated through his perceived success, he engaged

further in crime and self-destructive behaviors, including drug use and gambling, which ultimately brought him to the brink of death.

### i. Razhden's Status as a Vor is Not a Crime and is Misunderstood by the Government

While we recognize that being a *vor* is not an element of any of the crimes for which Razhden was convicted, a large focus of the Government's case against Razhden rested on him being a *vor*. In its warrant applications and affidavits, through its opening and closing at trial, the Government attempted to define the term *vor*. Admittedly, their definition came from the lore, presented by their expert witness, Special Agent Penza, a book, called Red Mafiya, published in 2000 and the internet. Everything they portrayed as knowledge was in actuality either outdated information, rumor, or the application of Italian Mafia concepts to a term that does not exist in America.

Through extensive interviews with people with intimate knowledge of the history and meaning of the term *vor*, including a former Special Agent for the FBI in the Eurasian Organized Crime Unit, we submit that the Government's concept of *vors* and their place in society are incorrect.[4] The Government presented the jury and the Court with an outdated view of *vors*, because it was a convenient way to complete their story of a man who they believed was a criminal mastermind and "Godfather," who came to America to pursue a criminal life. A true understanding of the culture, background and norms of the former Soviet Union and modern-day Russia are necessary to understand this term in context.

The Government based its understanding of *vors* on a definition given in the book Red Mafiya by Robert I. Friedman: a vor refers to an order of elite criminals from the former Soviet Union who received tribute from other criminals, offered protection, and used their recognized status as *vor* to adjudicate disputes among lower level criminals. *See*, S9 Indictment, (ECF No. 685), 17-Cr-350 (KBF), ¶ 1. This definition accurately portrays *vors* as they were at their inception in Soviet gulags. There, *vors* maintained order among the lawless. *See*, Mark Galeotti, *The Vory: Russia's Super Mafia*, 35-79 (1st ed. 2018). *Vors* gained respect and status by abiding by a rigid code of behavior including not marrying, spending considerable time in prison, and abstaining from drugs and alcohol. *See id*. As a result of their rejection of the Soviet authorities, *vors* were dependent on theft as a means of surviving. *Id*. As capitalism took hold, this lifestyle became obsolete. *Id*.

The 1990s were a time of renewal for the *vory* to fit the very different needs and opportunities of the time. *Id*. The old-style *vor*, with their extensive prison records, tattoos, collection of *obshack*, and set code of honor began to disappear. In its place, were men chosen by their peers because of their moral standing and trusted to resolve disputes fairly. During these hard times, people went to *vors* to help resolve their issues because the government and law enforcement were either non-existent or corrupt. *Vors* were trusted to help people because they lived not by the law of the land, they lived by a code of justice.

---

[4] This section is based on information gained during interviews with more than 20 people, related to Razhden's background, family history and Russian culture and norms. The names of all the people interviewed and their relationship to Razhden are attached hereto as Exhibit A.

Russia was essentially "lawless" after the fall of the former Soviet Union.  The 90s was a time of "legal, cultural and social crisis; ... a decade of drive-by shootings, car bombs, and the virtual theft of whole industries, in which the forces of order seemed powerless." Mark Galeotti, *The Vory: Russia's Super Mafia*, 111-113 (1st ed. 2018).  The police were unable or unwilling to help the citizens.  Work was scarce.  Everything was rationed, and money was completely worthless.  Kacha, a person Razhden helped in a time of need, described the 90s as a time when "a stick of gum was something extraordinary . . . a loaf of bread could cost as much as $200." This is the time when Razhden was raised and came of age.

In modern times, *vors* are not "the elite heads of organized crime organizations." S9 Indictment ¶ 1.[5]  In modern Russian culture, *vors* are men who are respected because of their education and ability to peacefully intercede and help resolve issues within their communities. They are more community court mediator than mob boss.  In general, "[t]he title has become a largely empty honorific, one often bestowed as a favour or bought as a vanity perk."  Mark Galeotti, *The Vory: Russia's Super Mafia*, 120 (1st ed. 2018).  The majority of modern days *vors* are "faux *vory* . . .  who use the title but have not earned it according to the old traditions, nor do they accept any accompanying limitations on their behaviour."  *Id*. "Regular people don't know or care about vors."  Natalia Zolotova, Razhden's ex-wife.

While in St. Petersburg, we interviewed many people of Russian and Georgian descent about *vors*.  The concept of being a *vor* was often referred to as having "status."  "A person with status is fair and a diplomat; it has nothing to do with being a gangster." Irakly Barakashvili, friend of Razhden. In our conversations, it was no secret that Razhden became a *vor* at some point, but he was a modern *vor*, not the antiquated version of the *vor* perpetuated by the Government.  In fact, Razhden's behavior when he was in the United States was in direct contrast with the status he declared so vociferously.

## b. Razhden Shulaya's Life History of Trauma, Complexities, and Addictions

Razhden is a complex and deeply flawed man.  He has faced many traumas, both physical and emotional, which should be considered before imposing a sentence. When considering the history and characteristics of Razhden, pursuant to 18 U.S.C. § 3553(a), there is a critical event that altered the direction of Razhden's life—the death of his father.  After speaking with those closest to Razhden and his family, they describe two Razhden Shulayas; one before his father's death and one after.

### i. Razhden Before His Father's Death

Razhden Shulaya was born in 1977 to Bondo and Nadia Shulaya.  He was born of their love during a whirlwind courtship after meeting on the street in St. Petersburg when Nadia was visiting from Georgia.  Bondo was 40 years old and Nadia was 14 years his junior.  Two years later Razhden's sister, Liya, was born.  Razhden grew up in a happy home in the former Soviet

---

[5] The S9 Indictment is a "trial indictment" focusing on the defendants who proceeded to trial on June 4, 2018. The S9 Indictment is substantively identical to the prior indictments concerning Razhden Shulaya and Avtandil Khurtsidze, respectively.

Union.  Razhden was the favored son and his father doted on him and poured his heart into him.  He invested deeply into Razhden's life and encouraged Razhden never to be above anyone else.

In 1987, just prior to the collapse of the Soviet Union, Razhden's father opened the first cooperative (restaurant) in St. Petersburg.  This was a very important event because cooperatives were a radical new type of economic reform that allowed for the existence of private ownership of enterprises, such as restaurants, cafes and shops; a dramatic shift from the socialist model of the economy.  This new sector of the economy and its subsequent wealth, however, left many cooperative owners open to threats from organized crime.

Razhden's parents' restaurant, Kachapuri, named after a signature Georgian cheese bread, was within 10 minutes walking distance from the Shulaya family home.  Along with the restaurant, the family was given seven hectares of land to be able to provide food for the restaurant.  The family also had a separate bakery.  Razhden began helping at the restaurant when he was 10 years old and was always there.

Every person we spoke to describe the importance of the restaurant. It was the center of the Georgian community in St. Petersburg.  The Georgians in St. Petersburg are an insular group.  This is partly because, like most immigrant groups, they faced significant hardships in their homeland and in their adopted land.  After the fall of the Soviet Union, the restaurant took on even greater importance.  Money was devalued, yet the restaurant still operated.  Even those who could not afford to pay were welcome and ate for free.  "They turned away no one . . . they gave bread to the homeless...line around the corner."  Gimzeri Kvitsiani.

Like many other cooperative owners, the success of Kachapuri made Razhden's family a target for organized crime.  In approximately 1991, at the age of 14, Razhden was kidnapped from the entrance of his apartment building.  He was blindfolded and taken to an unknown location by men carrying knives.  Razhden was repeatedly threatened while being held for ransom for a week.  At one point, Razhden was cut when he made a movement towards his captors.  Razhden's captors took a photograph of his head and sent it to his father with a message that they had decapitated his son.  A ransom, in an unknown sum, was paid and Razhden was eventually returned to his family but he was deeply emotionally traumatized.  In addition, Razhden's family endured extortion attempts, shootings, thefts, and a brutal physical assault.  No one ever went to authorities and no one was ever prosecuted for any of the crimes against the family because of the lack of trust in the court system and law enforcement in Russia.

During the 90s, the family car was repeatedly stolen from the front of their apartment building.  In 2002, the family farm was set on fire.  Razhden promised his father that he would rebuild the farm—a promise he kept with the help of his now ex-wife, Natalia.  In 2005, Razhden was shot in the back of the head while eating in his parents' restaurant.  His mother was working in the office at the time and came out to find Razhden on the floor.  She stuck her finger into the wound in his head to staunch the bleeding and rode with him to the hospital.  He suffers from chronic medical issues as a result of being shot and having brain surgery.

Education was important to Razhden's family.  According to his elementary school teacher and family friend, Zhanna Smirnova, Razhden has always wanted to excel in everything.

When Razhden had problems speaking Russian in school, because his family spoke Georgian at home, he approached his teacher to ask for tutoring. Even at a young age, she described Razhden as "a person who commanded respect" and "attracted people because of his aura." In high school Razhden and Liya studied for one year in England as part of a student exchange program. After high school Razhden graduated from undergraduate studies focusing on foreign languages and completed his graduate studies.

Razhden followed his father's example of generosity and giving back to his community. Razhden is consistently lauded as being exceptionally charitable. This is one of his father's characteristic traits that he shares. "He would never shy away from a person in distress." Zhanna Smirnova. Razhden's daughter, S.S., told a story of winning approximately $2,000 in a drawing contest. Razhden encouraged her to give the money to charity, which she did. S.S. also described the number of times that Razhden would give to others in need, telling S.S., "what would God do? He would help them." Father Alexey, at Abbot of the Temple Church, told us of numerous anonymous donations he received for a new church after Razhden's brother, a deacon, told Razhden about the church's aspirations to grow. Only after his arrest in this case did Razhden's brother tell Father Alexey that the donations had come from Razhden.

Razhden helped members of his Georgian community in many ways. Our video submission, attached as Exhibit B, and letters from family members and friends, attached as Exhibit C, show just a few of the many stories that exemplify Razhden's positive character traits and how he benefited his community in St. Petersburg. He never ignored or shied away from someone in need or distress. Razhden helped a fellow Georgian overcome alcoholism and gave her a job and a place to stay after her apartment was taken from her. He loaned money to purchase a truck to a milk delivery driver who was facing unemployment while raising a young child. That man now owns several trucks and has his own company. In several instances he used his good reputation to get prompt medical care for those who could not afford it. "Everyone approached him for help . . . it was because his character and reputation for always seeking to help others." Interview with Irakly Barakashvili. At times, when he did not have money, Razhden would borrow funds so he would not have to turn away a person in need.

Razhden met Natalia in 2003. They married in 2004 and their daughter, S.S. was born in 2005. The light of Razhden's life is his daughter, S.S. The strength of their bond is undeniable. It is easy to see that Razhden has transferred to his daughter all of the love and devotion his father gave to him. S.S. is an exceptionally mature 13-year-old. S.S. enjoys acting, learning English and is an accomplished artist. Both her artistic talents and English proficiency are evident in the heartfelt letter she wrote to Your Honor, attached hereto as Exhibit D. Razhden was in daily contact with his daughter until his arrest in this case. S.S. also visited her father during his travels after he left Russia and came to the United States during school breaks. In her letter, S.S. writes that without her father, "[her] heart is bursting with tears" and she feels like she is "drowning in this sea of anguish and pain . . ."

Although Razhden eventually abandoned their marriage, Natalia continues to support him and refers to him as her "soul." They remain close and have a healthy co-parenting relationship. Natalia is now the owner of the Shulaya family's farm. Under her management, the farm

continues to produce traditional Georgian cheeses and has also expanded to supplying meat and dairy products to farmer's markets and high-end restaurant groups.

Other than family, one of Razhden's passions is boxing. As a child and teenager in St. Petersburg, Razhden trained as a boxer but he was not very successful. He later channeled his love of boxing into becoming a promoter. From 2005 – 2009 Razhden promoted boxers throughout Europe. The most successful boxer Razhden promoted was Nikolai Valuev. Mr. Valuev, also known as the Russian Giant, won the World Boxing Association heavyweight title twice during this period. Of note, Razhden helped promote a fight against Evander Holyfield in Zurich in December 2008. Razhden's first short trips to the United States were for the purpose promoting boxing matches and arranging fights in the United States. Despite his earlier successes, Razhden gave up boxing promotion in 2009 when Nikolai Valuev retired after a series of knee surgeries.

In 2007, Bondo was savagely beaten with metal objects by several men on the staircase inside his family's apartment building and left for dead. The same staircase where Razhden was abducted years earlier. The most likely explanations for why Bondo was attacked relate to his success as a business owner. Either Bondo was followed home, beaten and robbed because he was known to carry money home from the restaurant each day; or Bondo had refused to pay part of his profits to extorters and became a target of people jealous of his success. Razhden's brother, Alexey, summed up his father's predicament in a Russian saying that loosely translates to, "Anytime someone does something good, shit always follows." Even in 2007, being successful in Russia made business owners targets of organized crime. Even today, Natalia told us that if her farm business continues to be successful she expects a knock on her door from someone, most likely a government official, demanding part of her profits.

After the attack, Bondo crawled out of the building and was found by a neighbor. He was transported to the hospital and he was hospitalized for several months. Razhden was by his father's side, day and night while he was hospitalized. In Russia, patients are responsible for supplying their own medications. Razhden sought out the best doctors and purchased the best medicines for his father. He even offered to donate his liver, but Bondo's heart was not strong enough for a transplant operation. On September 23, 2008, Bondo succumbed to cirrhosis of the liver, which was exacerbated by the decline in his health after the brutal attack.

### ii. *Razhden After His Father's Death*

Razhden lost almost everything he loved between 2008 and 2009. He lost his father in September 2008, he was divorced from Natalia and ended his boxing promotion career in 2009. Also, the restaurant was forced to close down. He was left decimated, a shell of his former self. Razhden became the head of his family after his father's death. Although he did not have money at the time, Razhden borrowed from others to be able to bury his father in a way he saw as fitting—in a good cemetery with a large mausoleum complete with a statute in his father's likeness.

Almost 10 years later, Razhden has a visceral reaction when asked about his father; a topic we were repeatedly told by others not to broach because every time, the clench of his jaw,

the balling of fists and the flush of his face betray the searing anguish and pain he feels as though reliving the event each time it is mentioned.

After his father's death, Razhden "lost himself." Natalia Zolotova.  Once a gregarious, generous and devoted family man, Razhden left St. Petersburg shortly after the death of his father.  Although everything Razhden loved was in St. Petersburg, his overwhelming grief led him away from home.  "Everything [t]here made him think of Bondo. It was too much; he just fled." Natalia Zolotova.  The overwhelming consensus of Razhden, his friends and family is that "he never would have left [St. Petersburg]" if his father was alive. Leva Shulaya, Razhden's brother.  Accordingly, if not for his father's savage and brutal attack, and death, Razhden would not have participated in criminal activity.

In many ways, Razhden inherited the "sin" of Bondo – never giving in to organized crime.  Razhden and his family became targets and to avoid future violence from organized crime, he entered the criminal world to learn who his enemies were, keep them close, and be friends with them.  When Razhden left St. Petersburg, he traveled to Thailand, throughout Europe and eventually to the United States.  He wanted to live up to the expectations his father had for him and he desperately wanted to avenge the death of his father.  With no information about those who committed the crime, he took steps into the criminal world to find out, from the inside, who was to blame.  When he arrived in the United States, he was a lost.  He did not know anyone, other than his wife, he did not speak the language and he sought companionship in his countrymen in Brighton Beach.  Razhden stepped further and further into the criminal world and away from the people who knew and cared for him, with almost deadly results.

### iii.   Drug and Gambling Addictions

Like most addicts, Razhden did not realize that he was one until it was almost too late.  It was not until he collapsed on the bed of his hotel room, struggling to move on his own or even open his eyes, praying for the chance to speak to his daughter one last time, that Razhden confronted the depths of his cocaine addiction.

Razhden first tried cocaine at the age of 39.  He was supplied by his "friends," some of whom turned out to be informants in this case.  All the pain he felt - the void left by the death of his father, his career and leaving home - faded away when he took cocaine.  It was fun at parties and it felt good.  But then he did not want to stop.  Later, he was unable to stop. He was either high or looking to get high most part of most days.  In a twist of fate, Razhden was arrested days after his overdose at Caesar's in Las Vegas.  He credits his arrest to saving his life.  While he hopes to never touch cocaine again, he wishes to obtain substance abuse treatment as part of any sentence he receives.

Every person we spoke to in Russia was stunned when they learned of Razhden's drug use.  While in Russia, he was a strong advocate against drugs and helped many people get help to overcome their additions.

While the Guidelines provide that an addiction to drugs and gambling are "not a reason for a downward departure," U.S.S.G. §5H1.4, courts continue to recognize the debilitating nature

of pathological gambling and drug addictions and their impact on criminality. Razhden has suffered from gambling addiction for many years. He recognizes now that he needs help for his gambling addiction. Prior to his arrest, Razhden felt a "need" to gamble. Before moving to the United States, he spent "days or weeks" in casinos in Europe. He loved everything about being in casinos; the lights, the music, the women and the rush of playing the games. He hid his gambling addiction from his family.

Razhden's need to gamble led, in part, to his actions in this case. Razhden considered the computer program to be comparable to card counting – just a way to get an edge up on the casino. He saw it as a way to increase his chances of winning back part of what he lost. He wasn't physically breaking into machines.

>    iv.   *Razhden Suffers from Significant Physical Injuries that Require Medical Attention*

While in St. Petersburg, we interviewed Dr. Arsen, the neurosurgeon who operated on Razhden after he was shot in 2005. He stated that he removed most of the bullet but Razhden has "small particles left" in the lower right region of the back of his head. Dr. Arsen also stated that Razhden suffered brain damage to the front of his head due to the kinetic energy and force of impact from the bullet. Dr. Arsen reported that based on fear for his life, Razhden left the hospital against medical advice before he was completely healed.

According to Dr. Arsen, a person who suffers an injury such as Razhden is at an increased risk for post-traumatic epilepsy if they get too emotional or stressed. With Razhden's type of injury, and leaving care before the wound was completely healed, Dr. Arsen stated that he would expect some long-term and short-term memory loss, headaches and possible seizures. He explicitly stated that "additional trauma would exacerbate" these symptoms and a blow to the head could cause epilepsy or a brain hemorrhage.

This last point is especially important in light of recent events at MDC where Razhden is currently housed. Razhden was attacked by other inmates and suffered several blows to the head, including a possible loss of consciousness. Prior to being attacked, Razhden was never involved in any acts of violence while in custody. While Razhden was turning blue from lack of oxygen, as corrections officers were absent and other inmates fled, Mr. Khurtsidze put his own life on the line to help. Razhden, and Mr. Khurtsidze, were transported to the hospital for treatment.

Following this assault, among other injuries, the back of Razhden's head was swollen. He continues to have bruising and a lump at the back of his head. Due to language barriers and BOP medical request policies, Razhden has struggled to request additional medical care. Due to the serious implications of a blow to the head, we respectfully request that Razhden be given a full medical examination, including brain imaging or other appropriate testing to ensure that he has not suffered any permanent damage from this assault.[6]

---

[6] We spoke with several MDC staff members about Razhden's conduct at the MDC in general and specifically regarding this incident. Staff members have informed us that Razhden is respectful and does not cause any problems for staff. Several staff members we spoke with were surprised that Razhden was involved in an altercation

15

   **c.   Analysis of the Purposes of Sentencing as they Relate to Razhden Shulaya
         Favors a Sentence of 180 Months' Imprisonment**

        Pursuant to § 3553(a), the Court must consider the purposes of sentencing, particularly
"just punishment;" deterrence, recidivism, and protection of the public; and rehabilitation and
treatment, as they relate to Razhden Shulaya.  These purposes, as applied to him in this case, all
would be satisfied by a sentence of 180 months' imprisonment.

                    *i.   "Just punishment"*

        A sentence beyond 180 months' imprisonment will not have any constructive retributive
or punitive effect.  Rather, it will have a destructive impact on Razhden, his mental and physical
health, and his family, and will be far "greater than necessary" to achieve the purposes of
sentencing, including "just punishment."  Razhden faces unique aggravating factors associated
with a lengthy sentence.  He will be incarcerated in the United States, away from all close
family, particularly, his mother, sister and daughter, and friends.  He will have extremely limited
contact with them.  He will likely never again see his mother.  He will lose the opportunity and
fulfillment of raising his only child, S.S., and sharing special moments with her.  Their
relationship is fractured and possibly beyond repair.  He will never again visit his father's grave.
As time passes, Razhden will lose friendships and other family members will distance.  For
someone who deeply loves and cares for his mother, daughter and family, and friends, such
consequences are significantly punitive.  Furthermore, Razhden will be separated from all that he
knows and is familiar with, namely his language and culture.  He will be forced to navigate a
prison world, rife with violence and abuse, in a different country and culture, under harsh
conditions.  Lastly, he is at risk of exacerbated physical and mental health problems associated
with long term incarceration because of the injuries related to the shooting that he suffered and
brain surgery, and other untreated traumas that have impacted his mental health.  As described
by Dr. Arsen, prison life will expose Razhden to an increased risk of physical and mental health
conditions.  In addition, the emotional and social toll that he will experience serving a lengthy
sentence separated from his family, friends and culture will undoubtedly result in physical and
mental health problems; problems that that will inevitably be inadequately treated by the Bureau
of Prisons ("BOP").

                    *ii.   Deterrence, Recidivism and Protection of the Public*

        Contrary to deterrence ideology, incarcerating people for years or decades does not
prevent offenders from re-offending.  Nor does it adequately deter potential offenders from
committing crimes.[7]  Rather, lengthy prison sentences promote high rates of recidivism.  During
prison sentences, especially lengthy ones, a person is likely to become institutionalized, lose

---

because he does not provoke others on the unit.  One staff member in particular stated that Razhden was lucky to be
alive and may not have been without the assistance of Mr. Khurtsidze.  On one occasion, Razhden received medical
care after meeting with counsel at night, due to concerns from one of the staff members regarding his health.

[7] Anthony Doob and Cheryl Webster, *Sentence Severity and Crime: Accepting the Null Hypotheses," Crime and
Justice*, 30:143-195, 2003.

positive and constructive family and social supports and gain negative influences, and be removed from needed employment and or rehabilitative opportunities.  This is particularly true for Razhden Shulaya.

      Separation from his family has had a pronounced impact on Razhden and his family. Prolonged separation through lengthy incarceration, along with no or inadequate medical treatment, will increase Razhden's risk of recidivism.  Following his deportation, he will return with great challenges to a country when it will be very difficult for him live responsibly and productively.[8]  Returning to this type of situation would be inconsistent with the purposes of sentencing, and present challenges that Razhden, and many others, would have immense difficulty overcoming.

      With respect to the need for a sentence to afford adequate deterrence to criminal conduct, we doubt that the imposition of a sentence greater than 180 months' imprisonment will have any bearing on deterrence and we are not aware of any empirical data establishing that it would.  In fact, the data is to the contrary.  There simply is no evidence that increases in sentence length reduce crime through deterrence.  In one of the best studies of specific deterrence, in the pre-

---

[8] Razhden Shulaya is subject to mandatory deportation.  "In determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, 18 U.S.C. § 3553(a), a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact of deportation will have on the defendant[.]" *United States v. Thavaraja*, 714 F.3d 253, 262-63 (2d Cir. 2014) (upholding "a substantial downward variance from the Guidelines range" for the "principal procurement officer" of a terrorist group due, in part, to the "prospect" of the defendant's "future deportation").  The impact of deportation and removal proceedings will have a unique impact on Razhden.  Prior to his deportation, he will have to serve at a significant portion of his sentence at a "Criminal Alien Requirement ("CAR")" prison run by a private corporation.  CAR prisons are overcrowded, and more dangerous and less secure than BOP facilities.  A 2016 report issued by the Office of the Inspector General for the U.S. Department of Justice found that CAR prisons have "higher assault rates," "more lockdowns" and "more guilty findings on serious inmate discipline charges" than BOP facilities.  *See* Office of the Inspector General, DOJ, Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons (August, 2016).  CAR prisons also provide inferior and inadequate medical care compared to BOP facilities.  *See e.g.,* Seth Freed Wessley, The Nation, *A Guide to Our Investigation of Deaths Inside the Federal Bureau of Prison's Immigrant-Only Facilities* (January 28, 2016) ("Our investigation found that the federal contract prisons operate under a different and less stringent set of rules than the rest of the BOP … Many of the BOP's policies on mental health and suicide prevention, for example, are either listed as guides or not included at all."); ACLU, *Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System* (June, 2014) ("Medical understaffing and extreme cost-cutting measures reportedly limit prisoners' access to both emergency and routine medical care … private prison companies [are encouraged] to place excessive numbers of prisoners in isolation.").  Ultimately, "CAR prisons … impose serious costs in health and human dignity." *See Id.*  Razhden will be forced to serve his sentence under harsh conditions, which will undoubtedly and adversely impact his medical conditions and mental health, in a CAR prison.  In addition, once he is transferred to the custody of the U.S. Immigration and Customs Enforcement ("ICE"), Mr. Shulaya could be detained for months, after already serving his sentence, with no or nominal mental health and medical services.  Lastly, instead of receiving any transitional or re-entry resources, such as early placement to a halfway house and discharge planning involving community mental health specialists, he will instead be detained beyond the length of his sentence, for an unknown period of time, without the benefit of any re-entry resources.  These are additional factors to be considered in deciding the appropriate sentence for Razhden.  *See e.g., United States v. Pacheco-Soto*, 386 F. Supp. 2d 1198, 1205-06 (D.N.M. 2005) (defendant received downward departure because he faced "an unwarranted increase in the severity of his sentence" due to his status as a deportable alien and his lack of citizenship was "irrelevant" to his drug offense).

guideline era, no difference was found, even between probation and imprisonment.[9]  The von Hirsch analysis, commissioned by the British Home Office, examined penalties in the United States and in several European countries.  It concluded that the "correlations between sentencing severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects."

The reason for this is that potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentencing consequences in the manner one might expect.  "There is generally no significant association between perceptions of punishment levels and actual levels. . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms."[10]  In addition, recidivism rates decline relatively consistently as age increases. The negative correlation between age and criminal recidivism has been documented across time and cultures in numerous studies.[11]  Now 41 years old, Razhden is at an age when his risk to engage in additional criminal activity is lessening.  Finally, as a result of his arrest, prosecution and anticipated sentence in this case, returning to criminal activity is low, if not impossible.  A sentence of 180 months' imprisonment will result in Razhden's release and deportation when he is in his 50s, likely in poor medical condition, while facing immensely difficult challenges related to his re-integration into his community.

A sentence of 180 months' imprisonment will communicate a strong message to potential offenders, particularly those outside of the United States.  However, attempting to justify punishment of one person as a means to deter others, raises serious questions of morality in that it presents the issue of whether it is moral to punish one person beyond what is necessary and just for that person to promote deterrence of others.  "Juridical punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime.  For one man ought never be dealt with merely as a means subservient to the purpose of another."  Immanuel Kant, *The Science of Right* 195 (W. Hastie Trans., 1790).  Simply put, general deterrence is not a good reason for a sentence in excess of 180 months' imprisonment.

---

[9] *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995).  *See also* Andrew von Hirsch, et. al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999).

[10] Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

[11] *See, e.g.,* Travis Hirschi & Michael Gottfredson, *Age and the Explanation of Crime*, 89 Am. J. Sociology 552, 555, 580 (1983); Elizabeth Oddone Paolucci et al., Nat'l Found. For Family Research & Educ., *A Review of Marital and Family Variables as They Relate to Criminal Recidivism 14* (Nov. 2000), http://www.csc-scc.gc.ca/research/092/r92e.pdf; Mark Ouimet & Marc Le Blanc, *The Role of Life Experiences in the Continuation of the Adult Criminal Career*, 6 Criminal Behavior & Mental Health 73, 83 (1996) (concluding that "there is a strong and significant effect of maturation that is independent of the exposure to anti-criminal institutions such as family or work").

       *iii.   Rehabilitation and Treatment*

       Razhden Shulaya needs a variety of treatment to assist in his rehabilitation so that he can best return to his community.  He needs treatment related to his addictions, namely drugs and gambling, and prior traumas.  In addition, it is expected that due to his lengthy confinement and harsh conditions, he will need medical and psychiatric care related to his prior brain injury that he suffered because of being shot.  Over time, he will experience increased headaches, memory loss, mood swings, depression and anxiety and other physical and cognitive symptoms.  Inadequate medical and psychiatric care provided by the BOP will exacerbate his symptoms and further punish him.

       As we believe the foregoing amply demonstrates, there is no need to incarcerate Razhden Shulaya for a period beyond our request to sufficiently punish him, deter him, to deter others, or to prevent recidivism and protect the public.  In this case for this defendant, all of the purposes of sentencing can be satisfied by a sentence of 180 months' imprisonment.

## 3.  Conclusion

       Razhden Shulaya should not be entirely defined as a criminal defendant or solely understood by the crimes that he committed.  Despite his serious crimes in this case, he is a son to Nadia, a father to S.S., a brother and a friend to many in Georgia and St. Petersburg.  While flawed, he is known by his family, friends and community as generous, hospitable, and someone willing to help anyone in need.  He is also an individual who has suffered serious traumas while raised and living during a time of "lawlessness" in Russia.  Unfortunately, he was unable to survive and recover from the death of his father.  In turn, he never lived up to the expectations and example of his father.  As stated repeatedly by those we interviewed, had Bondo not been savagely beaten, and died, Razhden Shulaya's life would not have deviated so off course to a world where he became lost in criminality, addictions to cocaine and gambling, partying and women.

       As Judge Weinstein described in *United States v. Blarek*, 7 F.Supp.2d 192, 210 (E.D.N.Y. 1998), a court's sentencing decision should be informed and guided by mercy and compassion.  Mercy and compassion are evinced by 18 U.S.C. § 3553(a), which provides that the lowest possible penalty consistent with the goals of sentencing must be imposed. *See also United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992) ("the United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom").  The bestowing of mercy and compassion is not conditional.  While convicted of serious offenses, Razhden has not forfeited the right to be sentenced with mercy and compassion.  He has not forfeited the chance to return to his family, friends and community in St. Petersburg.

       A sentence of life imprisonment or its equivalent, will have serious and devastating consequences for Razhden.  It will also remove any sense of "hope" for some kind of quality of life for him, his mother, S.S. and his family.  As Judge Hellerstein in the Southern District wrote so eloquently in *United States v. Carvajal*, No. 04 CR 222 (AKH), 2005 WL 476125 at *6 (S.D.N.Y. February 17, 2005), "Hope is the necessary condition of mankind … A judge should

be hesitant before sentencing so severely that he destroys all hope and takes away all possibility of useful life."

In this case, for Razhden Shulaya, we believe that a sentence of 180 months' imprisonment satisfies all the purposes of sentencing, conveys mercy and compassion, instills hope, and is "sufficient but not greater than necessary."

Respectfully submitted,

/s/

Anthony Cecutti
Jennifer Louis-Jeune

*Attorneys for Razhden Shulaya*