LAW OFFICE OF ANTHONY CECUTTI
217 Broadway, Suite 707
New York, New York 10007
Phone: (212) 619-3730
Cell: (917) 741-1837
Fax: (212) 962-5037
anthonycecutti@gmail.com

December 17, 2018

**BY ECF**
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

**SUPPLEMENTAL SENTENCING MEMORANDUM**

**Re: United States v. Razhden Shulaya; 17 Cr. 350 (KBF)**

Dear Judge Preska:

In their sentencing letter, the Government argues that Razhden Shulaya "deserves the maximum statutory sentence of incarceration." In making such contention, the Government is asking this Court to not only impose the maximum sentence on each count, but to also "stack" each one, and sentence Mr. Shulaya to a total of 65 years' imprisonment. Effectively, the Government believes that Mr. Shualya should be permanently separated from his daughter and family in St. Petersburg, Russia, age poorly under harsh conditions and ultimately die in prison. Despite his crimes of conviction, such an outcome is grossly excessive and contrary to the principles set forth in 18 U.S.C. §§ 3584, 3553 and U.S.S.G. § 5G1.2.

1. **This Court Should Impose Concurrent and not Consecutive Sentences on Each Count of Conviction**

Where a defendant is convicted of multiple offenses and exposed to the imposition of multiple terms of imprisonment at the same time, they are to "run concurrently unless the court orders or the statute mandates that the terms are to run consecutively." 18 U.S.C. § 3584(a). The sentencing court, "in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)." 18 U.S.C. § 3584(b). The Sentencing Guidelines further provide that

1

the sentencing court "shall determine the total punishment and shall impose that total punishment on each such count, except to the extent otherwise required by law" and that "if the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law." U.S.S.G. § 5G1.2(b)-(c). Finally, "if the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law." U.S.S.G. § 5G1.2(d).

In this case, there is no statute that mandates that the sentencing terms are to run consecutively. This Court is only bound by the primary directive of 18 U.S.C. § 3553(a) – to impose a "total punishment" that is "sufficient but not greater than necessary." As we stated in our sentencing submission, a sentence of no more than 15 years on Count One, with concurrent sentences on the other counts of conviction, is "sufficient, but not greater than necessary" based on the factors enumerated in 18 U.S.C. § 3553(a). This is also more than "adequate to achieve the total punishment." U.S.G. § 5G1.2(b)-(c).

   a. *The Government's Committed and Successful Efforts to Develop and Build Charges Against Razhden Shulaya Warrant a Substantial Variance and the Imposition of Concurrent Sentences*

The Government wholly ignores their role in developing and building charges against Mr. Shulaya, unequivocally arguing that he was the "driving force behind the array of crimes in which the Enterprise engaged." Government Sentencing Letter at 18. While he did use funds from other criminal activities, and engage in criminal acts, which he acknowledges, it was the Government who helped catapult him into the position he was in by the time of his arrest in June 2017, by providing him with the means to acquire significant and necessary capital.

Beginning in late 2014, the Government began using confidential informants in their investigation of Mr. Shulaya. At that time, Mr. Shulaya had significantly less resources than when he was arrested in June 2017. The Government used their informants continuously, for approximately 3 years, and paid them hundreds of thousands of dollars; funds that the informants exclusively utilized to live on in the United States. Moreover, the Government provided the financial means for Mr. Shualya and others to engage in a variety of criminal activities. The predominant way that the Government financed and grew Mr. Shualya's "enterprise" was through the sale of "contraband" cigarettes by way of an informant, "Slava." The Government purchased and sold "stolen" cigarettes, at full and reduced prices to Mr. Shulaya. The Government even regularly gave Mr. Shulaya cigarettes for free. Over the course of the investigation, the Government provided Mr. Shulaya with more than 500 cases of "stolen" cigarettes. This amounted to a constant and regular cash flow that totaled nearly $1.5 million. *See* Government Sentencing Letter at 13-15.

The Government's motivation was to build their charges against Mr. Shulaya and see their goal come to pass – the development of the casino scheme. Through the resale of contraband cigarettes, provided by the Government, Mr. Shulaya had the constant and accessible capital to help purchase the technology and develop a sophisticated casino fraud scheme, which he boasted would produce "millions and billions" of dollars. Prior to the Government's involvement, Mr. Shualya did not have the ability or the resources to achieve this. However, believing that the realization of the casino fraud scheme would translate into a major law enforcement accomplishment, the Government continued to sell and provide Mr. Shulaya with cigarettes for him to resell. In the end, however, the Government's efforts and investment in the casino fraud scheme was a failure.

The Government's assertion that it has no responsibility or role in financing Mr. Shulaya's criminal activities is patently false and inconsistent with the evidence presented at trial. In addition to the development of the casino fraud scheme, the funds from the resale of the contraband cigarettes helped finance Mr. Shulaya's other criminal activities. The Government could have ended its investigation into Mr. Shulaya's purchase and sale of "stolen" cigarettes at any time but they instead chose to continue supplying cigarettes, which resulted in an inflated tax loss and sentencing exposure for Mr. Shulaya.

      b. *The Government's Request for 65 Years' Imprisonment is "Cumulative Punishment" and Should Be Rejected*

The Government's contention that Mr. Shulaya "deserves the maximum statutory sentence of incarceration" is further undermined as the offenses described in Counts Two through Five are identical to the predicate acts that comprise the charged racketeering conspiracy in Count One. In building charges over the course of 3 years, and then prosecuting Mr. Shulaya in the manner the Government chose, the Government effectively sought to unfairly lengthen Mr. Shulaya's sentencing exposure. By charging Counts Two through Five, which describe conduct identical to the predicate acts that comprise the racketeering conspiracy charged in Count One, the Government increased Mr. Shulaya's sentencing exposure from 20 years (Count One) to 65 years.[1] As such, the imposition of consecutive sentences amounts to "cumulative punishment" and should be rejected.

      c. *Sentences that Other Similarly Situated Defendants Have Received, Further Reveal the Government's Efforts to Unfairly Lengthen Mr. Razhden Shulaya's Sentence*

---

[1] As was known to the trial court, Mr. Shulaya was offered a plea agreement by the Government whereby his sentencing maximum was 20 years. This was based on a plea of guilty only to Count One, along with the admission that he participated in predicate acts that are also charged as criminal offenses in Counts Two thru Five. Based on such offer, it is our understanding that the Government believed that Mr. Shulaya, for all his criminal conduct, should receive a sentence of no more than 20 years. Having exercised his constitutional right to go to trial, the Government now believes that a sentence more than three times that, for the same criminal conduct, is now appropriate for Mr. Shulaya. This apparent "trial penalty" must be rejected. Exacting such a penalty undermines the integrity of the criminal justice system.

3

As previously stated, a sentencing court, "in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)." 18 U.S.C. § 3584(b). Pursuant to 18 U.S.C. § 3553(a), this Court must consider sentences of other similarly situated defendants to "avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(6).

The chart attached as Exhibit "A," identifies several defendants charged and convicted with participating in Russian organized crimes. Like Mr. Shulaya, each had leadership functions and participated in a myriad of criminal activities, including economic crimes and violence. However, none received a sentence anywhere close to that sought by the Government for Mr. Shulaya. *See* Chart of Sentences Imposed for Other Russian Organized Crime Defendants attached as Exhibit "A."

We wish to draw the Court's attention to the sentences imposed for Mr. Shulaya's trial co-defendant, Avtandil Khurtsidze, and one of the Government's confidential informants in the instant case, Alexander Kutsenko.

Khurtsidze, a professional boxer, was a full participant in the charged enterprise. He was determined by the trial court to be Mr. Shulaya's "right hand man" and loyal confidant. He was an enforcer, who was involved in a "variety of ways" and played a "variety of roles … which were part of [the] multi-faceted criminal enterprise." Sent. Tr. 31:2 - 4. He participated in various aspects of the casino scheme and participated in numerous acts of violence. Of all the defendants who participated in violence, the Government, in support of an upward variance, argued he was the "single most violent individual, other than Shulaya himself," Sent. Tr. 10:25 – 11:2, and that there was "no reason, other than the enjoyment of inflicting pain, and the power and prestige that he thought he could bring to himself to participate in this criminal enterprise." Sent. Tr. 11:8 - 11. Furthermore, the Government argued that he was a "vector for pain and an agent for fear," Sent. Tr. 11:19 – 20, and that Khurtsidze participated in a "long run of pain, fear and intimidation … for no particular reason other than to bring himself prestige. Sent. Tr. 12:19 – 22. Based on his participation in violence and "breadth of activity," Sent. Tr. 40:10, and also finding Khurtsidze to have demonstrated a "lack of compassion, a lack of judgment, a lack of decency and a lack of generosity," Sent. Tr. 35:7 – 8, sentenced him to 10 years' imprisonment on each count of conviction, to run concurrently. He faced a statutory maximum sentence of 40 years' imprisonment.

Kutsenko was a confidential informant for the Government who testified at trial.[2] Following his release from prison in 2012, he began working for the Government. Kutsenko was sentenced to 192 months' imprisonment for his participation as a co-leader of a Russian criminal organization or "brigade" in the late 1990s. He engaged in extreme violence – assaults, kidnappings, extortion, arson, transportation of prostitutes, mail fraud, immigration fraud, robbery, and abductions. He also took local business owners hostage, beat them up and extorted them. Following his arrest, he engaged in efforts to obstruct justice.

---

[2] The Government paid Kutsenko over $100,000 for his participation in their investigation of Mr. Shulaya.

4

Despite direct similarities in conduct with Mr. Shulaya, the sentences imposed on Khurtsidze and Kutsenko, and others, pale in comparison to the sentence the Government seeks against Mr. Shulaya in this case. Such a sentence, or one that is anywhere close, will result in significant unwarranted sentence disparities. A sentence of no more than 15 years' imprisonment for Mr. Shulaya will avoid such disparities and be consistent with sentences imposed in this case and others.

2. **Conclusion**

Based on the reasoning set forth in this supplemental submission, and in our sentencing memorandum, and attached exhibits, including letters and video of interviews of family members, friends and others living in St. Petersburg, Russia, we respectfully submit that a sentence of no more than 180 months' imprisonment is "sufficient but not greater than necessary" based on the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

/s/

Anthony Cecutti
Jennifer Louis-Jeune

**EXHIBIT A**

1

| CASE NUMBER | DEFENDANT | CHARGES OF CONVICTION | GUIDELINES RANGE | GOVERNMENT REQUESTED SENTENCE | SENTENCE IMPOSED |
|---|---|---|---|---|---|
| 17 Cr. 350 (KBF) | Avtandil Khurtsidze | 1 count – RICO<br><br>1 count – Wire Fraud Conspiracy | 57 – 71 months' imprisonment | Upward variance | 120 months' imprisonment on each count, to run concurrently and $30,000 fine |
| Mr. Khurtsidze was described, by the Government, at sentencing, as "the right-hand man and the single most violent individual, other than Shulaya himself, within the context of the Shulaya Enterprise." Sent. Tr. 10:25 – 11:2. The Court described Mr. Khurtsidze as Mr. Shulaya's "confidante… [his] go-to man for many, many different types of tasks." Sent. Tr. 30: 11-13. He was an enforcer, who was involved in a "variety of ways" and played a "variety of roles … which were part of [the] multi-faceted criminal enterprise."  Sent. Tr. 31:2 - 4. In addition to violence, Mr. Khurtsidze was also involved in casino fraud.<br><br>The Government argued, at sentencing, that Mr. Khurtsidze was a "vector for pain and an agent for fear," Sent. Tr. 11:19 – 20. The Government requested an upward variance because they felt that the guidelines did not "adequately capture the depravity of [Khurtsidze's] years' long run of pain fear and intimidation that he inflicted upon multiple people, for no particular reason, other than to bring himself prestige." Sent. Tr. 12: 19-22. The Government also stated that the seriousness of Mr. Khurtsidze's actions were "among the most significant criminal conduct within the scope of this case, perhaps second only to Shulaya himself, " and "makes him significantly more culpable than some of the other defendants who received terms of imprisonment within or roughly around the guidelines range that Mr. Khurtsidze" faced.  Sent. Tr. 13: 11-13, 14-23. ||||||
| 98 Cr. 435 | Alexander Kutsenko | 4 counts – firearms offense, extortion conspiracy, extortion, | 168 – 192 months' imprisonment | Within Guidelines sentence | 132 months' imprisonment on 3 counts, to run concurrently, and 60 |

---

[1] All of the information contained in this chart was compiled from Government submissions and sentencing transcripts for the respective cases.

| | | | | | |
|---|---|---|---|---|---|
| | | kidnapping in aid of racketeering | | | months' imprisonment on firearms offense, to run consecutively |
| Mr. Kutsenko immigrated to the United Sattes in 1989, after bribing a KGB agent to obtain a visa.  Once in the United States, he engaged in criminal activity and violent and aggressive behaviors, including multiple shootings, and was convicted of crimes, including a weapons offense.  In one instance, he terrorized a woman with a machine gun, causing her to jump out of a second-story window.  In the late 1990s, Mr. Kutsenko was a co-leader of a Russian criminal organization or "brigade" – the "Gufield-Kutsenko Russian Organized crime brigade."  He engaged in racketeering activity involving extreme violence and directed others to do the same  – assaults, kidnappings, extortion, arson, transportation of prostitutes, mail fraud, immigration fraud, robbery, obstruction of justice and abductions.  He also took local business owners hostage, beat them up and extorted them.  Following his arrest, he made efforts to prevent victims from providing detrimental evidence to the Government, asked an individual to hide weapons that were in his residence, discussed plans to kill witnesses and burning down businesses, and directed others to extort business owners.  He pleaded guilty to using a firearm during a crime of violence, participation in an extortion conspiracy and kidnapping in aid of racketeering.  He was sentenced to 192 months' imprisonment. | | | | | |
| 98 Cr. 435 | **Dimitri Gufield** | 4 counts – firearms offense, arson, extortion conspiracy, extortion | 211 – 248 months' imprisonment | Within Guidelines sentence | 180 months' imprisonment on 2 counts, to run concurrently, and 60 months' imprisonment on firearms offense, to run consecutively |
| Along with Mr. Kutsenko, he co-lead the "Gufield-Kutsenko Russian Organized crime brigade."  Like Mr. Kutsenko, he participated in racketeering activity involving extreme violence and directed others to do the same.  He also engaged in similar post-arrest obstruction of justice efforts.  At sentencing, the court found that Mr. Gufield engaged in "senseless repetitive violence against other people, for no reason other than to get money."  In an arson that Mr. Gufield participated in, over $1 million of damage was sustained and 13 firefighters suffered injuries in extinguishing the fire. Additionally, the Court found that he was a "malingerer" after he attempted to assert a competency defense and later diminished capacity at sentencing. | | | | | |

| 13 Cr. 268 (JMF) | Anatoly Golubchik | 1 count - RICO | 21 – 27 months' imprisonment, according to plea agreement; 33 – 41 months' imprisonment after application of an enhancement found by the Court | Upward variance based on guidelines not adequately taking into consideration the offense conduct | 60 months' imprisonment and $75,000 fine |
|---|---|---|---|---|---|

Mr. Gloubchik pled guilty to "laundering money into the United States upwards of $50 million…" Sent. Tr. 16: 19 – 17:2. He participated in a racketeering conspiracy that engaged in illegal gambling, money laundering, and threats of violence. *See* Govt. Submission, ECF No. 866, Nov. 22, 2014 at 10. In its sentencing submission, the Government "described Mr. Gloubchik as a leader of [a] massive international gambling and money laundering enterprise," and asked for an above-guidelines sentence, in part, "because the defendant [was] the most culpable defendant charged in [the] Indictment." *See* Govt. Submission, ECF No. 866, Nov. 22, 2014 at 10; Sent. Tr. 7: 16-17.

Mr. Gloubchik's sentencing guidelines range, pursuant to his plea agreement, was only 21-27 months' imprisonment, driven by the underlying conduct, operating an illegal gambling business. At sentencing, in its request for an upward variance, the Government stated, "…none of us can understand why the guidelines for someone who pleads to racketeering for laundering 50 to $100 million in the United States with ties to Russian and American organized crime is barely higher guidelines than someone who runs a poker room in Brooklyn." Sent. Tr. 23: 3-8. The Court found, that "Mr. Gloubchik [wa]s beyond cavil a leader or organizer of the criminal activity" in his case and applied the aggravating role enhancement, pursuant to §3B1.1A, although it was not requested by the Government.  Sent. Tr. 10: 10-12.

| 13 Cr. 268 (JMF) | Vadim Trincher | 1 count - RICO | 31 – 33 months' imprisonment | Upward variance based on Guidelines not adequately taking into consideration the offense conduct | 60 months' imprisonment |
|---|---|---|---|---|---|
| Mr. Trincher ran the Taiwanchik-Trincher Organization, described by the Government as "one of the biggest bookmaking operations in the world," – a nationwide criminal enterprise which laundered tens of millions of dollars from Russia into the United States.  *See* Sent. Tr. 36: 20-21, ECF. No. 991, Filed 5/29/14, 13 Cr. 268 (JMF).    Mr. Trincher ran high-stakes illegal poker games and online gambling.  His organization operated under the protection of Alimzhan Tokhtakhounoz, a "vor," and the organization inherited the reputation of the vor and made threats of violence towards others. *See* Sent. Transcript, ECF. No. 991, Filed 5/29/14, 13 Cr. 268 (JMF).   In one two-month period, Mr. Trincher's organization paid $10 million to Tokhtakhounoz.<br><br>Mr. Tokhtakhounov, aka Taiwanchik, "is a vor; there is no dispute" and one of the leaders of the Taiwanchik-Trincher Organization. Sent. Tr. 38:13, ECF. No. 991, Filed 5/29/14, 13 Cr. 268 (JMF). This organization engaged in various criminal conduct, including running an illegal gambling business, money laundering and extortion.  Taiwanchik resolved disputes with implicit and sometimes explicit threats of violence and economic harm. The Organization also employed a sophisticated money laundering scheme to move tens of millions of dollars of illegal gambling proceeds from Russia though Cyprus and into the United States. From December 2011 through January 2012, he was paid $10 million by the Taiwanchik-Trincher Organization<br><br>The Court found an upward variance was appropriate because the scale, nature and scope of the conduct was not taken into consideration in the guidelines range, where the amount of money involved in the money laudering was between $50 to $100 million. *See* Sent. Tr. 44:16 – 45:13, ECF. No. 991, Filed 5/29/14, 13 Cr. 268 (JMF). ||||||

EXHIBIT A
PAGE 4

| 10 Cr. 895 (PGG) | Armen Kazarian | 1 count - RICO | 30 – 37 months' imprisonment | n/a | 37 months' imprisonment and $60,000 fine |
|---|---|---|---|---|---|
| Mr. Kazarian was described by the Government as a "vor" who "sat at the top of [the Mirzoyan-Terdjanian] criminal organization … that engaged in an extensive range of criminal offenses including the operation of a $100 million Medicare fraud billing ring. Mr. Kazarian engaged in extortion on the organization's and his own behalf. The Court, however, found that Mr Kaarian was not involved in the Medicare fraud but that Mr. Kazarian participated in a conspiracy to extort a $100,000 payment from someone. *See* Sent. Tr. 11: 1-4. 12. In sentencing Mr. Kazarian to 37 months' imprisonment, the Court found no disparity in sentences of others with similar conduct. *Id*. at 12. | | | | | |
| 10 Cr. 895 (PGG) | Davit Mirzoyan | 1 count each:– RICO; Conspiracy to Commit Healthcare Fraud; Conspiracy to Commit Bank Fraud; Conspiracy to Commit Money Laundering; Conspiracy to Commit Fraud in Connection with Identity Theft | 168 – 210 months' imprisonment as outlined in post-plea sentencing agreement; 292 – 365 months' imprisonment as calculated by the Court | 168 – 210 months' imprisonment | 210 months' imprisonment on two counts, 120 months' imprisonment on two counts and 60 months' imprisonment; all to run concurrently, $20 million forfeiture and $20 million restitution |
| Mr. Mirzoyan pled guilty, without a plea agreement. In its sentencing submission, the Government described Mr. Mirzoyan as the leader of a massive, nationwide fraud that stole millions of dollars from Medicare. *See generally* Govt. Sent. Submission, ECF No. 915, 4/11/17. The stipulated loss amount in Mr. Mirzoyan's case was "greater than $20,000,000 and less than $50,000,000." *Id*. at 3.<br><br>At sentencing, the Government stressed that this defendant was uniquely situated because he was "critical to every part" of the conspiracy. *See* Sent. Tr. 11: 21-25. Mr. Mirzoyan was the last defendant sentenced in his case and sentences ranged from probation to 135 months' imprisonment. Notably, the Probation Department recommended a sentence of 20 years – the statutory maximum was 75 years. *See* Sent. Tr. 19: 1-4. | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **10 Cr. 895 (PGG)** | **Robert Terdjanian** | 1 count - RICO | 100 – 125 months' imprisonment | **Within Guidelines sentence** | 125 months' imprisonment |
| The Court found that Mr. Terdjanian was involved in many acts of criminal conduct, including Medicare fraud, extortion, insurance fraud, credit card fraud and immigration fraud. *See* Sent Tr. 21: 16-21, ECF No. 744, Filed 9/12/13, 10 Cr. 895 (PGG). The stipulated loss amount was between $1 million and $2.5 million. The Court sentenced Mr. Terdjanian to a lengthy sentence, in part, because of his lengthy criminal record. *Id* at 22: 8-12. | | | | | |
| **16 Cr. 207 (KBF)** | Boris Nayfeld | 2 Counts - Interference with Commerce by Treat or Violence  (18 U.S.C. § 1951) | 78-97 months' imprisonment although the Court based its decision on preproffer Guidelines of 37-46 months' imprisonment | Downward departure pursuant to § 5K1.1 | 23 months' imprisonment on each count, to run concurrently |
| Mr. Nayfeld pled guilty, pursuant to a cooperation agreement, to one count of conspiracy to commit extortion in connection with being asked to arrange for a murder and agreeing to extort money from the victim to stop the plot and one count of actual extortion in relation to that scheme. *See* Sent. Tr. 2:21 – 3: 3. At sentencing, the Government described Mr. Nayfeld as "a complicated person with a rich criminal history," and a long track record, who "involved himself in all manner [of] illegal activity." *See* Sent. Tr. 11:24 - 12:15. He used his reputation to attempt to extract money from someone under the fear of death, something the Government described as "outrageous." *See* Sent. Tr. 13: 1-4. | | | | | |
| **95 Cr. 562 (CBA)**[2] | Vyacheslav Ivankov | n/a | n/a | n/a | 115 months' imprisonment |

---

[2] There is no information regarding this case available on PACER, due the date of conviction. The information cited here in for Vyacheslav Ivankov comes from two sources: Mark Galeotti, *The Vory* and Robert I. Friedman, *Red Mafiya*.

| | | | | | |
|---|---|---|---|---|---|
| Vyacheslav Ivankov came to the United States in 1992. Prior to coming to the United States, he had previously served a 10 year sentence in Russia and had been separately charged with the murder of two Turkish citizens. When Mr. Ivankov arrived in the United States, in 1992, he was already a vor. He was met at JFK airport by an Armenian vor. Mr. Ivankov soon began committing crimes in Brighton Beach and throughout the United States, including in Puerto Rico, Texas and throughout the northeast. Mr. Ivankov participated in money laundering, gambling, prostitution, arms sales, gasoline tax fraud and extortion. He collected tribute from legitimate businesses worldwide and had connections to leaders of crimal organizations in Russia and Russian state intelligence organizations. Mr. Ivankov was arrested in 1995, and charged with extortion of $2.7 million. At the time of his arrest, he was in possession of $75,000, passports with aliases from different countries and a firearm. ||||||
| **16 Cr. 553 (BMC)** | **Igor Krugly** | 1 count - RICO | 37 – 46 months' imprisonment | 46 months' imprisonment | 46 months' imprisonment and $25,000 forfeiture |
| "In June 2016, Mr. Krugly pled guilty to racketeering charges and admitted to his role in a multinational extortion conspiracy." Govt. Sent. Submission at 1, ECF No. 225, 12/7/17.  In its sentencing submission, the Government describes Mr. Krugly as "a prominent member of a violent criminal enterprise (the "Syndicate") with links to high-ranking members of Eastern European mafia." Govt. Sent. Submission at 1, ECF No. 225, 12/7/17. "Members of the Syndicate—nearly all of whom were born in states of the former Soviet Union[1]—engaged in a wide range of activities traditionally associated with organized crime, including extortion, illegal gambling, assault, loansharking, arson and drug trafficking." *Id*. at 2. According to the Government, Mr. Krugly co-owned and operated illegal gambling establishments and extortionately collected debts and was deeply involved in every aspect of the business.  *See id*. While he did not personally commit acts of violence, Mr. Krugly threatened others and was aware that the Syndicate relied on physical violence to accomplish his goals and he was present at many assaults in attempts to collect debts. *See generally*, Govt. Sent. Submission ECF No. 225, 12/7/17. The Government also requested imposition of a fine, despite his financial statement submitted to Probation,  based on his "extensive involvement in cash-intensive illicit activites and his history of perjury." *Id*. ||||||

Despite its description of Mr. Krugly as a "prominent member of a violent criminal Syndicate with links to high-ranking members of Eatern European mafia," the Government determined that a sentence of 46 months' imprisonment was sufficient and just punishment. *Id*. at 19.